# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 02-10606** |
| **YDALIA RODRIGUEZ,** | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **YDALIA RODRIGUEZ, MARIA** | § | |
| **ANTONIETA HERRERA, DAVID** | § | |
| **HERRERA, LUCY MORENO,** | § | |
| **ALFONSO MORENO and all those** | § | |
| **similarly situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **Adv. Proc. No. 08-1004** |
| | § | |
| **COUNTRYWIDE HOME LOANS, INC.** | § | |
| | § | |
| **Defendant.** | § | |

## MOTION FOR SUMMARY JUDGMENT AND
## <u>MEMORANDUM OF LAW IN SUPPORT THEREOF</u>

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                 <u>PAGE(S)</u>

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................23

*Chase v. Padgett*,
   268 B.R. 309 (S.D. Fla. 2001) ...............................................................27

*Continental Airlines, Inc. v. Air Line Pilots Ass'n, Inter.*,
   555 F.3d 399 (5th Cir. 2009) .................................................................23

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*,
   530 F.3d 395 (5th Cir. 2008) .................................................................23

*Eckland Consultants, Inc. v. Ryder Stilwell, Inc.*,
   176 S.W.3d 80 (Tex. App.-Houston [1st Dist.] 2004)...........................43

*In re Atwood*,
   293 B.R. 227 (9th Cir. 2003) ...........................................................31, 40

*In re Coho Res., Inc.*,
   345 F.3d 338 (5th Cir. 2003) .................................................................25

*In re Dominique*,
   368 B.R. 913 (Bankr. S.D. Fla. 2007) ...................................................27

*In re Goodman*,
   136 B.R. 167 (Bankr. W.D. Tenn. 1992)...............................................38

*In re Henthron*,
   299 B.R. 351 (E.D. Pa. 2003) ...............................................................30

*In re Johnson*,
   Case No. 08-30403, slip op. (June 8, 2009)...........................................37

*In re Lambright*,
   125 B.R. 733 (Bankr. N.D. Tex. 1991)............................................33, 38

*In re N. Coast Village, Ltd.*,
   135 B.R. 641 (B.A.P. 9th Cir. 1992)......................................................25

*In re Nosek*,
   544 F.3d 34 (1st Cir. 2008)........................................................32, 39, 43

*In re Padilla*,
   379 B.R. at 665 ..........................................................................26, 30, 31

*In re Padilla*,
   389 B.R. at 440 ......................................................................................30

*In re Placidi*,
   2008 WL 474239 (Bankr. M.D. Pa. Feb. 21, 2008) .........................................31, 40

*In re Pyott*,
   351 B.R. 899 (Bankr. E.D. Tenn. 2006) ........................................................26

*In re Quigley*,
   391 B.R. 294 (Bankr. N.D. W.V. 2008) ........................................................36

*In re Sammon*,
   253 B.R. 672 (Bankr. D.S.C. 2000) ............................................................25

*In re Sanchez*,
   372 B.R. 289 (Bankr. S.D. Tex. 2007) ........................................................33

*In re Sims*,
   278 B.R. 457 (Bankr. E.D. Tenn. 2002) .....................................................25, 26

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ....................................................................30

*Leeper v. Pennsylvania Higher Education Assistance Agency*,
   49 F.3d 98 (3d Cir. 1995) ........................................................................26

*Mann v. Chase Manhattan Mortgage Corp.*,
   316 F.3d 1 (1st Cir. 2003)........................................................................26

*Myles v. Wells Fargo Bank, N.A. (In re Myles)*,
   395 B.R. 599 (Bankr. M.D. La. 2008) ......................................................30, 35

*One Call Sys., Inc. v. Houston Lighting & Power*,
   936 S.W.2d 673 (Tex. App.-Houston [14th Dist.] 1996) ......................................17

*Padilla v. GMAC Mortgage Corp.*,
   389 B.R. 409, 443-44 (E.D. Pa. 2008)..........................................................38

*Rake v. Wade*,
   508 U.S. at 473........................................................................................36

*Rx.com v. Hruska*,
   2006 WL 2583434 ..................................................................................43

*Shell Oil Co. v. Capital Financial Services*,
   170 B.R. 903 (S.D. Tex 1994) ................................................................31, 33

*Simmons v. Savell*,
    765 F.2d 547 (5th Cir. 1985) ................................................................38

*Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*,
    938 S.W.2d 102 (Tex. App.-Houston [14th Dist.] 1996) ........................17

*Universal American Mortgage Co. v. Bateman (In re Bateman)*,
    331 F.3d 821 (11th Cir. 2003) ...............................................................24

*Wayne v. A.V.A. Vending, Inc.*,
    52 S.W.3d 412 (Tex. App.-Corpus Christi [1st Dist] 2001) ...................17

*Willis v. Chase Manhattan Mortgage Corp.*,
    2001 WL 1079547 (E.D. Pa. 2001) .........................................................30

*Wincheck v. Am. Express Travel Related Servs. Co.*,
    232 S.W.3d 197 (Tex. App.-Houston 2007) ........................................35, 43

*Zlupko v. Washington Mutual Bank*,
    2004 WL 2297400 (E.D. Pa. 2004) .........................................................30

## RULES AND REGULATIONS

Fed. R. Bankr. P. 2016.................................................................. passim

Fed. R. Bankr. P. 2016(a) ............................................................ passim

Fed. R. Bankr. P. 3004.........................................................................13

Fed. R. Bankr. P. 7056....................................................................1, 23

Fed. R. Civ. P. 12(b)(6)...........................................................................2

Fed. R. Civ. P. 56...........................................................................1, 23

Fed. R.Civ. P. 56(c) ...............................................................................23

## STATUTES

11 U.S.C. § 362........................................................................1, 25, 27

11 U.S.C. § 362(c)(1)........................................................................25, 28

11 U.S.C. § 362(c)(2)..............................................................................25

11 U.S.C. § 506(b) ........................................................................................................1, 4, 30, 31

11 U.S.C. § 524 .................................................................................................................1, 23

11 U.S.C. § 1328 .....................................................................................................................23

11 U.S.C. § 1322(b)(2) ....................................................................................24, 36, 37, 38

11 U.S.C. §1328(a) ..................................................................................................................24

Chapter 13 of Title 11 of the United States Code ................................................ passim

Tex. Civ. Prac. & Rem. Code § 38.001 ...............................................................................35

## **OTHER AUTHORITIES**

1 Henry J. Sommer, Collier Bankruptcy Manual (3d ed. Rev. 2002)..................................25

Dated:          September 29, 2009

## MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Defendant Countrywide Home Loans, Inc. ("Countrywide") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.  This Motion is filed pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this Adversary Proceeding by Fed. R. Bankr. P. 7056.

## MEMORANDUM OF POINTS  AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS.

### INTRODUCTION

Plaintiffs Ydalia Rodriguez ("Rodriguez"), Maria Antoineta and David Herrera (the "Herreras"), and Lucy and Alfonso Moreno (the "Morenos") (collectively the "Plaintiffs") filed petitions under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  Their claims, as presented in their First Amended Class Action Complaint, are a confusing collection of vague allegations and conjecture about "what must have happened" during their bankruptcy cases.

Plaintiffs contend Countrywide violated the Bankruptcy Code, federal statutes and the common law when it sought to enforce its contractual rights after the named plaintiffs obtained their Chapter 13 discharges.  Plaintiffs allege Countrywide's actions violated their Chapter 13 Plans, violated the automatic stay (11 U.S.C. § 362), violated 11 U.S.C. § 506(b) and Bankruptcy Rule 2016(a), and violated the terms of their bankruptcy discharge (11 U.S.C. § 524).  Plaintiffs also assert state law claims for breach of contract based on the theory that the Plans constituted new contracts between Countrywide and the debtors.

In part because the Complaint lacked specific factual allegations, Countrywide moved to dismiss all claims. Countrywide's Motion asserted three grounds for dismissal: (1) that the Court lacks subject matter jurisdiction; (2) that there are no private rights of action for certain of the claims asserted; and (3) that the allegations in the Complaint fail to state a claim. This Court denied Countrywide's Motion as to the first two grounds and deferred ruling on the third to allow Plaintiffs the opportunity to complete discovery and develop evidence that would support their claims.

At summary judgment, however, it is now incumbent upon Plaintiffs to identify specific evidence that supports every element of their causes of action. The actual evidence developed during discovery, however, is inconsistent with their claims. Indeed, the basic premise of Plaintiffs' Complaint is that because they made all of the payments required by their Plans, they should have emerged from bankruptcy with their accounts current in all respects. Plaintiffs assert that the only way that they could have emerged from bankruptcy owing more than their next monthly payment is if Countrywide violated the Code or Rules by, among other things, misapplying their payments or charging unapproved fees. But the reason each of the named Plaintiffs found him or herself owing money after bankruptcy was not the result of Countrywide's allegedly improper actions. Plaintiffs owed money due to their own failures to make all of their payments in bankruptcy or to propose a Plan that completely paid their arrears. None of the Plaintiffs were treated as being in default post-discharge because of a misapplication of payments or any allegedly unapproved fees and costs.

## PROCEDURAL HISTORY

At the outset of this litigation, Countrywide moved to dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(6). In its September 18, 2008 Memorandum Opinion ("Mem. Op."), the

Court only considered "a portion of Countrywide's Motion to Dismiss," namely "whether: (1) the Court lacks subject matter jurisdiction; and (2) Plaintiffs may assert private rights of action for Countrywide's alleged conduct."[1] *Mem. Op.* at 15.  The Court did not address "whether Plaintiffs have stated claims for violations of the Bankruptcy Code and Rules," because resolution of those arguments "would depend on the nature and timing of the disputed charge." *Id.* at 12, 15.  Instead, the Court deferred ruling on the validity of Plaintiffs' stated claims until discovery regarding the named Plaintiffs' accounts was completed.  *Id.* at 15.  Countrywide now seeks summary judgment on the merits of Plaintiffs' claims—the issue deferred by the Court's September 18 Opinion—which is ripe for resolution.

The Court's September 18 Opinion provides guidance about what is at issue in this Motion.  As the Court then noted, Plaintiffs' allegations, which the Court had to assume to be true, were "that they diligently completed their Chapter 13 plans and received a discharge." *Id.* at 2.  The Court observed, however, that: "If Countrywide is correct and has not charged any unapproved fees and expenses, then they should certainly prevail in this litigation." *Id.* at 3.

The Opinion then discussed the "mechanics of handling Chapter 13 mortgages," and the concept of the "fresh start." *Id.*  The Opinion acknowledged that Chapter 13 grants special rights to mortgage lenders that "have the effect of precluding the modification of a mortgage lender's right to payments pursuant to the lender's pre-petition mortgage contract." *Id.*  As the Opinion recognized, these "protections are not limited to principal and interest payments." *Id.* at 4.

> Most mortgage contracts, including Countrywide's, allow lenders to incur reasonable expenses necessary to protect their security interest in a debtor's home ("Reimbursable Expenses").  Many mortgage contracts, including Countrywide's, also contain provisions stating that the lender may charge and collect the incurred Reimbursable Expenses at any time.

---

[1]   Countrywide does not concede, and specifically preserves, its jurisdictional and private right of action arguments although they do not form the basis for this Motion.

*Id.*  Because of the anti-modification provisions of the Code, "[t]he plan may not *per se* preclude

the collection of fees and expenses allowed by the contract."  *Id.* at 3.

In the Court's view, however, the anti-modification protections granted to lenders are

"balanced" by § 1322(b)(5), which allows debtors to "cure arrearages and maintain current

payments through a Chapter 13 Plan."  *Id.* at 5.  The Court found the balance between Sections

1322(b)(2) and (b)(5) creates certain rights and obligations on both lenders and borrowers in a

Chapter 13 case:

> The debtor's obligations ensure payments to the mortgage lender and
> protection of the lender's collateral.  Accordingly, *the debtor must make
> all payments* within the time and in the amount prescribed by the Plan.  If
> the debtor misses a payment, the debtor violates the terms of the Plan and
> the debtor's case may be dismissed. . . .
>
> The mortgage lender must allocate payment among principal, interest, and
> arrearages in the manner described in the Plan.  If a mortgage lender
> allocates payments that the Plan dedicates to pre-petition arrearages to
> principal and interest on a post-petition charge, without court approval, the
> mortgage lender violates the terms of the Plan and the lender may be
> subject to liability for violating the order confirming the Plan.

*Id.* at 6 (emphasis supplied).

As to the particular claims pled in the Complaint, while not ruling on the issue, the Court

stated "Congress excepted mortgage debts from discharge," and "Reimbursable Expenses

incurred (but not collected)" are not discharged**.**  *Id.* at 7.  The Court advised it "does not

presently understand how Plaintiffs' allegations fall within the discharge injunction itself," but

allowed the claims to continue pending discovery.  *Id.*

Countrywide also sought dismissal of Plaintiffs' claims under § 506(b) and Rule 2016(a)

because the only alleged collection attempts from the debtors' estates were made through court-

approved processes.  *Motion to Dismiss* at 52-53.  While recognizing "resolution of this

argument would depend on the nature and timing of the disputed charges," the Court concluded that "a mortgage lender must file a Rule 2016 application before collecting any Reimbursable Expenses while a chapter 13 case remains pending." *Mem. Op.* at 7-8, 12.  Thus, the question of liability under Section 506 and Rule 2016 was to be resolved by Plaintiffs' development of a factual record that would support their claims.

Finally, Countrywide argued Plaintiffs failed to state a valid claim for breach of their Chapter 13 Plans because their confirmation orders did not create a new contract between Countrywide and the debtors.  *Motion to Dismiss* at 50.  Though abstaining from a decision on the merits, the Court stated Countrywide could violate the order confirming the debtors' plan by (1) "[c]ollecting Reimbursable Expenses without filing a Rule 2016 application or after the completion of the debtors' plan obligations," (2) applying "payments in a manner that is inconsistent with the plans," or (3) charging and collecting *unreasonable* amounts" of fees. *Memorandum Opinion* at 8, 22.  Once again, Plaintiffs were allowed to take discovery to determine if Countrywide's conduct supported those theories.

The result of the September 18 Opinion, then, was to defer ruling on Countrywide's substantive arguments, rather than reject them.  Under the Court's ruling, Plaintiffs were afforded the opportunity to develop a full record to determine if any of the reimbursable expenses at issue satisfied the elements necessary for each of their claims.  Discovery on the named Plaintiffs' accounts has now been completed.  Yet, there is no genuine issue of material fact that (if ultimately resolved in their favor) would allow them to recover under any of their legal theories.

## PLAINTIFFS' FACTS

Although the linchpin of Plaintiffs' Complaint is that each of these debtors made all of the payments required by his or her Plan and therefore should have emerged from his or her bankruptcy current, the facts tell a different tale. Rodriguez, for example, failed to make at least 30 post-petition payments in full during her bankruptcy, most often paying $750 per month, rather than the $938 per month she owed. The money Countrywide sought to collect from her after bankruptcy was largely the result of her failure to make full payments required by her Plan, not the misallocation of payments she made. The Herreras, in turn, did not include the full pre-petition arrearage owed to Countrywide in their Plan. When they discovered this mistake, the Herreras did not have the means to pay the full arrearage during the time left in their Plan. To allow the Herreras to complete their Plan, the parties entered into an Agreed Order to extend the Herreras' loan term and add the remaining unpaid debts to the principal balance of the loan. Countrywide, however, mistakenly failed to record the agreement in its servicing system. As a result, the post-discharge letters Countrywide sent the Herreras identified debts this Court approved and that should have been collected pursuant to that agreement. Finally, the Morenos failed to maintain their ongoing Plan and post-petition payments while they were in bankruptcy. This led to their bankruptcy case twice being dismissed on the Chapter 13 Trustee's motion, resulting in reimbursable expenses incurred by Countrywide outside of bankruptcy.

A summary of the undisputed facts of the Plaintiffs' bankruptcy cases follows:

### A.    Ydalia Rodriguez

Rodriguez filed her Chapter 13 petition on August 2, 2002 (the "Rodriguez Bankruptcy"). Declaration of Scott B. Nardi ("*Nardi Decl.*") at ¶ 4, and Ex. A thereto (attached hereto as Exhibit 1). Under the terms of Rodriguez's Note, the lender was authorized to accelerate the

loan if she defaulted by "failing to pay in full any monthly payment required by [the Note] prior to or on the due date of the next monthly payment" or by "failing, for a period of thirty days, to perform any other obligations contained in [the Note]." Deposition of Ydalia Rodriguez (September 2, 2009) ("*Rodriguez Dep.*") at 50-51, and Ex. 2 thereto (relevant excerpts of the *Rodriguez Dep.* are attached hereto as Exhibit 2). After the loan was accelerated, the Note allowed Countrywide to collect "reasonable and customary attorneys' fees for enforcing the Note." *Id.* Rodriguez's Deed of Trust also allowed Countrywide to "do and pay whatever is necessary to protect the value of the Property and [Countrywide's] rights in the property" when "there is a legal proceeding that may affect [Countrywide's] rights in the Property (such as a proceeding in bankruptcy)," and seek reimbursement from the debtor for any such expenses. *Id.* at 42, and Exhibit 1 thereto.

At the time of her Chapter 13 petition, Rodriguez was nine monthly mortgage payments behind. *Id.* at 73-75, and Ex. 7 thereto. Because of her default, Countrywide had accelerated the loan and referred it to Barrett Burke Daffin & Frappier, LLP ("Barrett Burke") for foreclosure. Declaration of Kelly S. May ("*May Decl.*") at ¶ 2 (attached hereto as Exhibit 3). Rodriguez filed for bankruptcy to try to cure her pre-petition default. *Rodriguez Dep.* at 26:21-27:2.

On September 19, 2002, Countrywide filed a proof of claim in the Rodriguez Bankruptcy. *Rodriguez Dep.* at 73-75, and Ex. 7 thereto. That proof of claim listed an arrearage of $8,919, comprised of nine missed monthly payments, pre-petition foreclosure attorneys' fees and costs, uncollected late charges and inspection fees. *Id.*; Deposition of Jennifer Reed (December 19, 2008) ("*Reed Dep.*"), at 159-60 (relevant excerpts of the *Reed Dep.* are attached hereto as Exhibit 4).

7

This Court confirmed Rodriguez's Chapter 13 Plan on November 7, 2002.  *Nardi Decl.* at ¶ 5, and Ex. B thereto.  Under the terms of the confirmed Plan, Rodriguez was responsible for making post-petition mortgage payments directly to Countrywide.  *Id.*; *Rodriguez Dep.* at 65:25-66:2, 75:24-76:1.  Rodriguez also was obligated to pay $360 per month to the Trustee, for 60 months, or until the satisfaction of her pre-petition debts provided for in the Plan.  *Nardi Decl.* at ¶ 6, and Ex. C thereto.  The Plan provided that property of the estate would revert back to Rodriguez at discharge.  *Id.*

Although the Complaint alleges Rodriguez made all payments required by her Chapter 13 Plan, the evidence demonstrates Rodriguez failed to pay, or failed to pay in full, her regular post-petition mortgage payments at least 30 times while she was in bankruptcy.  *Rodriguez Dep.* at 82:15-18; *Reed Dep.* at 139:11-21.  From August 2002 to March 2003, she missed three monthly payments, and, despite the fact her monthly post-petition payment was $938, she made only partial monthly payments of $700, $740, or $750 in September 2002, October 2002, January 2003, February 2003, and March 2003.  *Rodriguez Dep.* at 82:15-17, 94:1-9, 99:12-15, 102-03; *Nardi Decl.* at ¶ 7, and Ex. D thereto.  At her deposition, Rodriguez could not explain why she made these payments for less than the full amount due.  *Rodriguez Dep.* at 99:16-18.  But, as a result of her default, Countrywide moved the Court for relief from the automatic stay on March 26, 2003.  *Nardi Decl.* at ¶ 7, and Ex. D thereto.

On May 7, 2003, the parties resolved that motion by Agreed Order, adding $3,051.32 in post-petition arrearages, late charges, costs, and attorneys' fees to the total mortgage arrearage provided for by the Plan.[2]  *Id.* at ¶ 8, and Ex. E thereto.  The Agreed Order also instructed

---

[2]     The only other reimbursable expenses posted to Rodriguez's account during her bankruptcy included attorneys fees incurred by Countrywide in connection with the filing of its proof of claim and $172.50 in inspection fees, which were assessed in accordance with the terms of

Rodriguez to remit "regular post-petition monthly payments beginning May 1, 2003 and continuing thereafter," directly to Countrywide.  *Id.*  Pursuant to the Agreed Order, Countrywide was authorized to send future notices of default directly to Rodriguez and to charge attorney's fees of $50 in connection with any such default notice.[3]  *Id.*

From the entry of the Agreed Order in May 2003 through November 2005, Rodriguez failed to make an additional seven monthly post-petition payments.  *Reed Dep.* at 133-36.  And the twenty-five (25) monthly payments she did make during this time were all for only $750— $188 short of the actual monthly amount due.  *Id.* at 133-36, 139.[4]  Once again, Rodriguez had no explanation for why she failed to make her post-petition mortgage payments in full. *Rodriguez Dep.* at 106:14-16, 137.  When Countrywide received partial payments from Rodriguez, Countrywide placed the payment amount in suspense and, when enough money had accrued, applied it to her post-petition principal and interest due and advanced her contractual due date by a month.[5]  *Reed Dep.* at 133:5-136:17.

---

Rodriguez's mortgage contract in connection with inspections of the property conducted after she defaulted on her post-petition payments.  Payments were applied to $92 in inspection fees during bankruptcy, but the remaining reimbursable expenses were either waived or reclassified as non-recoverable by Countrywide during its post-bankruptcy review of the loan, and thus were not collected from Rodriguez.  *May Decl.* at ¶ 3.

[3]  The Court entered an Order on August 7, 2003 modifying Rodriguez's Plan to reflect the terms of the Agreed Order.  *Nardi Decl.* at ¶ 9, and Ex. F thereto.  On August 28, 2003, pursuant to the terms of the Agreed Order, Countrywide filed an amended proof of claim for $11,970, which included the post-petition arrearage, charges, costs, and fees provided for by the Agreed Order, in addition to the pre-petition debt already subject to Rodriguez's plan.  *Rodriguez Dep.* at 112-13, and Ex. 13 thereto.

[4]  Ms. Rodriguez acknowledged she was only paying $750 per month despite the fact her monthly payments under the May 2003 Agreed Order were to be $938.  *See Rodriguez Dep.* at 86:2-7.

[5]  Notably, when a short payment was immediately applied to principal and interest, it meant that the monthly escrow payment, which would have been included if the proper monthly payment had been submitted, remained unpaid—thus increasing the post-petition escrow shortage on Rodriguez's account.

9

As a result of her failure to make payments in the proper amount each month, by November 2005, Rodriguez was approximately 12 monthly payments behind, totaling $11,256 behind. *Id.* at 133-36, 140. On November 17, 2005, Barrett Burke sent Rodriguez a Notice of Default that erroneously stated Rodriguez was only three post-petition monthly payments behind and notified her that, pursuant to the Court's May 9, 2003 Agreed Order, Countrywide was assessing her $50 for the notice.[6] *Id.* at 130-31, 143-44, and Ex. 21 thereto. Rodriguez paid the amount listed in the notice of default on November 26, 2005, and Countrywide erroneously treated her account as current post-petition, despite the fact she was still in post-petition default. *Id.* at 131.

Thereafter, in August 2006, Rodriguez again defaulted on her post-petition monthly payment. On August 17, 2006, Barrett Burke sent Rodriguez another notice informing her she was in default for one $938 post-petition monthly payment and she owed $50 in attorneys' fees pursuant to the May 2003 Agreed Order. *Rodriguez Dep.* at 130-31; *Reed Dep.* at 130:7-13, and Ex. 20 thereto. That notice omitted the additional post-petition arrearages Rodriguez had accumulated by not paying, or partially paying, her post-petition monthly mortgage payment. *Reed Dep.* at 143:11-21. Rodriguez paid the $988 in August 2006, and Countrywide again mistakenly treated Rodriguez as current post-petition. *Id.* at 130:20-21, 143-44.

During her bankruptcy, Rodriguez's failure to make full monthly payments resulted in an escrow shortage accumulating on her account. *Id.* at 160-63. On January 19, 2007, Countrywide sent Rodriguez an escrow review. *May Decl.* at ¶ 5, and Ex. 1 thereto. That review showed an escrow shortage of $5,443.75, which Rodriguez could either pay in a lump sum by March 1,

---

[6]     The omitted monthly payments were the result of a manual bookkeeping error by a Countrywide employee that showed Rodriguez due for her September 2005 payment rather than for the October 2004 payment. *Reed Dep.* at 140, 143-44.

2007, or over time by adjusting her monthly payments to $1,451.57 per month, starting in March 2007. *Id.* Rodriguez agreed to the increased monthly payments, and thereafter paid $1,451.57 per month from March through August 2007. *Rodriguez Dep.* at 132; *Reed Dep.* at 114.

On August 27, 2007, Rodriguez received her discharge. *Nardi Decl.* at ¶ 10, and Ex. G thereto. By that time, she had satisfied the initial pre-petition arrearage ($8,919.38) and the additional post-petition arrearage ($3,051.32) provided for by her Amended Chapter 13 Plan. *May Decl.* at ¶ 6. Countrywide treated both of these debts as satisfied. *Id.* As part of a post-discharge review of the loan, however, Countrywide discovered and corrected the errors in its internal records concerning the contractual due date for Rodriguez's loan. *Reed Dep.* at 141. Rodriguez was seriously delinquent due to the cumulative effect of her failure to make her full monthly payments throughout her bankruptcy. *Id.* at 143-44. Also as a result of Countrywide's post-bankruptcy discharge audit of Rodriguez's account, Countrywide reclassified $200.00 in post-petition reimbursable expenses and waived $80.00 of the $172.00 in post-petition inspection fees posted to Rodriguez's account. *May Decl.* at ¶ 7.

Because of the serious delinquency on her account, on November 15, 2007, Countrywide sent Rodriguez a Notice of Default explaining she was behind $8,709.42 in post-petition monthly charges (6 payments at $1451.57 including her monthly escrow payments), and also owed $290.30 in late fees, minus $162.52 held on her behalf in suspense. *Rodriguez Dep.* at 134, and Ex. 19 thereto; *Reed Dep.* at 112. That deficiency consisted entirely of post-petition monthly payments Countrywide either never received, or for which Countrywide received only partial payment, and contractual late charges incurred as a result of the delinquent post-petition monthly payments. *May Decl.* at ¶ 9. It included no fees for professional services that could have been

subject to Rule 2016 or other reimbursable expenses.  *Rodriguez Dep.* at 133:17-134:9, and Ex. 19 thereto.

On November 29, 2007, Countrywide also sent Rodriguez a monthly statement itemizing the escrow shortages and other amounts due.  Compl. Ex. EE.  Importantly, none of the amounts listed in the notice of default or monthly statement were pre-petition debts or debts paid through Rodriguez's Plan.  *May Decl.* at ¶ 9.  Rodriguez failed to cure the default, resulting in her loan being accelerated once again and Countrywide referred the loan to Barrett Burke to initiate foreclosure proceedings.  *Reed Dep.* at 157-58; Compl. Ex. MM.

After Rodriguez moved to reopen her bankruptcy case, Countrywide advanced its own money to cure her remaining delinquency.  *Reed Dep.* at 153.  Countrywide canceled the foreclosure, did not treat the arrearage as an amount due from Rodriguez, and her account was deemed current through February 2008.  *Id.*; *Rodriguez Dep.* at 166:4-6.

## B.      Maria Antoineta and David Herrera

The Herreras filed their Chapter 13 petition on November 29, 2001 ("the Herrera Bankruptcy").  *Nardi Decl.* at ¶ 11, and Ex. H thereto.  Countrywide had acquired the Herrera loan from Washington Mutual and began servicing it in August 2001.[7]  *May Decl.* at ¶ 10.

The Herreras' Deed of Trust allowed Countrywide to "do and pay whatever is necessary to protect the value of the Property and [Countrywide's] rights in the property" when "there is a legal proceeding that may affect [Countrywide's] rights in the Property (such as a proceeding in bankruptcy)," and seek reimbursement for any such expenses.  Deposition of Antonieta Herrera (July 1, 2009) ("*A. Herrera Dep.*") at 70-71, and Ex. 5 thereto (relevant excerpts from the *A.*

---

[7]     At the time of that acquisition, there were $865 in fees outstanding on the  Herreras' account.  Prior to the Herreras' bankruptcy, $837.14 was credited to the account, reducing the total reimbursable amount of such expenses to $27.86.  *Reed Dep.* at 179:23-180:19.

*Herrera Dep.* are attached hereto as Exhibit 6).  The Herreras understood these terms to mean Countrywide could collect its costs incurred if they defaulted on their loan.  Deposition of David Herrera (July 2, 2009) ("*D. Herrera Dep.* at 32:18-33:4 (relevant excerpts of the *D. Herrera Dep.* are attached hereto as Exhibit 6); *A. Herrera Dep.* at 69:6-70:14, 74:12-25.

On April 12, 2002, the Court entered an order confirming the Herreras' Chapter 13 Plan. *Nardi Decl.* at ¶ 12, and Ex. I thereto.  The order confirmed that secured creditors such as Countrywide retained their liens and that the Herreras were responsible for making their regular post-petition mortgage payments, and payments for post-petition taxes, directly to Countrywide. *Nardi Decl.* at ¶ 13, and Ex. J thereto.  The Herreras' Plan also provided the property of the estate reverted back to them upon confirmation.  *Id.*; Deposition of Ellen Stone (September 3, 2009) ("*Stone Dep.*") at 31:10-13 (relevant excerpts from the *Stone Dep.* are attached hereto as Exhibit 7).

The Herreras' Plan contained a fundamental error that would have consequences for their case.  At the time the Herreras filed for bankruptcy, they were 11 monthly mortgage payments in arrears ($9,994.27) and owed $438.60 in fees and costs.  *A. Herrera Dep.* at 91, and Ex. 9 thereto.  Accordingly, Countrywide's proof of claim, which was filed by Barrett Burke on May 25, 2002, listed an arrearage of $10,432.87.[8]  *Id.*  The Herreras' attorney, Ellen Stone, testified she never saw Countrywide's proof of claim and, therefore, on August 27, 2002, filed a proof of claim pursuant to Rule 3004 that listed Countrywide's arrearage as $2,931.10.  *Stone Dep.* at 40, 43-44, 49 and Exs. 2 & 4 thereto.  This $2,931.10 total, which also was included in the amended Plan ultimately confirmed by this Court, was not based on any information provided by Countrywide.  Instead, Ms. Stone based the arrearage on a proof of claim filed by

Fleet Mortgage Corporation (the Herreras' previous servicer) during the Herreras' prior bankruptcy case. *Id.* at 47:22-25; 52:23-25. Amidst this confusion, the Trustee set up the Herreras' Plan payment to pay the $2,931.10 arrearage rather than the actual arrearage of $10,432.87. *Id.* at 32, and Ex. 2 thereto.

Like Rodriguez, the Herreras defaulted on their regular post-petition mortgage payments to Countrywide during their bankruptcy. *See D. Herrera Dep.* at 43:7-9; *A. Herrera Dep.* at 97:5-8. As a result, Countrywide moved the Bankruptcy Court for relief from the automatic stay on July 30, 2002. *Nardi Decl.* at ¶ 14, and Ex. K thereto. Countrywide's motion demonstrated that the Herreras were in arrears for four post-petition monthly payments through and including the July 2002 payment. *Id.* In addition, pursuant to the terms of the Herreras' Note and Deed of Trust, Countrywide claimed $705 in costs and attorneys fees incurred by Countrywide in connection with the Motion for Relief. *Id.* at ¶ 15, and Ex. L thereto. The Herreras' counsel was notified of the $705 in costs and attorneys' fees and acknowledged it was reasonable. *Stone Dep.* at 59:13-16, 20-23.

Countrywide's motion was resolved by an Agreed Order entered by the Court on December 2, 2002. *Nardi Decl.* at ¶ 15, and Ex. L thereto. That Order provided for the Herreras' payment to Countrywide of post-petition arrearages and attorneys' fees totaling $5,435.00 (including post-petition payments for April through August 2002, and attorneys' fees and costs of $705). *Id.* These amounts were to be paid in six monthly installments, and Countrywide was entitled to charge the Herreras $25.00 for attorneys' fees in connection with any subsequent notice of default necessitated by post-petition defaults. *Id.* There is no dispute

---

[8]     In connection with Barrett Burke's filing of the proof of claim, Countrywide posted bankruptcy fees in the amount of $200.00 to the Herreras' account. *May Decl.* at ¶ 12.

the Herreras owed, and Countrywide was authorized to collect, those amounts.  *A. Herrera Dep.* at 77:10-78:10.

It was not until October 2006 that the Chapter 13 Trustee's office discovered the deficiency in the Herreras' Plan.  The Trustee's office then notified the Herreras' counsel that, during its final audit, it discovered the Plan did not provide for the Herrera's full pre-petition arrearage as listed in Countrywide's proof of claim.  *Stone Dep.* at 59-60, 65, and Exs. 6 & 7 thereto.  The Trustee's office requested that Herreras' counsel advise it whether Countrywide's proof of claim was correct.  *Id.* at 59-60, 64, and Ex. 6 thereto.  The Herreras' counsel did not respond until December 2006, when she filed an objection to the proof of claim (four and a half years after it had been filed).  *Id.* at 72-73.

After subsequent discussions with Countrywide,[9] on March 27, 2007, counsel for the Herreras confirmed to the Chapter 13 Trustee that the original arrearage stated in the Plan was incorrect.  *Id.* at 65, 68:6-16, and Ex. 7 thereto.  Counsel for the Herreras stated the objection to the proof of claim was filed "to see if [Countrywide] could prove which months the debtors actually missed, but it appear[ed to her] that the POC may [have] be[en] pretty close to being correct."  *Id.*

The Herreras' objection to the proof of claim was subsequently resolved by an Agreed Order entered by the Court on June 22, 2007.  *Nardi Decl.* at ¶ 16, and Ex. M thereto.  The parties agreed to credit certain trustee funds and add the remainder of the Herreras' unpaid arrearage to the principal balance of their loan to be paid through regular monthly payments over

---

[9]    Counsel for the Herreras e-mailed counsel for Countrywide asking for detail about the missing months' payments claimed by Countrywide.  *Stone Dep.* at 70, and Ex. 10 thereto. Counsel for Countrywide thereafter notified the Herreras' counsel that payments were missed for September 1999, May 2000, June 2000, September 2000, January - April 2001, June 2001, September 2001, and November 2001.  *Id.*

an extended loan term. *Id.*; *Stone Dep.* at 75.  The terms of the loan modification that were

agreed to in conjunction with the Agreed Order provided that $98.67 in bankruptcy fees and

$140.00 in miscellaneous fees would be among the debts paid up-front at the outset of the

agreement. *Stone Dep.* at 75; *A. Herrera Dep.* at Exhibit 23 (email between counsel for the

Herreras and counsel for Countrywide itemizing the amounts to be paid by the Agreed Order).[10]

Under the terms of the Order, the Herreras would eventually pay all amounts outstanding on their

account and, after discharge, the Herreras' account would be deemed current through July 30,

2007. *Nardi Decl.* at ¶ 16, and Ex. M thereto.  The Herreras were then discharged from

bankruptcy on August 24, 2007. *Id.* at ¶ 17, and Ex. N thereto.

Due to an administrative error, Countrywide's non-bankruptcy servicing records were not

updated to reflect the terms of the parties' agreement to add the Herreras' arrearage to their

principal balance. *Reed Dep.* at 174.  As a result, Countrywide's non-bankruptcy records

continued to show the Herreras' account in serious default. *Id.* at 168-69.  As a result, on or

about December 31, 2007, Countrywide sent the Herreras a Monthly Statement that listed the

$8,327 in unpaid arrearages, as well as the inspection and other fees totaling $238.67. *May Decl.*

at ¶ 14, and Ex. 3 thereto.  The $238.67 in fees was the total outstanding on the Herreras'

account at the time and the amount included in the loan modification that was entered into in

conjunction with the June 22, 2007 Agreed Order. *See May Decl.* at ¶ 13.

The Herreras did not cure the apparent arrearage and, because of the serious delinquency

in monthly payments shown on Countrywide's servicing records, the loan was referred to

foreclosure in January 2008.  Compl. Ex. 3.  That foreclosure sale was suspended after the

---

[10]   Countrywide had previously applied $206.33 in payments to post-petition reimbursable
expenses it had posted to the account. *Reed Tr.* at 180-81.

Herreras' bankruptcy was reopened on February 12, 2008. *Stone Dep.* at 81; *A. Herrera Dep.* at 115.

### C.    Alfonso and Lucy Moreno

On or about October 18, 1978, non-parties Ray G. Farris and Erma J. Farris executed a Veterans Administration promissory note in the amount of $16,975.00 to purchase their home, which was secured by a Deed of Trust Note also dated October 18, 1978. Deposition of Lucy Moreno (September 1, 2009) ("*L. Moreno Dep.*") at 22, and Ex. 3 thereto (relevant excerpts of the *L. Moreno Dep.* are attached hereto as Exhibit 8). In January 1979, the Morenos purchased that property from the Farrises, and assumed the Farrises' mortgage. *Id.* at 16-17, and Ex. 1 thereto.

The provision in the Morenos' Note governing acceleration provided:

If any deficiency in the payment of any installment under this note is not made good prior to the due date of the next such installment, at the option of the holder, this note shall become immediately due and payable without notice and the lien given to secure its payment may be foreclosed.

*Id.* at 22, and Ex. 3 thereto. The Morenos' Note contains an entirely different standard than the Rodriguez or Herrera notes—it does not require acceleration and allows for reimbursement of any fees "actually incurred." *Id.* The Moreno Note provides:

If collection on this note is made through a Probate Court or a Bankruptcy Court, or other appropriate legal proceedings, or if after default this note is placed in the hands of an attorney at law for collection, the undersigned promise(s) to pay all costs of such collection, including attorney fees, if actually incurred, not to exceed ten per centum (10%) of the amount owing on this note at the time of filing claim hereon or date of default, whichever is earlier.

*Id.*[11] The Morenos understood these provisions authorized Countrywide to collect the fees and costs incurred in conjunction with any default by the Morenos. Deposition of Alfonso Moreno

---

[11]    The Morenos' loan explicitly allows for reimbursement of any fees *actually incurred*, and is not contractually subject to a reasonableness requirement. While Texas state law typically

(September 3, 2009) ("*A. Moreno Dep.*") at 30:9-18 (relevant excerpts of the *A. Moreno Dep.* are attached hereto as Exhibit 9); *L. Moreno Dep.* at 25:3-14, 53:14-54:3.

When Countrywide began servicing the Morenos' loan in early 2001, the Morenos were already in default. *L. Moreno Dep.* at 40, and Ex. 4 thereto. The Morenos continued to fail to make their monthly payments and, on or about August 11, 2001, Countrywide sent notice to the Morenos informing them their loan was in serious default with an arrearage of $3,108.33.[12] *May Decl.* at ¶ 15, and Ex. 4 thereto. The notice informed the Morenos that if their default was not cured by September 15, 2001, their mortgage would be accelerated and become due in full, and Countrywide would initiate foreclosure proceedings. *Id.* The Morenos did not cure their delinquency, and the loan was accelerated and referred to Barrett Burke for foreclosure. *Id.* at ¶ 16. In connection with the Morenos' default, Countrywide incurred $807.60 in fees, including attorneys' fees for the trustee sale, costs for preparation of the demand letter and posting the notice of sale, and fees for a pre-foreclosure title search. *Id.* Under the terms of the Morenos'

---

allows for collection of "reasonable" attorneys' fees, it permits parties to contract around the reasonableness requirement, as they did here. Parties are free to adopt a more liberal (or more strict) standard for recovery of attorneys' fees in their contract than the statute provides, and the appellate court is bound by their choice. *Wayne v. A.V.A. Vending, Inc.,* 52 S.W.3d 412, 417-18 (Tex. App.-Corpus Christi 2001, pet. denied); *One Call Sys., Inc. v. Houston Lighting & Power,* 936 S.W.2d 673, 676 (Tex. App.-Houston [14th Dist.] 1996, writ denied). For the Morenos, the contract's provisions will control, and Countrywide's ability to collect attorneys' fees would not be trumped by a normal statutory requirement of reasonableness. *See, e.g., Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.,* 938 S.W.2d 102, 118 (Tex. App.-Houston [14th Dist.] 1996, no writ) (basing attorney's fees on underlying contract rather than statutory requirements); *One Call Sys.,* 936 S.W.2d at 676 (upholding award of attorneys' fees in absence of other affirmative relief because parties were free to adopt more liberal standard for recovery of attorney's fees in their contract and appellate court is bound by their choice).

[12] That arrearage included nine missed monthly payments of $252.00 from October 2000 through June 2001, two missed monthly payments of $276.00 for July-August 2001, for a total of $2,820, $101.76 in late charges for October - August 2001, along with $58.57 in uncollected late charges, and $128.00 in uncollected costs. *May Decl.* at ¶¶ 15-16 and Ex. 4 thereto.

Note and Deed of Trust, Countrywide posted those amounts to the Morenos' account.  L. Moreno Dep. at 22, and Ex. 3 thereto.

On October 18, 2001, the Morenos filed a Chapter 13 bankruptcy petition.  *Nardi Decl.* at ¶ 18, and Ex. O thereto.  Countrywide's attorneys filed a proof of claim on November 30, 2001, identifying an arrearage amount of $4,641.57, consisting of $807.60 in foreclosure attorneys' fees, $58.57 in uncollected late charges, $107.00 in inspection fees, $116.40 in accrued late charges, and $2,552.00 in missed monthly payments.  *L. Moreno Dep.* at 63, and Ex. 12 thereto. Countrywide also incurred $200 in bankruptcy attorneys' fees in connection with the proof of claim, and posted those fees to the Morenos' account, consistent with their loan documents. *Reed Dep.* at 43.

On January 18, 2002, the Chapter 13 Trustee filed a Motion to Dismiss the Morenos' bankruptcy case for failure to file a feasible plan.  *Nardi Decl.* at ¶ 19, and Ex. P thereto. Thereafter, on February 5, 2002, the Morenos filed an amended Chapter 13 Plan, which proposed, among other things, to pay Countrywide the full $4,641.57 arrearage identified on Countrywide's proof of claim.  *Id.* at ¶ 20, and Ex. Q thereto.  The amended Plan also provided the Morenos would be responsible for making their regular monthly post-petition mortgage payments directly to Countrywide.  *Id.*  That amended Plan was confirmed on February 22, 2002. *Id.* at ¶ 21, and Ex. R thereto.  The amended Plan provided the property of the Morenos' estate reverted back to them upon confirmation.  *Id.* at ¶ 20, and Ex. Q thereto.

The Morenos understood their obligation to continue making payments to Countrywide. *A. Moreno Dep.* at 49:23-50:2; *L. Moreno Dep.* at 75:3-6.  Nevertheless, like the other Plaintiffs, the Morenos failed to maintain their post-petition monthly payments.  On May 8, 2002, Countrywide filed a Motion for Relief from the automatic stay.  *Nardi Decl.* at ¶ 22, and Ex. S

thereto.  In connection with that Motion, Countrywide incurred attorneys' fees and costs in the amount of $705, and again, consistent with their loan documents, posted those charges to the Moreno account.  *Reed Dep.* at 43-44.  The Morenos cured the delinquency and Countrywide withdrew its motion on June 5, 2002.  *Id.* at 44.

In late 2002 and early 2003, however, the Morenos again fell behind on their post-petition mortgage payments.  Compl. ¶¶ 107-108; *L. Moreno Dep.* at 72.  Accordingly, on February 4, 2003, Countrywide filed another Motion for Relief from the automatic stay.  *Nardi Decl.* at ¶ 23, and Ex. T thereto**.**  In connection with the filing of that motion, Countrywide incurred a total of $455 in bankruptcy attorneys' and filing fees, and posted those fees to the Morenos' account, consistent with their loan documents.  *Reed Dep.* at 58.  The Court resolved Countrywide's motion on March 5, 2003, when it entered an Agreed Order modifying the stay, providing the Morenos were to continue to remit to Countrywide the regular post-petition payments provided for by the plan, but also adding $1,853.16; post-petition arrearages ($1,104), late charges ($44.16), and attorney's fees and costs ($705).  *Nardi Decl.* at ¶ 24, and Ex. U thereto.  The $705 in attorneys' fees and costs provided for in the Agreed Order were those incurred by Countrywide in filing the first motion for relief.  *May Decl.* at ¶ 19.  The Order mandated payment of the post-petition arrears in six installments of $308.86, due on the 15th of each month from March through August 2003.  *Nardi Decl.* at ¶ 24, and Ex. U thereto.  There is no dispute Countrywide was authorized to collect all those amounts.  *A. Moreno Dep.* at 52:18-54:1; *L. Moreno Dep.* at 74:10-76:22.  The Agreed Order also authorized Countrywide to assess

the Morenos $50.00 for any subsequent notice of default.[13]  *Nardi Decl.* at ¶ 24, and Ex. U

thereto.

On March 13, 2003, the Court, on the Trustee's Motion, dismissed the Morenos'

bankruptcy case for failure to maintain their plan payments.  *Id.* at ¶ 25, and Ex. V thereto; *L.*

*Moreno Dep.* at 88:15-19.  After dismissal, Countrywide's attorneys proceeded to schedule a

trustee sale of the Morenos' property.  *Reed Dep.* at 53.  In connection with that sale,

Countrywide incurred attorneys' fees in the amount of $604.16, and posted those fees to the

Morenos' account.  *Id.*

On March 25, 2003, the Morenos filed a motion to reinstate their bankruptcy case and to

modify their Chapter 13 plan to bring their payments current.  *Nardi Decl.* at ¶ 26, and Ex. W

thereto.  The Court reinstated the Morenos' case on April 3, 2003.  *Id.* at ¶ 27, and Ex. X thereto.

Thereafter, on June 26, 2003, the Court granted the Morenos' motion to modify their Chapter 13

plan.  *Id.* at ¶¶ 28-29, and Exs. Y & Z thereto.  The Order modified the monthly payments to the

Chapter 13 Trustee, and provided, among other things, that plan payments in arrears to the

Chapter 13 Trustee would be deemed cured, but that any interest on secured claims being paid to

the Trustee would continue to accrue.  *Id.*

The Morenos once again defaulted on their plan payments, and on December 24, 2003,

the Chapter 13 Trustee filed another motion to dismiss the Morenos' bankruptcy case.  *Id.* at ¶

30, and Ex. AA thereto.  The Court dismissed the case on January 22, 2004.  *Id.* at ¶ 31, and Ex.

BB thereto.  A foreclosure sale of the Morenos' property was again scheduled.  *Reed Dep.* at 54.

In connection with that scheduled sale, Countrywide incurred attorneys' fees in the amount of

---

[13]   The Agreed Order provided if Countrywide did not receive any payments by the dates set
forth in the Order, Countrywide "shall send written notice" and "may charge Debtor $50.00
for any notice given pursuant to this Order."  *Nardi Decl.* at ¶ 24, and Ex. U thereto.

$616.32, and posted those fees to the Morenos' account, consistent with their loan documents. *Reed Dep.* at 54. On January 24, 2004, the Morenos filed a Motion to reinstate their bankruptcy case, and on February 24, 2004, the Court granted their motion. *Nardi Decl.* at ¶ 32, and Ex. CC thereto; Minute Entry, February 24, 2004. The Morenos did not modify their plan upon reinstatement and, as with the previous reinstatement, the Court Order did not address the fees incurred by Countrywide. *See* Minute Entry, February 24, 2004.

The Morenos became delinquent on their post-petition payments on numerous subsequent occasions. Countrywide sent the Morenos three notices of default throughout their bankruptcy, and, pursuant to the March 2003 Agreed Order, charged the Morenos $50 for each of these notices. *Reed Dep.* at 62-63; *Nardi Decl.* at ¶ 24, and Ex U thereto.

The Morenos were discharged from bankruptcy on December 27, 2006. *Nardi Decl.* at ¶ 34, and Ex EE thereto. Pursuant to the terms of their amended Plan and the March 2003 Agreed Order, the Morenos had finally cured their pre-petition arrearage, and Countrywide treated that pre-petition debt as satisfied. *May Decl.* at ¶ 22. As of the date of discharge, however, the Morenos were delinquent for two months of post-petition payments, and owed thousands of dollars in uncollected costs and fees. *Id.* at ¶ 22. The Morenos missed additional post-bankruptcy payments causing Countrywide to send a notice of default on December 3, 2007. *L. Moreno Dep.* at 95-96, and Ex. 29 thereto. In addition to monthly charges and late charges totaling $921.42, the notice of default identified $2,719.53 in uncollected costs. *Id.* Of this $2,719.53, $1231.98 in reimbursable expenses had been incurred while the Morenos' bankruptcy case was dismissed. *May Decl.* at ¶ 23. Moreover, an additional $111.00 in fees were assessed post-discharge, and the remaining $1,322.73 were reimbursable expenses posted to the Morenos'

account while they were in bankruptcy,[14] as well as $43.82 in pre-petition return payment fees that had not been waived by Countrywide at that time.  *Id.*  None of those amounts were ever paid by the Morenos.  *Id.*

Countrywide stopped all collection efforts against the Morenos around the time this adversary proceeding was filed.  *May Decl.* at ¶ 24.  To date, the Morenos have not paid any of the fees listed on the December 3, 2007 notice.  *Id.*

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates entry of summary judgment when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (made applicable by Fed. R. Bankr. P. 7056). The mere existence of some factual dispute is not enough to defeat summary judgment.  Rather, to avoid summary judgment, Plaintiffs must show a dispute over facts that is both material—one "that might affect the outcome of the suit under the governing law"—and genuine—where the evidence "is such that a reasonable jury could return a verdict" for Plaintiffs.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, in order to withstand a motion for summary judgment, Plaintiffs "must set forth specific facts showing the existence of a genuine issue concerning every essential component of its case."  *Continental Airlines, Inc. v. Air Line Pilots Ass'n, Int'l.*, 555 F.3d 399, 405 (5th Cir. 2009) (citations omitted).  The evidence set forth by Plaintiffs must not be mere "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008) (quotations and citations omitted).

---

[14]   Six-hundred and forty-seven dollars and fifty cents of this amount were monthly inspection fees that were performed when the Morenos were not current on their loan.  Pursuant to their

Despite a fully developed factual record, Plaintiffs cannot point to evidence sufficient to demonstrate the existence of a genuine issue of material fact about each of the required elements of their claims, and thus, Countrywide is entitled to summary judgment.

## ARGUMENT

## I.     THE DISCHARGE INJUNCTION IS INAPPLICABLE TO PLAINTIFFS' CLAIMS.

Counts IV and IX of Plaintiffs' Amended Complaint purport to state claims under 11 U.S.C. § 524 and § 1328 for violation of the Plaintiffs' discharge injunctions and related orders.  In order to maintain a claim for violation of the discharge injunction, Plaintiffs must produce evidence Countrywide attempted to collect a debt that was, in fact, discharged.  11 U.S.C. § 524.  Plaintiffs have not met—and cannot meet—this burden because the mortgage debt at issue is exempt from discharge under 11 U.S.C. § 1328(a).

11 U.S.C. § 1328(a) provides for "a discharge of all debts provided for by the plan … except any debt[:] (1) provided for under section 1322(b)(5)" of this title.  Because the Plaintiffs' mortgage debts were provided for under § 1322(b)(5), their contractual obligations were not discharged and are not subject to the discharge injunction.  *Mem. Op.* at 7; 11 U.S.C. § 1328(a); *Universal American Mortgage Co. v. Bateman (In re Bateman)*, 331 F.3d 821, 832 (11th Cir. 2003) ("a secured creditor's claim for mortgage arrearage survives the confirmed plan to the extent it is not satisfied in full by payments under the plan, or otherwise satisfied under the terms of § 1325(a)(5), because to permit otherwise would deny the effect of 11 U.S.C. § 1322(b)(2), which, in effect, prohibits modifications of secured claims for mortgages on a debtor's principal residence").  Indeed, in its September 28, 2008 Opinion, this Court stated it did not "understand

---

Deed of Trust, those inspection fees were contractually reimbursable and ranged in amount ranging from $11 to $14 per month.  *May Decl.* at ¶ _.

how Plaintiffs' allegations fall within the discharge injunction itself." *Mem. Op.* at _.  The Court

went on to explain why the discharge injunction is inapplicable to Plaintiffs' claims:

> Not all debts are discharged by § 1328.  Congress excepted mortgage debts from discharge. Section 1328(a)(1) specifically excepts from discharge "debts provided for under section 1322(b)(5)."  Principal, interest, and arrearages provided for by the plan are not discharged. Nor are Reimbursable Expenses incurred (but not collected) discharged.

*Mem. Op.* at 7.  As the mortgage-related debts at issue were not discharged, Countrywide is

entitled to summary judgment on Plaintiffs' discharge injunction claims.

## II.     THERE IS NO EVIDENCE TO SUPPORT PLAINTIFFS' CLAIMS FOR VIOLATION OF THE AUTOMATIC STAY.

Similarly, Countrywide is entitled to judgment on Count III and Count VIII of the

Amended Complaint for "violations of the automatic stay" and "willful violations of the

automatic stay," because there is no evidence Countrywide made any improper attempts to

collect from the Plaintiffs' estates.

### A.     Legal Standard

In order to assess Plaintiffs' automatic stay claims, it is important to recognize what

conduct § 362 actually prohibits.  The protections of § 362 apply only to actions taken during a

debtor's bankruptcy when the automatic stay is in effect.  Activity that post-dates discharge, or

that occurs while the stay has lapsed (such as while the Morenos' bankruptcy case was

dismissed), is outside the purview of § 362.  *See* 11 U.S.C. § 362(c)(1) and (c)(2); Sept. 18, 2008

Order at 26 ("Upon granting of the discharge, the estate ceases to exist."); *Chapman v.*

*Bituminous Ins. Co.* (*In re Coho Res., Inc.*), 345 F.3d 338, 344 n.16 (5th Cir. 2003); 1 HENRY J.

SOMMER, COLLIER BANKRUPTCY MANUAL ¶ 362.06, at 342-48 (3d ed. Rev. 2002) (explaining

the automatic stay expires when a case is closed or dismissed or when a debtor receives a

discharge).

Even during a bankruptcy case, however, efforts to collect debts through the bankruptcy process—*e.g.*, through a proof of claim, motion for relief, agreed order, etc.—do not violate the automatic stay.  *See Kenney v. Capital One Fin. Corp., (In re Sims)*, 278 B.R. 457, 471-72 (Bankr. E.D. Tenn. 2002) (holding that filing a proof of claim does not constitute an act to collect property of the estate in violation of the stay); *In re Sammon,* 253 B.R. 672, 681 (Bankr. D.S.C. 2000) ("the automatic stay serves to protect the bankruptcy estate from actions taken by creditors outside the bankruptcy court forum, not legal actions taken within the bankruptcy court"); *Prewitt v. N. Coast Village, Ltd.* (*In re N. Coast Village, Ltd.)*, 135 B.R. 641, 644 (B.A.P. 9th Cir. 1992) ("the automatic stay does not apply to proceedings against the debtor in the home bankruptcy court").[15]

In addition, Plaintiffs assert claims for violation of Sections 362(a)(1) and (3)-(6), each of which requires an actual attempt to collect *from the property of debtor's estate* (or pre-petition debts from property of the debtor).  Internal accounting practices, including the posting of fees to accounts, do not violate these prohibitions.  *See Padilla v. Wells Fargo Home Mortgage, Inc. (In Re Padilla),* 379 B.R. at 663, 664 (Bankr. S.D. Tex. 2007) (holding the "mere posting of a charge, without more, is not 'an act to obtain possession,'" as it does not take or threaten to take estate property.); *see also Mann v. Chase Manhattan Mortgage Corp.*, 316 F.3d 1, 3 (1st Cir. 2003) (mortgagee's internal bookkeeping entries, in continuing to accrue its post-petition attorney fees to debtor's account, did not violate the automatic stay); *Leeper v. Pennsylvania Higher Education Assistance Agency*, 49 F.3d 98, 104 (3d Cir. 1995) (holding the accrual of post-petition interest to a debtor's account does not violate the automatic stay); *Kerney,* 278 B.R.

---

[15]   This is true, even if Plaintiffs assert any of Countrywide's proofs of claim or motions for relief were incorrect or false.  *See Prott v. Fairbanks Capitol Corp. (In re Pyott),* 351 B.R.

at 471 ("internal bookkeeping entries by a creditor" cannot violate the automatic stay).  Nor does

a misallocation of funds violate the stay.  *In re Padilla*, 379 B.R. at 665 (any interpretation to the

contrary "misinterprets the scope of the 'acts' covered by" § 362(a)).  The issue central to a stay

violation claim is whether the creditor had the right to collect estate funds, not what it does with

those funds after collection.

Taken together, these principles mandate that Plaintiffs produce evidence Countrywide

improperly attempted to collect property of the estate or to collect pre-petition debts directly

from the debtor while the automatic stay was in effect.  Even after extensive discovery, however,

Plaintiffs have not—and cannot—point to evidence of any actions by Countrywide that could

have violated the automatic stay.

**B.     There Is No Evidence in The Record That Could Support a Stay Violation Claim.**

Countrywide is entitled to summary judgment on Rodriguez' stay violation claim as all of

the amounts it collected or attempted to collect from Rodriguez came through court-approved

processes.  For example, Countrywide's September 19, 2002 proof of claim, which included

$8,118 in unpaid monthly payments, $631.14 in foreclosure attorneys' fees, $108.24 in

uncollected late charges, and $62.00 in inspection fees, was allowed by the Bankruptcy Court in

its November 7, 2002 Confirmation Order.  *Rodriguez Dep.* at 73-75, and Ex. 7 thereto; *Nardi

Decl.* at ¶ 5, Ex. B.

After Rodriguez failed to make her ongoing monthly payments during the bankruptcy,

Countrywide filed a motion for relief from the automatic stay on March 26, 2003.  That motion

was resolved by the May 7, 2003 Agreed Order.  *Id.* at ¶ 8, Ex. E.  The Agreed Order allowed

899, 905, n.4 (Bankr. E.D. Tenn. 2006) ("Actions allowed by the system do not violate the stay even if wrong, such as filing a false proof of claim.").

27

Countrywide to collect $3,752.00 in unpaid monthly payments, $550 in attorney's fees, $105 in costs, and $144.32 in late charges.  The Agreed Order also authorized Countrywide to send future notices of default directly to Ms. Rodriguez and to charge her $50 per notice.  Ms. Rodriguez triggered the notice two times, when she defaulted on her monthly payments in November 2005 and August 2006.  *Reed Dep.* at 130-31, 143-44, and Exs. 20 & 21 thereto.  Countrywide is entitled to summary judgment as to all of the amounts it collected in connection with the proof of claim, Agreed Order, and notices of default.  Because each of these attempts was through court-approved processes (and the debts were therefore specifically approved), they cannot constitute a violation of the automatic stay.[16]  Moreover, Plaintiffs can produce no evidence that Countrywide sought to collect pre-petition debts directly from Rodriguez.

Countrywide is entitled to summary judgment on the Morenos' stay violation claims for similar reasons.  Countrywide filed a proof of claim on November 30, 2001, that was allowed by the Bankruptcy Court on February 22, 2002.  *L. Moreno Dep.* at 63, and Exhibit 12 thereto.  The following arrearage amounts were listed on, and collected through, that proof of claim: $3,552.00 in unpaid monthly payments, $807.60 in foreclosure attorneys' fees, $58.57 in uncollected late charges, $107.00 in inspection fees, and $116.40 in accrued late charges.

Because the Morenos missed multiple post-petition payments, Countrywide filed a motion for relief from the automatic stay on February 4, 2003, which was resolved by the March 5, 2003 Agreed Order.  *Nardi Decl.* at ¶ 24, Ex. U.  Under the terms of the Agreed Order, the Court approved $1,104 in unpaid monthly payments, $44.16 in late charges, $105.00 in costs,

---

[16]  Similarly, there is no question that the updated escrow analysis provided by Countrywide to Rodriguez cannot constitute a violation of Section 362.  *See***,** *e.g.*, *In re Dominique*, 368 B.R. 913 (Bankr. S.D. Fla. 2007); *Chase Manhattan Mortgage Corp. v. Padgett*, 268 B.R. 309, 314 (S.D. Fla. 2001).  Indeed, the Plan and Confirmation Order specifically required

and $600.00 in attorney fees.  The Agreed Order also provided that Countrywide was authorized to send default notices to the Morenos directly and charge them $50.00 for any default notice given pursuant to the Agreed Order.  Accordingly, the three charges in the amount of $50 for default notices, posted to the Morenos' account on June 2, 2003, January 24, 2005, and September 19, 2006, were covered and approved by that Agreed Order as well.  *Reed Dep.* at 62-63.

Although Countrywide took steps toward foreclosure and incurred reimbursable expenses on both occasions when the Morenos' bankruptcy case was dismissed, it is axiomatic that the automatic stay was not in effect while the case was dismissed.  *See* 11 U.S.C. § 362(c)(1) (The automatic stay runs  "until the earliest of . . . the time a discharge is granted or denied.").  Accordingly, no attempt to collect pre-petition debts from the Morenos at that time could have violated the stay.  In any event, both foreclosure processes were halted after the Morenos' case was reinstated, and Countrywide never collected those reimbursable expenses from the Morenos prior to discharge.  *May Decl.* ¶ 24.  Accordingly, other than post-petition monthly payments and trustee payments, all of Countrywide's collections and attempts to collect that occurred while the Morenos' automatic stay was in effect were through court-approved processes, which—as a matter of law—cannot violate the automatic stay.

Countrywide is also entitled to summary judgment as to the Herreras as all collections or attempts to collect from property of the estate came through court-approved processes.  Countrywide filed a proof of claim on May 25, 2002.  *A. Herrera Dep.* at 91, and Ex. 9 thereto.  The arrearage listed in that proof of claim included $9,994.27 in unpaid monthly payments,

---

Rodriguez to maintain her post-petition taxes and insurance.  Nardi Decl. at ¶¶ 5-6 , and Exs. B and C thereto.

$11.00 in inspection fees, $399.74 in accrued late charges, and $27.86 in pre-petition attorneys' fees.

After the Herreras failed to maintain regular post-petition mortgage payments, Countrywide filed a motion for relief from the automatic stay on July 30, 2002.  Under the terms of the Agreed Order resolving that motion, the Court approved $705 in attorney's fees and costs and $4,730 in unpaid monthly payments. *Nardi Decl.* at ¶ 15, Ex. L.  Finally, the subsequent loan modification agreement was embodied in the terms of the 2007 Agreed Order.  As noted above, the terms of that loan modification agreement provided that any outstanding arrearage, after application of certain moneys paid to the Trustee, would be added to the end of the Herreras' loan and paid after discharge.  That agreement included $238.67 in outstanding reimbursable expenses.  As those collection efforts were all part of court-approved processes, there is simply no argument that Countrywide violated the automatic stay by collecting or attempting to collect such amounts.  Nor can Plaintiffs produce evidence that Countrywide sought to collect pre-petition debts from the Herreras directly while their stay was in place.

## III.   COUNTRYWIDE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CAUSES OF ACTION FOR VIOLATIONS OF § 506(b) and RULE 2016.

Count V of the Plaintiffs' Amended Complaint alleges Countrywide violated § 506(b) and Bankruptcy Rule 2016(a) by assessing and collecting unapproved fees and costs.  Even assuming Plaintiffs could bring a claim for violations of § 506(b) and Rule 2016(a), there is no evidence Countrywide violated these provisions.[17]

---

[17]   Countrywide maintains there is no private right of action created by Section 506(b) or Rule 2016, but does not repeat those arguments here, as they were more fully presented in Motion to Dismiss briefing.  Nevertheless, Countrywide brings to this Court's attention *Myles v. Wells Fargo Bank, N.A. (In re Myles),* 395 B.R. 599, 608 (Bankr. M.D. La. 2008), in which the court found there was no private right of action for violation of § 506(b) or Rule 2016, citing Third Circuit case law *(Henthorn v. GMAC Mortgage Corp. (In re Henthron), Willis*

A.      **Legal Standard**

The coverage of both Section 506(b) and Rule 2016(a) is limited in scope.

Section 506(b) applies only to post-petition, pre-confirmation charges.  *See Financial Sec.*

*Assurance v. T-H New Orleans Ltd. Pntrshp. (In re T-H New Orleans Ltd. Pntrshp.),* 116 F.3d

790, 797 (5th Cir. 1997); *Padilla*, 379 B.R. at 657; *Myles v. Wells Bank, N.A. (In re Myles),* 395

B.R. 599, 608 (Bankr. M.D. La. 2008) ("The plaintiffs' claims under section 506(b) also fail

because that section governs residential mortgage claims only from the filing of the petition

through confirmation.  It does not apply after confirmation.").  And notably, the invocation of a

creditor's rights under Section 506(b) is purely voluntary—Countrywide was free to elect not to

seek reimbursement of such pre-confirmation fees through the Plaintiffs' bankruptcy plans.  *See*

*Padilla v. GMAC Mortgage Corp.,* 389 B.R. at 409, 440 (Bankr. E.D. Pa. 2008) ("Nothing the in

the text of § 506(b) imposes any time lines or states that invocation of § 506(b) is mandatory or

provides that a secured creditor that does not invoke § 506(b) forfeits its right to payment.").

Though Rule 2016(a) is not so limited, its plain language restricts its applicability to

"compensation for services, [and] reimbursement of necessary expenses."  Accordingly, Rule

2016(a) does not apply to post-petition monthly payments or other loan charges.  In addition,

Rule 2016(a) only applies to money sought "from the estate."  Attempts to collect after the estate

has ceased to exist or from non-estate property do not violate Rule 2016.  *See Shell Oil Co. v.*

*Capital Fin. Servs.*, 170 B.R. 903, 906 (S.D. Tex. 1994).  Third, this Court has held Rule 2016(a)

is limited to actual collection attempts; the mere posting of fees to an account does not implicate

the Rule.  *See Padilla*, 379 B.R. at 668 (Rule 2016 is "only triggered when a creditor actually

---

*v. Chase Manhattan Mortgage Corp.,* No. Civ.A. 01-CV-1312, 2001 WL 1079547 (E.D. Pa.
Sept. 14, 2001); 299 B.R. 351 (E.D. Pa. 2003); *Zlupko v. Washington Mutual Bank*, No.
Civ.A. 02-CV-1179, 2004 WL 2297400 (E.D. Pa. Oct. 13, 2004)).

seeks property of the estate.  An internal record entry, without subsequent collection activities, does not implicate these provisions.").  Finally, while a Rule 2016 application is one way to secure court approval of reimbursable expenses to be collected from the estate, the procedure provided by Rule 2016 is not exclusive.  Approval of reimbursable expenses may be sought in the form of Amended Proofs of Claim, Agreed Orders, or similar procedures.  *See Atwood v. Chase Manhattan Co. (In re Atwood),* 293 B.R. 227, 232 (9th Cir. 2003) (request for allowance may be made through a fee application under Rule 2016 or through a proof of claim); *Deutsche Bank Nat'l Tr. Co. v. Placidi (In re Placidi)*, 2008 WL 474239 (Bankr. M.D. Pa. Feb. 21, 2008) (fees may be requested via proof of claim, Rule 2016 application, or motion for relief).  Because collection attempts from the estate for reimbursable expenses were expressly approved by the Bankruptcy Court, Plaintiffs cannot meet their burden of demonstrating a violation of Rule 2016(a) or § 506(b).

**B.      It Is Undisputed Section 506(b) and Rule 2016 Are Inapplicable to Countrywide's Conduct.**

The only post-petition pre-confirmation fees even arguably subject to the provisions of Section 506(b) (and never included in a proof of claim) were the attorneys' fees incurred by Countrywide in connection with the proofs of claims filed by its attorneys in the Plaintiffs' bankruptcies.  As Countrywide never collected those fees from Rodriguez or Moreno, however, there was no possible violation of Section 506(b).  And as for the Herreras, while Countrywide did apply $101.33 in payments to the proof of claim fees during bankruptcy, that application was ultimately ratified by the parties agreement endorsed by the 2007 Agreed Order which was designed to bring the Herreras current (see above).

**1.      The Rodriguez Account**

Countrywide is entitled to summary judgment on Rodriguez' Rule 2016 claim because all the reimbursable expenses Countrywide incurred during Rodriguez' bankruptcy and sought to collect from the estate were approved by the Bankruptcy Court. As discussed above, in addition to its proof of claim, which included pre-petition attorneys fees and costs and inspection fees, Countrywide filed a motion for relief from the automatic stay that was resolved by the May 7, 2003 Agreed Order. *Nardi Decl.* at ¶ 8, Ex. E. That Agreed Order provided for $655 in attorneys fees and costs. The Agreed Order also allowed for $50 in fees to be charged if additional notices of default were required. Because Rodriguez continued to miss payments, notices of default were sent on November 17, 2005 and August 17, 2006. *Reed Dep.* at 130-31, 143-44, and Exs. 20 & 21 thereto. On both occasions, $50 in fees were charged pursuant to the May 7, 2003 Agreed Order. Accordingly, those reimbursable expenses were properly incurred and sought to collect by Countrywide during Rodriguez' bankruptcy. The only other reimbursable expenses collected by Countrywide from Rodriguez were the $172.50 in inspection fees discussed above. Indeed, Countrywide did not seek to collect any reimbursable expenses from Rodriguez post-discharge. *May Decl.* at ¶ 3. Thus, to the extent Rodriguez's Section 2016 claim survives summary judgment, it could only be as to the $92 in inspection fees actually collected by Countrywide during her bankruptcy, but such a claim fails because there is no suggestion that Rodriguez's post-bankruptcy default was caused by the collection of those fees. *See Ameriquest Mortgage Co. v. Nosek (In re Nosek)*, 544 F.3d 34, 48 (1st Cir. 2008) (claims based on improper accounting during bankruptcy dependent upon showing that creditor treated debtor as in default *because of* the challenged accounting). Countrywide is entitled to summary judgment on Rodriguez' Rule 2016(a) claim.

### 2.    The Herrera and Moreno Accounts

All the reimbursable expenses Countrywide incurred sought to collect from the Herreras' and Morenos' estates were approved by the Bankruptcy Court.  Both the Herreras' and the Morenos' Plans provided for property of the estate to revert to the debtor <u>upon confirmation</u>.  *See Nardi Decl.* at ¶¶ 13, 20, Exs. J & Q thereto.  The law in this Circuit is that "unless the Plan provides otherwise," "when property vests in the debtor at confirmation, *there is no longer a bankruptcy estate*."  *Shell Oil Co.*, 170 B.R. at 906.  Accordingly, where the Plan vests property in the debtor at confirmation, there is no post-confirmation estate and any post-confirmation attempt to collect reimbursable expenses is not subject to Rule 2016(a)."  *Id.*; *see also Sanchez v. Ameriquest Mortgage Co. (In re Sanchez)*, 378 B.R. 289, 301-02 (Bankr. S.D. Tex. 2007) ("in the Fifth Circuit, once a plan is confirmed in a Chapter 13 case, there is no longer any estate unless the plan says otherwise"); *In re Lambright*, 125 B.R. 733, 734-35 (Bankr. N.D. Tex. 1991).

Accordingly, to violate Rule 2016(a), any attempt to collect from the property of the Herreras' estate had to have occurred prior to the Plan's April 11, 2002 confirmation.  Between the petition date and the confirmation date, however, Countrywide made no attempts to collect reimbursable expenses from the Herreras (other than filing its proof of claim).

Like the Herreras, the Morenos' Chapter 13 plan also provided that the property of the estate reverted to the debtors *upon confirmation*, which occurred on February 22, 2002.  *Nardi Decl.* at ¶ 20, Ex. Q.  The only reimbursable expenses Countrywide sought to collect prior to February 22, 2002 were those set forth in the proof of claim that Countrywide filed on November 30, 2001.  *L. Moreno Dep.* at 63, and Ex. 12 thereto.  The proof of claim sought $807.60 in foreclosure fees and $107.00 in inspection fees.  Not only are the bulk of these fees irrelevant, as they were incurred pre-petition, but all of the reimbursable expenses sought on the proof of claim

were allowed by the amended plan on February 22, 2002. *Nardi Decl.* at ¶ 20, Ex. Q. As a result, Plaintiffs cannot point to any evidence Countrywide violated Rule 2016(a).

And, even if the Court determines that Rule 2016(a) applies to the Morenos post-confirmation, all of the reimbursable expenses incurred and sought by Countrywide from the Morenos post-confirmation and pre-discharge also were approved by the Bankruptcy Court. Countrywide filed two motions for relief, one on May 8, 2002, and one on February 4, 2003. *Id.* at ¶ 22, 23, Exs. S & T. The first motion for relief was withdrawn, and the second motion for relief was resolved by an Agreed Order on March 5, 2003, which provided for $705 in attorneys fees and costs. *Id.* at ¶ 24, Ex. U. In addition, Countrywide charged $50 in fees for default notices pursuant to the March 5, 2003 Agreed Order. *Reed Dep.* at 62-63. Countrywide acknowledges it incurred $604.16 and $616.32 in attorneys fees and costs while the Morenos' bankruptcy case was dismissed. *Id.* at 53-54. But at the time these fees were incurred, the Morenos were not in bankruptcy and Countrywide was not subject to Rule 2016. In any event, Countrywide never sought to collect those fees from the Morenos' estate, so Rule 2016 was never applicable.

## IV.   PLAINTIFFS' CLAIMS FOR VIOLATION OF THEIR PLANS ARE NOT SUPPORTED BY THE EVIDENCE.

Plaintiffs assert five separate claims allegedly based on "violations" of their chapter 13 Plans. Counts I, II, VI, VII, and XIV. At the heart of these claims is Plaintiffs' assertion that their Chapter 13 Plans created new contracts governing the relationship between Countrywide and the debtors, and Countrywide essentially breached those new contracts. In the alternative, Plaintiffs suggest Countrywide's actions violated the terms of their confirmation orders. But there are no allegations Countrywide violated those orders apart from the conduct alleged to breach the confirmed plans themselves.

As an initial matter, Countrywide is entitled to judgment as a matter of law on Plaintiffs' breach of contract claim because Plaintiffs' Plans were not contracts. And, even if the Plans could constitute contracts, Plaintiffs have not identified any provision of their Plans that Countrywide violated. Moreover, because Countrywide did not collect unapproved reimbursable expenses, Plaintiffs could not have been damaged by any breach of their Plans or alleged new contracts.

### A.    Plaintiffs' Plans Were Not Contracts.

Countrywide is entitled to summary judgment on Plaintiffs' breach of contract claim and their related claim for attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 38.001, because the contention the Chapter 13 Plans created new contracts between Plaintiffs and Countrywide is legally incorrect. The Chapter 13 Plans were the subject of confirmation orders. The Plans were not signed by the parties, there was no consideration exchanged between the parties, and they were not entered into voluntarily.[18] Simply put, the Plans have none of the hallmarks of, and were not, contracts. *See Wincheck v. American Express Travel Related Servs. Co.,* 232 S.W.3d 197, 202 (Tex. App.-Houston, 2007 [1st Distr.]) (citing *Prime Prods., Inc. v. S.S.I. Plastics, Inc.,* 97 S.W.3d 631, 636 (Tex. App.-Houston 2002, pet. denied)); but *see In re Myles*, 395 B.R. 599 (holding plaintiff has breach of contract claim stemming from violation of Chapter 13 plan).

Although some courts have colloquially referred to the confirmation of a Chapter 13 Plan as creating something "akin to a 'new contract'," it is recognized such a reference is really nothing more than "a useful analogy in relating a complex legal event to a layperson, a

---

[18]    Indeed, with the Herrera Plan, there was no "meeting of the minds," as the Plan did not encompass the full arrearage listed in Countrywide's proof of claim.

continuation order is no way a new contract between a debtor and the debtor's creditors." *In re Quigley*, 391 B.R. 294, 306 (Bankr. N.D. W.Va. 2008).

> **B.      Plaintiffs Can Produce No Evidence Countrywide Breached Any Provision of Their Chapter 13 Plans.**

Even if the plans could form the basis of Plaintiffs' contract claims, Countrywide would be entitled to summary judgment because Plaintiffs cannot point to any term of the Plan Countrywide breached. [19]  Each of Plaintiffs' Chapter 13 Plans (and, for that matter, their Confirmation Orders) contained, among others, the following three directives: (1) the debtor shall make monthly payments to the Trustee to pay the claims; (2) the Trustee shall make disbursement pursuant to the provisions of the plan; (3) each secured creditor shall retain the lien existing prior to the commencement of the case to secure payment of the allowed amount of its claim. *Nardi Decl.* at ¶¶ 5, 6, 12, 13, 20-21; Exs. B, C, I, J, Q, and R thereto.  No term of any of the Plaintiffs' Chapter 13 Plans or confirmation orders addresses reimbursable expenses.

Countrywide's entitlement to its reimbursable expenses was instead governed by the terms of the loan contracts. [20]  As noted above, the Plaintiffs each had defaulted prior to

---

[19]   The confirmation of Plaintiffs' Chapter 13 Plans did overlay certain requirements concerning the timing of Plaintiffs' repayment of contractually due pre-petition debt— "essentially splitting" a debtor's pre-petition arrearages and ongoing mortgage payment into two separate obligations:  the pre-petition portion to be paid through the Trustee and the ongoing post-petition debt to be paid by the debtor. S*ee Rake v. Wade,* 508 U.S. 464, 473 (1993); Mem. Op. at 5 (portion of monthly amount paid during bankruptcy "allocated to the outstanding pre-petition arrearages, and the remainder must be allocated to current principal and interest payments.").  There is no evidence that Countrywide did not handle these aspects of servicing the Plaintiffs' loans properly.

[20]   Under 11 U.S.C. § 1322(b)(2), a mortgagee like Countrywide, whose interests are protected by a lien on the debtor's primary residence, cannot have its contractual rights modified by a Chapter 13 bankruptcy plan.  *See* 11 U.S.C. § 1322(b)(2) (providing that a Plan may "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence.*") (emphasis added); *Nobelman v. American Savings Bank*, 508 U.S. 324, 329-330 (1993) (holding that all rights arising under applicable debt instruments may not be modified where the

bankruptcy, and, in fact, Countrywide had already accelerated the debts secured by the Morenos' and Rodriguez's Deeds of Trust.  Under the terms of their Notes, therefore, Countrywide was entitled to reimbursement of "all of its costs and expenses in enforcing th[e] Note" (with respect to Rodriguez) and "all costs of collection, including attorneys fees, if incurred" up to ten percent of the total loan balance (with respect to the Morenos).  *Rodriguez Dep..* at 50-51 and Ex. 2 thereto; *L. Moreno Dep.* at 22 and Ex. 3 thereto.  These loan provisions are essentially identical to those analyzed by this Court in its recent *Johnson* decision.  *See In re Johnson*, Case No. 08-30403, slip op. at 6-7 (Bankr. S.D. Tex. June 8, 2009).  As recognized in *Johnson*, where (as here) a loan is accelerated prior to bankruptcy, such provisions are unambiguous and absolutely authorize the collection of all "reasonable fees and costs."  *Id.* at 7.

Similarly, the Herreras' and Rodriguez's Deeds of Trust authorized Countrywide to "do and pay whatever is necessary to protect the value of the Property and [Countrywide's] rights in the Property."  *Rodriguez Dep..* at 42 and Ex. 1 thereto; *A. Herrera Dep.* at 70-71 and Ex. 3 thereto.  One such necessary step is the right to ensure the property (which is Countrywide's sole security protecting its right to repayment) is occupied and in good condition when the debtors are in default.  Accordingly, Countrywide acted within its contractual rights when it ordered inspections of the Plaintiffs' properties while they were in bankruptcy.  Under the terms of the Deeds of Trust, the costs of such inspections were clearly reimbursable.  Indeed, this Court has previously recognized a mortgagee's right to collect such fees and costs survive the filing of a bankruptcy petition.  *See In re Johnson*, Case No. 08-30403, slip op. at 2.

By asserting their Chapter 13 Plans place contractual limits on Countrywide's right to assess and collect post-petition debt (for example, by requiring an application for fees even if

---

obligation is secured solely by a primary residence; such rights were "bargained for by the

Countrywide does not seek to collect them from the estate), Plaintiffs' theory goes far beyond the terms of the Plans (or even Rule 2016) to improperly modify Countrywide's contracts.[21]  The logical conclusion of Plaintiffs' position is that a secured creditor is *required* to collect post-petition reimbursable expenses from the estate.  Yet, such a requirement is not only absent from the Plans and confirmation orders, it would be contrary to other provisions of the Code and Rules that permit, but do not require, secured creditors to seek to collect post-petition arrearages.  *See, e.g., In Re Padilla*, 389 B.R. at 443-44 (E.D. Pa. 2008) (Section 506(b) and Section 1322(b)(5) do "not impose any obligation on [the Creditor] to give notice or make demand for payment of the post-petition legal expenses during the pendency of the Debtor's bankruptcy case," and Rule 2016 "does not apply to a creditor who does *not* seek legal expenses from the bankruptcy estate."); *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 551 (5th Cir. 1985) ("Although filing a proof of claim may be prerequisite to the allowance of certain [post-petition] claims, no creditor is required to file a proof of claim."); *In re Goodman*, 136 B.R. 167, 169 (Bankr. W.D. Tenn. 1992) (the plain language of § 1305 makes it clear a creditor controls whether a proof of claim is filed for post-petition debt and a debtor may not force a post-petition creditor to file a proof of claim); *In re Lambright*, 125 B.R. at 735 ("Creditors who have post-confirmation claims may deal with the debtor as if no bankruptcy has been filed").

Permitting Countrywide to utilize the procedures provided by the Code and Rules if it elected to collect the reimbursable expenses from the estate or wait to collect them at some later time is entirely consistent with how most post-petition debts are handled, and is consistent with the loan contracts, which allow Countrywide to seek its reimbursable expenses "at any time."

---

mortgagor and the mortgagee" and are protected from modification by § 1322(b)(2)).

*Rodriguez Dep.*. at 42 and Ex. 1 thereto; *A. Herrera Dep.* at 70-71 and Ex. 3 thereto.  Nor would

it affect the debtors' rights to cure their arrearages or maintain their post-petition payments under

§ 1322(b)(5), because until the lender demands reimbursement, there is no arrearage to cure.[22]

      **C.**      **Even If Plaintiffs' Legal Theories Were Correct, There Is No Evidence To Support Their Claims.**

      Even if the Plaintiffs' Plans did form new contracts with Countrywide, there is no

evidence Countrywide violated those contracts.  In its Opinion on Countrywide's Motion to

Dismiss, this Court explained it believed Plaintiffs may be able to state a claim for breach of

contract or breach of plan by showing Countrywide breached the terms of the Chapter 13 Plans

by either (a) misapplying trustee payments to post-petition debt or mortgagor payments to pre-

petition debt or (b) by collecting post-petition debts that were added to Plaintiffs' accounts

without an application pursuant to Rule 2016 or that were unreasonable.  *Mem. Op.* at 22.  After

ample time for discovery, Plaintiffs cannot point to any such evidence.

      **1.**      **Countrywide Did Not Cause Any Defaults Through the Misapplication of the Plaintiffs' or the Trustees' Payments.**

      In *Nosek*, the First Circuit specifically found there could be no cause of action for a

violation of a Chapter 13 Plan based on the mere internal misapplication of payments unless the

confirmed plan contains specific language mandating particular accounting practices.  *In re*

*Nosek*, 544 F.3d at 49.  Even then, a debtor may only sue for such a violation if it resulted in

actual damage, such as the creditor treating the debtor as in default *because of* the challenged

accounting.  *Id.* at 48.  Here, there is absolutely no suggestion in the record that the plans

---

[21]    Section 1322(b)(2) only limits modification of the loan contract through the Plan. Countrywide does not contest that, had it sought to collect reimbursable expenses from the estate, provisions of both the Code and the Rules would have conditioned its rights to do so.

controlled Countrywide's internal accounting.  And none of the defaults Countrywide sought to collect from Plaintiffs post-bankruptcy was the result of a misapplication.

Indeed, as discussed above, the attempts to collect after bankruptcy were the result of missed or short payments by the debtor, pre-petition debt that was not properly paid as part of the Plan (in the case of the Herreras and the Morenos), or late fees, inspection fees, and other post-petition costs to which Countrywide was contractually entitled.  None of the amounts sought were the result of prepetition debt that would have been paid but for a misapplication of trustee payments, nor were they post-petition amounts that would have been paid but for a misapplication of mortgagor payments.  Plaintiffs cannot point to any evidence to suggest Countrywide misapplied any payments that resulted in an effort to collect improper debt, nevermind any damages from a misapplication.  As a result, Plaintiffs have no claim that Countrywide breached their Chapter 13 plans by misapplying payments.

**2.      Reimbursable Expenses Approved by Court Do Not Violate The Plaintiffs' Plans**

Without evidence of any misapplication, Plaintiffs are left to support their claims by producing evidence Countrywide collected reimbursable expenses that were accrued post-petition without notice to the Court and the Plaintiffs.  No such claim, of course, can arise from reimbursable expenses that were approved by Agreed Orders, allowed claims, or the like.  *See In re Atwood,* 293 B.R. at 232 (request for allowance may be made through a fee application under Rule 2016 or through a proof of claim); *In re Placidi*, 2008 WL 474239 (Bankr. M.D. Pa. Feb. 21, 2008) (fees may be requested via proof of claim, Rule 2016 application, or motion for relief).

---

[22]    On the other hand, requiring reimbursement through the Plan could be harmful to the interest of debtors such as the Herreras, who may not be able to successfully complete their Plans if required to pay reimbursable expenses through Plan payments.

Accordingly, Countrywide is entitled to summary judgment on Plaintiffs' claims with respect to all such reimbursable expenses.

With respect to Rodriguez, the Court approved a total of $696.14 in reimbursable expenses as part of Countrywide's proof of claim and another $655 as part of the 2003 Agreed Order. The Court also approved the $100 in fees posted to Rodriguez's account in connection with the notices of default sent by Countrywide in December 2005 and September 2006. *Rodriguez Dep.* at 73-75, and Ex. 7 thereto; *Nardi Decl.* at ¶ 8, and Ex. E thereto; *Reed Dep.* at 130-31, 143-44, and Exs. 20 & 21 thereto. As those fees were specifically approved by the Court, and were collected during bankruptcy through court-approved processes, they cannot constitute plan violations.[23] Moreover, because the amounts identified on the post-bankruptcy notice of default Countrywide sent to Rodriguez in 2007 only included the deficiency created by Rodriguez's failure to timely make her post-petition payments in the proper amounts – one of her own plan obligations – there is no evidence of any post-petition reimbursable expenses being sought after bankruptcy in breach of Rodriguez' plan.

As for the Herreras, Countrywide is entitled to summary judgment as to all of the fees and costs listed on its 2002 proof of claim. *A. Herrera Dep.* at 91, and Ex. 9 thereto. Summary judgment also is appropriate with respect to the $705 in fees and costs included in the Agreed Order entered on December 2, 2002, and the $25 in fees allowed for sending a notice of default in October 2006. *Nardi Decl.* at ¶ 15, and Ex. L thereto. In addition, as a result of the 2007 Agreed Order entered by the Court to resolve the Herreras' proof of claim objection, the parties agreed that all amounts then outstanding, including past due payments and $238.67 in outstanding fees and costs (including inspection fees and bankruptcy fees), would be added to

the end of the Herreras' loan and collected after their discharge from bankruptcy.  *Stone Dep.* at 75; *A. Herrera Dep.* at Exhibit 23.

That agreement was approved by the Bankruptcy Court, as manifested by the June 2007 Amended Agreed Order.  Although an administrative error resulted in Countrywide not properly recording the loan modification agreement, the amounts identified on the December 2007 notices Countrywide sent to the Herreras did not include any reimbursable expenses other than the $238.67 included in the terms of the agreement approved by the Court, and Countrywide's failure to record the Agreed Order did not violate the Plan.  Indeed, the purpose of the Agreed Order was to avoid an unfeasible modification of the Plan.  Accordingly, the Herreras are unable to point to evidence of any reimbursable expenses Countrywide sought to collect that violated their plan.

The Morenos are also unable to point to any reimbursable expenses Countrywide actually collected without approval from the bankruptcy court.  Countrywide is entitled to summary judgment as to the $914.60 allowed in its November 2001 proof of claim.  *L. Moreno Dep.* at 63, and Ex. 12 thereto.  Countrywide also is entitled to summary judgment as to the $855 specifically approved through the Agreed Order entered in March 2003, including the $150 in fees posted to the Morenos' account for sending notices of default in June 2003, January 2005, and September 2006.  *Nardi Decl.* at ¶ 24, and Ex. U thereto; *Reed Dep.* at 62-63.  And, while a total of $1,769.60 in reimbursable expenses was approved as part of the proof of claim and Agreed Orders, Countrywide only collected $1,739.37 during the course of the Morenos' bankruptcy.  *May Decl.* at ¶ 21.  Accordingly, the Morenos have no evidence Countrywide collected improper reimbursable expenses from them during bankruptcy.

---

[23]    Once again, to the extent Rodriguez has any claim here, it can only be based on the $92 in

Furthermore, of the $2,719.53 in reimbursable expenses Countrywide identified on the December 3, 2007 notice of default, $1232.98 was incurred while the Morenos were not in bankruptcy.  Countrywide is entitled to summary judgment as to those amounts, because there is no evidence that the Plan ever encompassed those reimbursable expenses, nor could the Bankruptcy Code possibly apply to them while their case was dismissed.

### 3. Plaintiffs Were Not Damaged Because Countrywide Did Not Collect Unapproved Reimbursable Expenses.

Finally, as to the Morenos, even with respect to those fees that were not specifically approved through Agreed Orders or otherwise, Plaintiffs' claims cannot survive for the simple reason they never actually paid any such fees to Countrywide.  A claim for breach of contract requires: (a) the existence of a valid contract; (b) a failure to perform the terms specified by the contract, and (c) damages.  *See Winchek,* 232 S.W.3d at 202.  Without having paid the fees, Plaintiffs cannot point to any damages suffered that would support their claims.  *See Rx.com v. Hruska*, No. Civ. A. H-05-4148, 2006 WL 2583434, at *6 (S.D. Tex. Sept. 7, 2006) (stating that "[p]roof of damages is [] an essential [] element" to a breach of contract claim); *Eckland Consultants, Inc. v. Ryder Stilwell Props., Inc*., 176 S.W.3d 80, 89 (Tex. App.-Houston 2004) ("[a] breach of contract claim cannot survive if the plaintiff was not damaged by the breach").

As detailed above, the only post-petition fees or costs that (a) Countrywide assessed while the Morenos were in bankruptcy; (b) Countrywide "sought to collect" from Plaintiffs after discharge; and (c) were not previously subject to Court approval, were the $1,486.55 in reimbursable expenses (including $647 in inspection fees incurred during the Morenos' bankruptcy and another $42 in such fees incurred after they were discharged) that were included on the post-bankruptcy default notice sent to the Morenos.  Countrywide has never collected

---

contractually due inspection fees paid while she was in bankruptcy.

those fees.  As a result, Plaintiffs can produce evidence of no damages, and their claims must fail

accordingly.  *See*, *e.g.*, *In re Nosek*, 544 F.3d at 46-48 (mere internal misapplication of payment,

without any resulting default or consequences, does not amount to a cause of action).

*        *        *

Even if their theories about a potential cause of action for breach of their Chapter 13

plans are valid, Plaintiffs have failed to point to evidence that would support their claims asserted

in Counts I, II, VI, VII, and XIV.  Countrywide, therefore, is entitled to summary judgment on

those counts.[24]

## CONCLUSION

For all of the foregoing reasons, Countrywide is entitled to Summary Judgment on all of

Plaintiffs' claims.

Respectfully submitted,

/s/ David L. Permut
Thomas M. Hefferon
David L. Permut
Goodwin|Procter LLP
901 New York Avenue, N.W.
Washington, DC  20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444

Thomas A. Connop
Locke Lord Bissell & Liddell LLP
2200 Ross Avenue, Suite 2200

---

[24]  Plaintiffs' lack of viable claims in their other counts cannot be remedied by their pro forma claims for contempt (*see* Compl., Count X. ¶¶ 208-213), declaratory relief (Count XI, ¶¶ 214-216), a preliminary injunction, (Count XII, ¶¶ 217-229), a permanent injunction (Count XIII, ¶¶ 230-31), and attorneys' fees (Count XIV, ¶¶ 232-237).  Each of these claims is duplicative or derivative of Plaintiffs' underlying substantive claims.  Because Plaintiffs cannot point to any evidence to support their underlying substantive claims, Countrywide is also entitled to summary judgment as to the derivative claims asserted in Counts XI-XIV of the Amended Complaint.

45

Dallas, TX  75201
Telephone: (214) 740-8547
Facsimile: (214) 756-8547

ATTORNEYS FOR DEFENDANT
COUNTRYWIDE HOME LOANS, INC.

Dated:  September 29, 2009

LIBW/1699720.17

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2009, a true and correct copy of the foregoing documents has been served via ECF, to the following counsel of record:

**U.S. TRUSTEE:**
Charles Sterbach
Barbara Jue
606 N. Carancahua, Ste. 1107
Corpus Christi, TX 77476

**ATTORNEYS FOR PLAINTIFFS**

Karen L. Kellett
The Kellett Law Firm,
A Professional Corporation
900 Jackson Street, Suite 120
Dallas, TX 75202

Ellen C. Stone
Antonio Martinez, Jr.
The Stone Law Firm, P.C.
62 E. Price Road
Brownsville, TX 78520

Gary Klein
Shennan Kavanagh
Roddy Klein & Ryan
727 Atlantic Avenue, 2nd Floor
Boston, MA 02111

/s/David L. Permut
David L. Permut