

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

**ENTERED**
**12/09/2009**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **YDALIA RODRIGUEZ; aka RODRIGUEZ;** | § | **Case No. 02-10605** |
| **aka PARDO,** | § | |
| Debtor(s). | § | |
| | § | **Chapter 13** |
| | § | |
| **YDALIA RODRIGUEZ,** *et al*, | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **Adversary No. 08-01004** |
| | § | |
| **COUNTRYWIDE HOME LOANS, INC.,** | § | |
| Defendant(s). | § | **Judge Isgur** |

<u>**MEMORANDUM OPINION**</u>

For the reasons set forth below, the Court grants, in part, and denies, in part, Countrywide's Motion for Summary Judgment.

**Background**

This lawsuit concerns whether Countrywide Home Loans, Inc. (now BAC Home Loans Servicing, LP) impermissibly attempted to foreclose on homes owned by individuals who had recently completed chapter 13 bankruptcy cases. Plaintiffs allege that Countrywide sought foreclosure despite Plaintiffs' completion of their chapter 13 plans. The chapter 13 plans allegedly cured all of Plaintiffs' home mortgage defaults.

This Court previously issued a Memorandum Opinion on September 18, 2008 regarding Countrywide's Motion to Dismiss under FED. R. CIV. P. 12(b)(6). *See Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 396 B.R. 436 (Bankr. S.D. Tex. 2008). That Memorandum Opinion assumed the well-plead facts in the complaint were true. Since the issuance of that Memorandum Opinion, the parties have engaged in substantial discovery. Some of the facts in

Plaintiffs' complaint appear to have sufficient factual support to overcome Countrywide's motion for summary judgment; other facts have developed to the point that the factual allegations in the complaint have proven to be incorrect.

Although this Court relies on many of the legal conclusions set forth in its 2008 Memorandum Opinion, the Court must revisit the issues raised by Countrywide in light of the development of a factual record.

Nevertheless, the background of the case is set forth in the 2008 Memorandum Opinion and will not be repeated here.  Instead, that opinion is incorporated by reference.

Countrywide claims that summary judgment should be granted because:

1.      Claims for violation of the discharge injunction are inapplicable to Countrywide's conduct and should be dismissed;

2.      There is no evidence that the automatic stay was violated by Countrywide's alleged conduct;

3.      There is no evidence that Countrywide's actions violated the chapter 13 plans or the orders confirming the chapter 13 plans;

4.      There is no evidence that Countrywide violated § 506(b) or Rule 2016(a) because any "unapproved" fees were not assessed against the estate;

5.      There is no "breach of contract" cause of action that exists separately from the "violation of the plan" cause of action; and

6.      There are no damages from Countrywide's alleged conduct because it did not actually collect any unapproved fees and expenses.

As set forth below, summary judgment is granted on the first two points, denied on points three and four, granted on the fifth point, and granted in-part and denied in-part on the sixth point.

**Jurisdiction**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.  This is a core proceeding under § 157(b)(2).

**Summary Judgment Standard**

Summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009). FED. R. BANKR. P. 7056 incorporates Rule 56 in adversary proceedings.[1]

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine issue of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine issue of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5 th Cir. 2008) ("A genuine issue of material fact exists

---

[1] Rule 56 was amended, effective December 1, 2007.  Although most changes were stylistic, the changes to Rule 56(c) were substantive.  Prior to the amendment, Rule 56(c) provided that the Court "shall" grant summary judgment if the relevant criteria were met.  Effective December 1, 2007, the word "shall" was changed to "should".  The Committee Notes to the 2007 amendment state that the word "[s]hould" was substituted for "shall" to recognize that, "although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact." FED. R. CIV. P. 56 advisory committee's notes (2007). As one commentator noted, "even when a motion for summary judgment is properly made and supported, it need not be granted . . . [s]uch a motion may be granted - indeed, it should be granted - but it does not have to be granted."  Bradley S. Shannon, *Should Summary Judgment Be Granted?*, 58 Am. U. L. Rev. 85, 95 (2008).

if a reasonable jury could enter a verdict for the non-moving party."); *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008). A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009); *LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Nevertheless, a court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F. 393, 405 (5th Cir. 2003). The Court should not weigh the evidence inasmuch as a credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003); *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Sossamon*, 560 F.3d at 326; *U.S. v. 92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). The non-moving party has a duty to respond with specific evidence demonstrating a disputed fact issue. *Celotex Corp. Cattrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *92,203.00 in United States Currency*, 537 F.3d at 507. When identifying specific evidence in the record, the non-movant must "articulate the manner in which that evidence supports that party's claim."

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004); *Raga v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

If the movant does not bear the burden of proof, the movant must show the absence of sufficient evidence to support an essential element of the opposing party's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412; *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006). Movants who do not bear the ultimate burden of proof often seek summary judgment after discovery has produced insufficient evidence to support the non-moving party's claims. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The non-movant must "go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue" rather than relying on conclusory allegations. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163–64 (5th Cir. 2006); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Ultimately, the motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

### Motion to Strike

As a preliminary matter, the Court addresses Plaintiffs' motion to strike the Declaration of Kelly May ("May Declaration"). Countrywide submitted the May Declaration on September 29, 2009 in support of its Motion for Summary Judgment. Ms. May is employed by Countrywide as the Vice President of Bankruptcy Management and is responsible for supervising Countrywide's bankruptcy operations.

Plaintiffs move to strike the entire May Declaration. However, in resolving motions to strike, courts must use "a scalpel, not a butcher knife." *Perez v. Volvo Car Corp.*, 247 F.3d 303,

315 (1st Cir. 2001).  Thus, courts may only strike the improper portions of an affidavit. *Id.*  The striking of improper portions includes the removal of conclusory statements of fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

The May Declaration includes conclusory statements of fact.  Accordingly, the Court strikes the following conclusory statements:

1.      "The deficiency listed on the November 15, 2007 notice of default resulted from the post-petition payments Ms. Rodriguez either missed or paid in the wrong amount, as well as contractual late charges incurred as a result of those delinquent post-petition monthly payments. None of the amounts listed in the November 15, 2007 notice of default or the subsequent monthly statement sent to Ms. Rodriguez on November 29, 2007 included pre-petition debts or debts paid through Rodriguez's Plan.  Nor did they include any amounts for reimbursable expenses."  May Declaration, ¶ 9.

2.      "When Countrywide began servicing the Herrera loan, it was seriously delinquent . . . ." May Declaration, ¶ 11.

3.      "On or about December 31, 2007, Countrywide sent the Herreras a Monthly Statement that listed . . . inspection and other fees totaling $238.67 that had been incurred after the Herreras filed for bankruptcy protection." May Declaration, ¶ 14.

4.      "On December 3, 2007, Countrywide sent the Morenos a notice of default, which identified uncollected reimbursable expenses in the amount of $2,719.53.  Countrywide incurred $1,231.98 of that when the Morenos were not in bankruptcy, and an additional $111.00 resulted from post-bankruptcy reimbursable expenses." May Declaration, ¶ 23.

The foregoing statements in the May Deposition are conclusory statements that fail to set forth with specificity how and when the respective charges, fees, and costs were incurred. Instead of submitting blanket assertions of total the amounts that are due, Countrywide should have provided an itemized fee break-down illustrating Countrywide's basis for claiming that such amounts were due. Accordingly, the Court strikes paragraphs 9, 11, 14 and 23 of the May Declaration. The remaining contents of the May Declaration are allowed.

Furthermore, Countrywide submitted an amended Declaration of Kelly May on November 9, 2009, over two weeks after the Court's October 22, 2009 hearing on Countrywide's Motion for Summary Judgment. Under FED. R. CIV. P. 6(b), "the trial court has broad discretion to accept late filed affidavits, 'where the failure to act was the result of excusable neglect.'" *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) (citing FED. R. CIV. P. 6(b)). "Absent an affirmative showing of excusable neglect, a trial court does not abuse its discretion in refusing an untimely proffer." *Id.* (citations omitted).

In *Slaughter*, the Fifth Circuit affirmed the district court's refusal to accept additional supporting affidavits filed after the court held a summary judgment hearing. *Id.* The Fifth Circuit noted that excusable neglect was lacking because "the late-filed affidavits were prepared long before the summary judgment motion was filed." *Id.*

Based on *Slaughter*, the Court refuses to consider the amended Declaration of Kelly May. The amended declaration states, almost verbatim, the same information that is contained in the May Declaration. The only significant difference is that the amended declaration includes business records that were omitted from the May Declaration. Countrywide could have provided the business records when it submitted the May Declaration, but it chose not do so. Accordingly, since Countrywide could have submitted the business records with the May Declaration, the

Court refuses to consider the late-filed amended Declaration of Kelly May. *See Id.* (finding that the "tactical decision" to withhold affidavits does not amount to "excusable neglect.").

Furthermore, Ms. May was deposed in December 2008 and Ms. May did not have any personal knowledge of the respective Plaintiffs' cases.  Although Plaintiffs subsequently had the opportunity to re-depose Ms May, the Court, in its discretion, finds that Countrywide should not be allowed to submit additional testimony from Ms. May at this time.

### Summary Judgment Granted on Discharge Injunction

Plaintiffs claim that Countrywide, by attempting to recover certain expenses and threatening to foreclose if the expenses were not paid, violated the discharge injunction under §§ 524 and 1328.  However, Plaintiffs' argument fails to fully appreciate the extent to which mortgagees hold a special status in a chapter 13 bankruptcy case. *See Cano v. GMAC Mortgage Corp. (In re Cano)*, 410 B.R. 506, 529 (Bankr. S.D. Tex. 2009).  As set forth below, because of this special status, the claims held by home mortgage lenders are not discharged at the conclusion of a successful chapter 13 bankruptcy case and, therefore, are not subject to the discharge injunction. *Id.* at 532.  Accordingly, summary judgment is granted on all claims that Countrywide violated the discharge injunction in these cases.

There are three statutory provisions that, construed together, remove home mortgages from the discharge provisions of chapter 13.  First, § 1322(b)(2), the "anti-modification" provision, prohibits a chapter 13 plan from modifying the rights of the holders of claims secured by home mortgages.[2] 11 U.S.C. § 1322(b)(2).  As previously explained by this Court:

> The provision effectively incorporates a mortgage lender's pre-petition mortgage contract into the chapter 13 plan by precluding modification of the mortgage lender's contractual rights.  Accordingly, a chapter 13 plan may not reduce the

---

[2] Section 1322(b)(2) provides, in relevant part, that  a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . ." 11 U.S.C. § 1322(b)(2).

> lender's claim to the value of the collateral under § 506. A plan may not alter the contractual interest rate. Nor may the plan exclude collection of fees and costs incurred post-petition and allowed by the mortgage contract.

*Id.* at 529 (citations omitted).

Section 1322(b)(2)'s broad prohibition of modifications to mortgage agreements is limited, however, by § 1322(b)(5), which permits certain narrow modifications.[3] *See Cano*, 410 B.R. at 531 ("Section 1322(b)(2) prohibits a plan from modifying a mortgage lender's contract rights other than the modifications allowed by § 1322(b)(5)."). Section 1322(b)(5), irrespective of the terms of the mortgage contract, allows modification of home mortgages for the purpose of enabling debtors to "cure mortgage arrearages and maintain current payments through a chapter 13 plan." *Id.* at 529. Thus—even if the lender is entitled to accelerate the loan or foreclose on the home under the mortgage contract—§ 1322(b)(5) gives debtors the opportunity to keep their homes by curing defaults and maintaining payments under the chapter 13 plan. *Id.* at 530. As explained by the Fifth Circuit, a primary purpose of chapter 13 and § 1322(b)(5) is "to provide homeowners with the continuing right to cure defaults and preserve their primary asset." *Mendoza v. Temple-Inland Mortgage Corp. (In re Mendoza)*, 111 F.3d 1264, 1269 (5th Cir. 1997).

Section 1322(b)(5) allows mortgage payments to be cured and maintained, but does not provide a discharge mechanism. The applicable discharge provisions are contained in §§ 524 and 1328. Section 1328 "grants the debtor a discharge of most debts provided for by the chapter 13 plan" upon the completion of all plan payments. *Rodriguez*, 396 B.R. at 442. Upon the Court's grant of a discharge order, the "debtor is immune from *personal liability* on any

---

[3] Section 1322(b)(5) provides that the plan may "notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due[.]" 11 U.S.C. § 1322(b)(5).

discharged debt."[4] *Id.* (emphasis added).   The discharge order is effectuated through § 524's discharge injunction, which bars creditors from attempting to collect a discharged debt. *Id.*; *see also Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 449, 124 S. Ct. 1905, 158 L. Ed. 2d 764 (2004) ("The discharge order releases a debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt and by operating as an injunction to prohibit creditors from attempting to collect or to recover the debt.") (citations omitted).

Plaintiffs claim that Countrywide violated the discharge order in their respective bankruptcy cases.   However, the Bankruptcy Code does not provide that all debts are discharged in chapter 13. *Id.*   Among other debts, § 1328(a) excepts any debt "provided for under section 1322(b)(5)" from discharge. 11 U.S.C. § 1328(a)(1).

Read in concert with § 1322(a)(2), §§ 1322(b)(5) and 1328(a)(1) bar the discharge of home mortgage debts.   Section 1322(a)(5) enables debtors to keep their homes by curing arrearages and maintaining plan payments.   It provides the "continuing right" to maintain a mortgage account. *Mendoza*, 111 F.3d at 1269.   But § 1328(a)(1) explicitly provides that arrearages are not discharged.   Further, § 1322(a)(2) bars the chapter 13 plan from modifying the mortgage contract, except to bring debtors current under their contract.   The debtor has no power to alter, reduce or eliminate the mortgage debt except by making mortgage payments.[5] Therefore, unless the mortgage debt is fully paid under the plan, the debtor must continue to

---

[4] The discharge eliminates a debtor's personal liability on a debt, but it does not prohibit an action in rem against property of the debtor that is subject to a valid lien. *See Dewsnup v. Timm*, 502 U.S. 410, 418, 112 S. Ct. 773, 116 L. Ed. 2d 903 (1992).

[5] This differs from the debtor's power with respect to other secured creditors.   For example, debtors are regularly able to "strip down" the value of liens held by non-mortgagee secured creditors when the creditor is undersecured. *In re Estrada*, 387 B.R. 875, 879 (Bankr. M.D. Fla. 2008).   A creditor is undersecured when the collateral is worth less than the debt it secures.   Through "strip down," the debtor is able to reduce the secured debt to the value of the collateral and the remaining deficiency becomes unsecured debt. *Id.*

make monthly payments according to the mortgage contract after the debtor has completed the chapter 13 plan. Essentially, the three provisions enable (i) debtors to keep their homes when they were previously in default and likely in danger of losing their homes pre-bankruptcy, (ii) debtors to cure post-petition arrearages, and (iii) mortgage contracts to survive bankruptcy and continue to bind the parties after the successful conclusion of a chapter 13 case.

At oral argument, the Court repeatedly inquired of Plaintiff's counsel how a discharge could be imposed against a home lender. There was an extensive discussion of §§ 1322(b)(2), 1322(b)(5) and 1328(a)(1). Counsel was able to fully explain the importance and benefits of a discharge. But, counsel was unable to provide a statutory basis upon which the Court could grant a discharge of home mortgage debt. The Court finds that no statutory basis exists for discharging home mortgage debt.

The Court is well aware that a primary purpose of chapter 13 is to enable debtors to receive a "fresh start." The fresh start:

> [G]ives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. The various provisions of the Bankruptcy Act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act.

*Local Loan Co. v. Hunt,* 292 U.S. 234, 244-45, 54 S. Ct. 695, 699, 78 L. Ed. 1230 (1934). The discharge of preexisting debt, and the concomitant discharge injunction, play a major role in providing the debtors with this fresh start. However, the discharge is not the only way in which chapter 13 debtors are provided with a fresh start.

In the mortgage context, homeowners receive a fresh start through the ability to stave off foreclosure, cure arrearages, and maintain mortgage payments. This gives homeowners the

opportunity to remain in their homes and emerge from bankruptcy current on their mortgage payments.

Furthermore, the absence of a discharge does not preclude other legal remedies. Principles of res judicata apply in bankruptcy cases. *See Stoll v. Gottlieb*, 305 U.S. 165, 59 S. Ct. 134, 83 L. Ed. 104 (1938). For example, if the Court determines the amount required to cure a mortgage arrearage, the Court's determination has the same effect as any other Court judgment. If the Court errs, the parties must appeal the order rather than ignore it. Thus, although a mortgage arrearage is not discharged, the amount of the arrearage is established by the Court's judgment and a mortgage lender cannot wait until a bankruptcy case has closed to claim that a greater amount was needed to cure an arrearage. Similarly, principles of estoppel also apply in bankruptcy cases. For instance, a lender may not stipulate to one cure amount, and then decide that it has erred and seek more money after the conclusion of a chapter 13 bankruptcy case. *See also In re Simmons*, 379 B.R. 143, 150 (Bankr. N.D. Ill. 2007) (rejecting mortgagee's attempt— nearly two years after plan confirmation—to collect $35,066.35 in prepetition arrearages when GMAC originally filed a proof of claim for $19,748.78 in arrearages). But, the foregoing principles that are so stressed by the Plaintiffs are not the equivalent of a discharge.

Summary judgment is granted on all claims that Countrywide violated the discharge injunction in these cases.[6]

---

[6] Plaintiffs filed a supplemental brief on November 6, 2009 citing cases holding that post-discharge, undisclosed fees were discharged. Nevertheless, the Plaintiffs failed to provide a statutory basis for the relief they seek. In fact, one of the cases acknowledges that the interpretation of the statutory framework adopted by this Court is "literally correct." *See In ree Eddins*, 2008 WL 4905477, *2 (Bankr. N.D. Miss. October 20, 2008). The Court is not persuaded that it should depart from the unambiguous statutory framework and delve into the realm of policy on this point.

**Summary Judgment Granted On Automatic Stay Violations**

Plaintiffs allege that Countrywide impermissibly applied a portion of their mortgage payments to the payment of legal fees and other charges rather than to the principal, interest and escrow payments due under their loans.  Countrywide acknowledges that such applications of funds existed, although on a smaller scale than what is alleged by the Plaintiffs.  At this stage, the Court is satisfied that there is evidence supporting Plaintiffs' claims, at least to an extent.

The issue is whether such conduct—if ultimately proven—violates the automatic stay. Plaintiffs correctly cite several recent opinions by highly respected bankruptcy judges holding that such misapplications of plan payments violate the stay. *In re Jones*, 366 B.R. 584, 599 (Bankr. E.D. La. 2007), aff'd 391 B.R. 577 (E.D. La. 2008); *In re Sanchez,* 372 B.R. 289, 313 (Bankr. S.D. Tex. 2007); *In re McCormack*, 203 B.R. 521, 525-26 (Bankr. D.N.H. 1996); *In re Payne*, 387 B.R. 614, 638-39 (Bankr. D. Kan. 2008).  However, Plaintiffs do not state precisely which provision of the automatic stay has been violated.

Accordingly, the Court must evaluate the statute's plain language to determine whether the misapplication of payments voluntarily made by debtors violates the automatic stay. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.").  There are eight prohibitions contained in § 362(a). 11 U.S.C. § 362(a).  Each is evaluated below:

| Section | Description of Action that is Barred | Analysis |
| --- | --- | --- |
| **§ 362(a)(1)** | Continuation of a lawsuit or other proceeding. | Payment was voluntary and not the result of a lawsuit or other proceeding. |
| **§ 362(a)(2)** | Enforcement of a judgment. | Payments were voluntary and not the result of a judgment. |

| § 362(a)(3) | Acts to obtain possession of estate property or to exercise control over estate property. | Countrywide received a voluntary payment. If it had been properly applied, there could have been no complaint about the receipt of the funds. Once received, the funds became Countrywide's property. As explained in more detail below, although Countrywide may have been obligated by the plan and the confirmation order to credit the payment as provided in the plan, the funds belonged to Countrywide, obviating any claim of improper exercise of control over *estate* property. |
| :--- | :--- | :--- |
| § 362(a)(4) | Creation, perfection or enforcement of liens against estate property. | The alleged misapplication was not the creation, perfection or enforcement of a lien. |
| § 362(a)(5) | Creation, perfection or enforcement of liens against debtor property. | The alleged misapplication was not the creation, perfection or enforcement of a lien. |
| § 362(a)(6) | Acts to collect, assess or recover pre-petition claims. | Countrywide's actual claim is a prepetition claim. The fees allegedly charged by Countrywide arose post-petition. The Debtors made the payment voluntarily. The receipt and cashing of the check could not violate the automatic stay unless this provision was interpreted so broadly as to make the collection and application of all post-petition voluntary payments a stay violation. |
| § 362(a)(7) | Setoff of mutual debts. | This is not alleged to be a setoff. |
| § 362(a)(8) | Continuation of certain Tax Court proceedings. | Obviously, not applicable. |

Accordingly, the Court finds that the plain language of § 362 does not apply to Countrywide's conduct.

Further, the Plaintiffs have not persuaded the Court that it should depart from the plain language of § 362 in this case. Plaintiffs rely on *Jones*, where the Court held that the stay was violated because the misapplied funds were property of the estate:

> Wells Fargo charged Debtor's account with unreasonable fees and costs; failed to notify Debtor that any of these postpetition charges were being added to his account; failed to seek Court approval for same; and paid itself out of estate funds

> delivered to it for the payment of other debt. All of this was accomplished without notifying anyone, Debtor, the Trustee, or the Court, that Wells Fargo was assessing postpetition charges and diverting estate funds for their satisfaction.

*Jones*, 366 B.R. at 600.

This Court cannot agree with *Jones*. The linchpin of *Jones* is that Wells Fargo "paid itself out of estate funds delivered to it for the payment of other debt." *Id.* Respectfully, this is not an accurate description. Wells Fargo cashed the check it received from the debtor. There was no stay violation from the cashing of the check. *See Padilla v. Wells Fargo Home Mortgage, Inc. (In re Padilla)*, 379 B.R. 643, 664 (Bankr. S.D. Tex. 2007) ("The conduct in question involves two separate acts: an initial deposit within a general account, and a latter allocation from the general account to individual accounts. The first act involved 'property of the estate', the second did not. Only the second act, involving non-estate property, was allegedly wrongful."). When the funds were then applied by Wells Fargo, they were misapplied. But, at that stage, they were no longer estate funds. *See Citizens of Md. v. Strumpf*, 516 U.S. 16, 21, 116 S. Ct. 286, 113 L. Ed. 2d 258 (1995) (holding that the breach of a promise to disburse funds, without a physical taking or possession, does not violate § 362(a)(3)).

There is, indeed, a problem with the conduct described in *Jones*. However, the problem is not a violation of the stay as § 362 simply does not apply to Countrywide's conduct. *See Padilla*, 379 B.R. at 665 ("[T]he posting of an item from one internal account to another is not an act to obtain possession of estate property . . . . The improper allocation of payments may violate the confirmed plans, but does not violate the automatic stay.").

The Court also respectfully disagrees with the remaining cases relied upon by Plaintiffs. *Sanchez* adopts the reasoning in *Jones* and is rejected by this Court for the same reasons set forth above. *See Sanchez*, 372 B.R. at 313. *McCormack* does not specify which part of § 362 is

violated. *McCormack*, 203 B.R. at 525-26.   Although *Payne* contains no specific subsection reference, the Court reads *Payne* to hold that the stay violation was the misapplication of estate funds. *Payne*, 387 B.R. at 638-39.   The Court reiterates that the misapplication of funds already received by a lender does not constitute a violation of § 362(c)(3).

Accordingly, since the Court will not depart from § 362's plain language, summary judgment is granted to Countrywide with respect to the alleged violations of the automatic stay.

### Summary Judgment Denied on Violations of Plans or Confirmation Orders

Plaintiffs claim that Countrywide violated their bankruptcy plans and the orders confirming their plans.   Countrywide opposes Plaintiffs' allegations.   However, Countrywide admits that, after the conclusion of Plaintiffs' respective cases, it sent notices of foreclosure based on amounts that were either (i) cured by the plan; (ii) not authorized by Rule 2016; (iii) in breach of stipulations made with the Debtors; or (iv) mistakenly excluded from prior notices of default.   Countrywide also acknowledges that it misapplied plan payments in the Rodriguez case. As set forth below, given the summary judgment evidence presented and Countrywide's admissions, summary judgment is denied on this issue.

11 U.S.C. § 1327(a) provides that the "provisions of a confirmed plan bind the debtor and each creditor . . . ." 11 U.S.C. § 1327(a).   Accordingly, the Court order confirming a debtor's plan "imposes reciprocal rights and obligations on the debtor and the mortgage lender." *Cano*, 410 B.R. at 531.

The debtor is obligated to make timely payments to the mortgage lender and to protect the lender's collateral. *Id.*   If the debtor fails to meet its obligations, the lender may "seek relief such as dismissal of the case or termination of the automatic stay." *Id.*

16 / 36

The obligations placed upon the mortgage lender ensure that the debtor has the opportunity to "cure arrearages and emerge from bankruptcy no longer facing foreclosure because of default." *Id.* The mortgage lender is obligated to "allocate payments amongst principal, interest, and arrearages in the manner prescribed by the plan." *Id.* If, for example, the mortgage lender "allocates payments that the plan dedicates to pre-petition arrearages to principal and interest or to a post-petition charge, without court approval, the mortgage lender violates the plan and may be subject to liability for violating the order confirming the plan." *Id.* As discussed below, the mortgage lender is also obligated to abide by FED. R. BANKR. P. 2016, which requires a mortgage lender to file a Rule 2016 application before collecting any reimbursable fees and costs during the pendency of a chapter 13 case. *Id.* at 532.

Due to the unique facts surrounding each case, the Court separately addresses each of the Plaintiffs' claims.

### i. The Rodriguez Case

In the Rodriguez case, Countrywide stipulated to a pre-petition mortgage deficiency of $8,919.38 and a post-petition mortgage deficiency of $3,051.52 that would be paid by the trustee through the Rodriguez's plan. Rodriguez paid both of these arrearages by the time she received her discharge on August 27, 2007.

Furthermore, pursuant to an agreed order entered into between Rodriguez and Countrywide during Rodriguez's case, Countrywide was required, in the event of a default, to send Rodriguez notice of such default. The parties agree that Countrywide subsequently sent Rodriguez notice of default on two occasions and that *Rodriguez cured the amounts stated in the default notices*. Rodriguez alleges that, except for the two notices of default, Rodriguez's post-

confirmation monthly mortgage statements did not show any past due amounts or delinquent fees.[7]

However, after Rodriguez completed her plan payments and was granted a discharge, Rodriguez received notice from Countrywide that she was in default in the amount of $8,837.20. The notice further stated that Countrywide was accelerating Rodriguez's debt and setting a foreclosure sale for March 4, 2008.

Countrywide claims that the two previous default notices mistakenly understated the amount owed by Rodriguez. Countrywide states that it did not realize its errors until after Rodriguez received her discharge.  Similarly, Countrywide claims that the monthly mortgage statements, which showed that Rodriguez's account was current, mistakenly failed to disclose that Rodriguez was actually seriously delinquent on her payments.   Thus, according to Countrywide, Rodriguez owed Countrywide $8,837.20 in mortgage payments and late fees at the time Rodriguez received her discharge.   Countrywide claims that the majority of the money owed by Rodriguez was due to Rodriguez's failure to make full monthly mortgage payments during her case.

Countrywide further admits that it misapplied $92.00 of a mortgage payment made by either the trustee or Rodriguez.   The $92.00 was apparently credited towards the payment of undisclosed inspection fees that were not provided for in the plan.

Based on the evidence presented, the Court finds that Countrywide may have violated Rodriguez's plan and the order confirming Rodriguez's plan.   Accordingly, summary judgment is denied.

---

[7] In Countrywide's supplemental brief, Countrywide argues that the agreed order with Rodriguez did not require Countrywide to demand all delinquent amounts.  This argument raises additional questions of fact that the Court is unable to resolve at this time.

### ii.  The Herreras' Case

In the Herreras' case, Plaintiffs claim that Countrywide assessed and collected numerous relatively small fees that were not approved by the Court.  At the time of the Herreras' bankruptcy filing, their fee balance was $38.86, according to the Plaintiffs.  Plaintiffs allege that Countrywide secretly charged the Herreras $200.00 for bankruptcy fees and at least $190.00 for post-petition inspection fees.  Plaintiffs further claim that Countrywide collected at least a portion of these hidden fees post-confirmation by misapplying mortgage payments made by either the trustee or the Herreras.  Countrywide denies misapplying plan payments but has not offered sufficient evidence for the Court to conclude that no such misapplications occurred.

Countrywide also admits that it failed to abide by the June 22, 2009 agreed order that Countrywide entered into with the Herreras.  The agreed order provided that $8,327.00 in unpaid pre-petition arrearages—which were not originally included in the Herreras' confirmed plan— would be added to the Herreras' principal balance and would be paid through regular monthly payments on an extended loan term.  The agreed order further stated that once the Herreras paid $1,274.99, they would be treated as current on their mortgage.  The Herreras subsequently made the $1,274.99 payment, received their discharge on August 24, 2007 and thereafter continued to make their monthly mortgage payments.

Nevertheless, on December 17, 2007, Countrywide sent the Herreras a notice of default stating that they owed $8,793.13.  The letter informed the Herreras that Countrywide would institute foreclosure proceedings if the Herreras did not make the $8,793.13 payment by January 21, 2008.[8]  This $8,793.13 amount included the $8,327.00 in arrearages that Countrywide had agreed would be paid by the Herreras over an extended period of time post-discharge.

---

[8] Countrywide states that this was due to an administrative error whereby Countrywide's non-bankruptcy servicing records were not updated to reflect the agreed order.

Countrywide also admits that the $8,793.13 amount included inspection and other fees totaling $238.67, but does not explain the basis for the remaining charge of $227.46.[9] Countrywide claims that it was permitted to charge the Herreras $238.67 under their agreed order.  Plaintiffs argue that the $238.67 charge was for hidden fees that were never disclosed to anyone during the bankruptcy or approved by the Court.  Alternatively, Plaintiffs claim that to the extent the $238.67 fee was included in the agreed order, it was supposed to be added to the balance of their loan along with the $8,327.00 in pre-petition arrearages and paid over an extended period of time.  The Court finds that the $238.67 inspection fees and the unknown charge of $227.46 raise additional questions regarding fees charged by Countrywide.

Given (i) Countrywide's admission that it failed to abide by an agreed order modifying the Herreras' plan and, (ii) the remaining genuine issues of material fact regarding the posting and collection of fees, the Court denies summary judgment on this issue.

### iii. The Morenos' Case

In the Morenos' case, Countrywide filed a proof of claim on November 30, 2001 in the amount of $4,641.57.  There is no dispute that this arrearage was satisfied by the time the Morenos received their discharge on December 27, 2006.

There is also no dispute that Countrywide attempted to collect $2,719.53 in fees and costs after the Morenos received a discharge and that Countrywide threatened to foreclose if the full amount was not paid quickly.  Countrywide claims that it did not need Court authorization for $1,231.98 of the $2,719.53 because $1,231.98 was incurred during two separate periods when

---

[9] $8,793.13 – $8,327.00 – $238.67 = $227.46.

the Morenos' case was dismissed.[10]   The Plaintiffs dispute when the $1,231.98 in fees were incurred.   Plaintiffs also allege that the entire $2,719.53 arose from hidden fees that were never disclosed during the pendency of the Morenos' case.   The evidence suggests that at least a portion of the fees charged by Countrywide were either permissible or authorized.   Nevertheless, at this time, the Court is unable to find that Countrywide conducted itself appropriately with regard to all of the fees charged to the Morenos.[11]

The Plaintiffs further argue that Countrywide misapplied a portion of the mortgage payments made by either the Morenos or the trustee to pay undisclosed fees.   Countrywide disagrees with this contention but has not offered evidence to support its position.

The Court concludes that there are genuine issues of material fact yet to be resolved in this case.   Specifically, Countrywide has failed to show that there is an absence of evidence that the Morenos' plan payments were misapplied.   The evidence suggests that Countrywide may have violated the Morenos' plan and the order confirming the plan.   Accordingly, summary judgment is denied.

### Summary Judgment Denied on 2016 Violations

Plaintiffs claim that Countrywide violated FED. R. BANKR. P. 2016[12], which "requires any party who seeks compensation from a debtor's estate to file with the court an application setting

---

[10] The Morenos case was dismissed on March 13, 2003.  The Court vacated the first dismissal order on April 3, 2003.     The case was dismissed again on January 22, 2004.  The Court vacated the second dismissal order on February 24, 2004.

[11] Countrywide filed a supplemental brief arguing that any actions taken by Countrywide with respect to the Morenos while their case was dismissed were not subject to the automatic stay, Rule 2016, or any other provision of the Code or Rules.  The Court declines to rule on this issue at this time due to unresolved fact questions concerning what actions were actually taken by Countrywide while the Morenos' case was dismissed.

[12] Rule 2016 provides: "An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested . . . .  *The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the*

forth the source of the costs and the amounts requested." *Cano*, 410 B.R. at 532. "Under the plain language of Rule 2016, a mortgage lender must file a Rule 2016 application before collecting any reimbursable fees and costs while a chapter 13 case remains pending." *Id.*

Plaintiffs allege that Countrywide violated Rule 2016 and impeded their right to a fresh start by (i) secretly diverting monthly mortgage payments to pay undisclosed fees and expenses assessed during the course of Plaintiffs' bankruptcies, and (ii) seeking to collect the remaining undisclosed fees and expenses after the Plaintiffs had emerged from bankruptcy.

Countrywide responds that it did not actually collect any unapproved fees from the Plaintiffs' estates and therefore did not violate Rule 2016. Countrywide admits[13] that it attempted to collect fees and expenses, which accrued during the Plaintiffs' cases, *after* the Plaintiffs had emerged from bankruptcy. Countrywide also admits that it threatened foreclosure on account of the unpaid fees and expenses.

But, according to Countrywide, Plaintiffs' estates ceased to exist upon the confirmation of Plaintiffs' bankruptcy plans.[14] Countrywide alleges that because a debtor's post-confirmation income is not an estate asset, Countrywide did not violate Rule 2016. Since, according to Countrywide, Rule 2016 does not apply to post-confirmation collection activity, Countrywide claims that Rule 2016 also does not to apply to the collection activity at issue in this case; namely, the collection of fees and expenses that are assessed during bankruptcy but not collected until post-bankruptcy.

---

*application is filed by a creditor or other entity.* Unless the case is a chapter 9 municipality case, the applicant shall transmit to the United States trustee a copy of the application." FED. R. BANKR. P. 2016 (emphasis added).

[13] In the Morenos' case, Countrywide admits that it sought to collect $1,486.55 in expenses after the Morenos were discharged and that at least $647.00 of the expenses sought were assessed during the Morenos' bankruptcy case. In the Herreras' case, Countrywide admits that it sought to collect $238.67 in fees and expenses, which accrued during the Herreras' bankruptcy case, after the Herreras received their discharge.

[14] As discussed below, Countrywide also argues, in the alternative, that the a debtor's estate exists post-confirmation only to the extent necessary for the satisfaction of the plan.

The Court will address each prong of Countrywide's argument separately. First, whether Rule 2016 applies to post-confirmation collection activity and, second, whether Rule 2016 applies to fees and expenses assessed during bankruptcy but not collected until post-bankruptcy.

### i.   Application of Rule 2016 Post-Confirmation

Countrywide filed a supplemental brief on November 9, 2009. In its brief, Countrywide stated that Rule 2016 is inapplicable to acts to collect from post-confirmation income of debtors because post-confirmation income is not estate property. Accordingly, Countrywide alleges that Rule 2016 does not apply to its attempt to collect fees and expenses from the debtor post-bankruptcy.

Countrywide's argument is based on 11 U.S.C. § 1327(b), which provides, "[e]xcept as otherwise provided in the plan or the order confirming the plan, the *confirmation of a plan vests all of the property of the estate in the debtor.*" 11 U.S.C. § 1327(b) (emphasis added). Thus, according to Countrywide, Rule 2016 is inapplicable post-confirmation because at confirmation the estate ceases to exist, and Rule 2016 only applies when an entity seeks compensation from the estate.

Although this Court does not see a conflict under the facts of this case, as discussed below, other Courts have found that a conflict exists between §§ 1327(b) and 1306(a). *See Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340 (11th Cir. 2000); *Black v. United States Postal Serv. (In re Heath)*, 115 F.3d 521, 524 (7th Cir. 1997); *Kolenda v. Annese*, 212 B.R. 851, 853 (Bankr. W.D. Mich. 1997); *In re Petruccelli*, 113 B.R. 5, 9 (Bankr. S.D. Cal. 1990). Section 1306(a) provides, in part, that property of the estate includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 21 of this title . . . ." 11 U.S.C.

§ 1306(a)(2).  Thus, under § 1306(a)(2), income received post-confirmation remains property of the estate until the case is closed, dismissed or converted.

The supposed conflict involves whether income received by the debtor post-confirmation is property of the debtor or the estate under §§ 1327(b) and 1306(a)(2).  Under § 1306(a)(2), all of the debtor's post-petition income is property of the estate until the case is closed, dismissed or converted.  Section 1327(b), on the other hand, provides that unless stated otherwise in the plan, the confirmation of the plan vests all of the property of the estate in the debtor.

Courts have generally dealt with this supposed conflict using one of four approaches: The "reconciliation" approach, "estate termination" approach, "estate transformation" approach, and "estate preservation" approach.  The "reconciliation" approach gives full meaning to the plain text of both §§ 1306(a) and 1327(b), and has been adopted by a majority of the Circuit Courts who have confronted the issue.   As discussed below, the Court adopts the reconciliation approach today.  The estate termination approach holds that the chapter 13 estate terminates upon confirmation of the plan.  The estate transformation approach provides that the chapter 13 estate terminates on confirmation of the plan, except as is necessary to fund payments to be made through the chapter 13 trustee. The estate preservation approach holds that no estate property leaves the estate until the chapter 13 plan is completed.

The first approach, which has been adopted by three Circuit Courts, is the reconciliation approach.  The reconciliation approach harmonizes the two statutory provisions by giving full meaning to both.  It correctly finds that there is no conflict between §§ 1306(a) and 1327(b).  As was explained by the Eleventh Circuit in *Waldron*:

> While the case is pending, the post-petition property ... [is] added to the estate until confirmation, the event that triggers [section] 1327(b) and "vests" the property of the estate in the debtor. That is, the property interests comprising the pre-confirmation estate property are transferred to the debtor at confirmation, and

this "vesting" is free and clear of the claims or interests of creditors provided for by the plan, [section] 1327(b), (c). Finally, the property of the estate once again accumulates property by operation of [section] 1306(a) until the case is "closed, dismissed, or converted."

*In re Waldron*, 536 F.3d 1239, 1243 (11th Cir. 2008) (quoting *City of Chicago v. Fisher (In re Fisher)*, 203 B.R. 958, 962 (N.D. Ill. 1997). Thus, under *Waldron*, future, post-confirmation earnings are property of the estate.

The Court follows *Waldron's* reconciliation approach because it is the only one of the four approaches that interprets §§ 1327(b) and 1306(a)(2) in harmony. The Court sees no reason to follow an approach that varies from the plain text of the Bankruptcy Code. *See Morton v. Mancari*, 417 U.S. 535, 552, 94 S. Ct. 2474 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); *United States v. Caldera-Herrera*, 930 F.2d 409, 411 (5th Cir. 1991) ("Where possible statutes must be read in harmony with one another so as to give meaning to each provision.").

Section 1306(a)(2) provides that "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted" are property of the estate. Section 1327(b) provides that, unless otherwise stated, "the confirmation of the plan vests all of the property of the estate in the debtor." The two statutes can be reconciled by treating all post-confirmation, *future income* as property of the estate. Thus, at confirmation, all of the property that is *currently* property of the estates could vest in the debtor; and all of the debtor's future income would still be estate property. *See also In re Reynard*, 250 B.R. 241, 246 (Bankr. E.D. Va. 2000) ("The only manner in which the two provisions can be read in harmony is if the assets of the chapter 13 estate as of the date of the confirmation of the

chapter 13 plan vest in the debtor, the estate continues and the assets set out in § 1306(a) acquired after confirmation become property of the chapter 13 estate when acquired.").

The First and Eight Circuits have also adopted the reconciliation approach.  In *Barbosa*, the First Circuit recognized that "by virtue of sections 1327(b)-(c), property of the estate at the time of confirmation vests in the debtors free of any claims from the creditors." *Barbosa v. Solomon*, 235 F.3d 31, 36 (1st Cir. 2000).  Nevertheless, the First Circuit determined that "the *estate does not cease to exist* . . . and it continues to be funded by the Debtors' regular income and post-petition assets as specified in section 1306(a)." *Id.* (emphasis added).  Similarly, in *Neiman*, the Eight Circuit held:

> We join the line of cases holding the estate continues to exist after confirmation of the Chapter 13 plan. Upon reviewing § 1327 regarding the effect of confirmation, even if property of the estate vests in the debtor at confirmation, that does not necessarily mean that the estate no longer exists. The estate can continue to exist as a legal entity after confirmation even if it holds no property.

*Sec. Bank of Marshalltown Iowa v. Neiman*, 1 F.3d 687, 690 (8th Cir. 1993).

Additionally, the reconciliation approach makes practical sense based on the primary objectives of chapter 13. "One of the primary purposes of Chapter 13 . . . is to offer debtors an incentive to gradually repay their obligations rather than to liquidate their assets under Chapter 7." *In re Burba*, 1994 WL 709314, *17 (6th Cir. Nov. 10, 1994).  Instead of liquidating pre-petition assets through chapter 7, qualified debtors may keep many of their assets and pay for them through the chapter 13 plan.  In order to retain title to their property, debtors must commit to pay their future disposable income to their creditors for up to five years. 11 U.S.C. § 1322(d). Thus, there is a trade: The debtor retains assets and pledges income.  A portion of this future stream of income is then used to pay creditors with liens on retained assets.  The result is a coherent legislative framework.  The assets that the debtor keeps under the plan are vested in the

debtor; future income is vested in the estate.  Thus the assets and the income are owned by the proper parties under the literal interpretation of the Bankruptcy Code.  The symmetry is not only pleasing to the mind, but consistent with Congressional language.

The second approach is the estate termination approach.  Under the estate termination approach, all property of the estate becomes property of the debtor upon confirmation and ceases to be property of the estate. *Shell Oil v. Capital Fin. Servs.*, 170 B.R. 903, 905-06 (S.D. Tex. 1994).  This approach "follows section 1327(b) to the letter." Robert A. Leflar, *Section 1327(b) Says What? And Related Issues in the Termination or Extension of the Chapter 13 Bankruptcy Estate*, 2000 Ark. L. Notes 55, 58 (2000).  *Shell Oil* clearly demonstrates the significance attributed to § 1327(b) under the estate termination approach: "When the court confirms a plan, the property of the estate vests in the debtor unless the plan says otherwise. 11 U.S.C. § 1327(b). When property vests in the debtor, it is no longer property of the estate." *Shell Oil*, 170 B.R. at 905-06.

Although Countrywide generally subscribes to this approach, the principal case supporting this approach does not mention the effect of § 1306 on the termination.  The issue in *Shell Oil* did not involve post-petition wages. *Id.* at 905.  Section 1306 is not even mentioned in *Shell Oil.*  We find the case inapposite.  Nevertheless, for the purposes of completeness, we evaluate the termination theory.

The estate termination approach elevates § 1327(b) to the point that it cannot be reconciled with § 1306(a).  Essentially, the approach amends § 1306(a) to provide that post-petition earnings and property are property of the estate until the case is closed, dismissed, converted *or until a plan is confirmed*.  This Court is not in the business of amending legislative enactments. *See United States v. Cavada*, 821 F.2d 1046, 1048 (5th Cir. 1987) ("Even if two

statutes conflict to some degree, they must be read to give effect to each, if that can be done without damage to their sense and purpose, unless there is evidence either in the text of the statute or the legislative history that the legislature intended to repeal the earlier statute and simply failed to do so expressly.").  There is no evidence that Congress intended to supersede or amend § 1306(a) through § 1327(b).  Accordingly, the Court rejects the estate termination approach.

The third approach is the estate transformation approach.  Countrywide argues, in the alternative, that the Court should adopt this approach.  The estate transformation approach holds that property necessary for the execution of the plan remains property of the estate after confirmation, and the remaining non-essential property becomes property of the debtor at confirmation. *Telfair*, 216 F.3d at 1340.  The approach is a compromise between the estate termination and estate preservation approaches. *Id.* ("The estate transformation approach . . . protects the interests of both the debtor and the creditors.").

Like the estate termination approach, the Court finds that the estate transformation approach fails to satisfy fundamental principles of statutory interpretation.   The estate transformation approach is really a "split-the-baby" approach that, in substance, improperly effectuates the amendment of both §§ 1306(a) and 1327(b). *See* Blanche D. Smith, *Property Of The Estate-To Be Or Not To Be? That Is The Question The Trustee Asks Of Thee*, 21-Jan Am. Bankr. Inst. J. 28, 66 (2003) ("[A]rguably, [the estate transformation] theory nullifies both §§ 1306(a) and 1327(b) by not giving full credit to either.").

Under the estate transformation approach, Section 1306(a) is amended to provide that property of the estate includes all property and earnings that (i) the debtor acquires post-confirmation and before the case is closed, dismissed or converted, *and* (ii) *is necessary for the*

*execution of the bankruptcy plan*.  Similarly, § 1327(b) is amended by the estate transformation approach to provide "except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate *not necessary for the execution of the bankruptcy plan* in the debtor."  As stated above, this Court is not authorized to amend legislation, or to interpret seemingly conflicting statutory provisions in a manner that has the effect of amending them, when the provisions can be reconciled.  Accordingly, given the statutory consistency of the reconciliation approach, Court refuses to adopt the transformation approach.

Countrywide nevertheless urges the Court to adopt the estate transformation approach and cites authority from two Circuit Courts in support of its position.  However, it is noteworthy that one of the two Circuit Court opinions advocated by Countrywide is *Telfair,* an Eleventh Circuit opinion that preceded *Waldron* by 8 years. *See Telfair*, 216 F.3d at 1333. As stated above, *Waldron* explicitly held that post-petition earnings remain estate property. *Waldron*, 536 F.3d at 1243. *Waldron* also revisited and clarified *Telfair's* use of the estate transformation approach: "Our analysis is not . . . governed by the estate transformation approach that we adopted in *Telfair* . . . We adopted that approach to resolve the tension between §§ 1306(a) and 1327(b) regarding *property interests that existed at confirmation*." *Waldron*, 536 F.3d at 1242 (emphasis added). *Waldron* added that ""[w]e did not address in *Telfair* entirely new *property interests acquired by the debtor after confirmation* and unencumbered by any preexisting obligation." *Id.* (emphasis added).  Accordingly, this Court finds *Telfair* inapplicable to the case at hand.[15]

---

[15] Even if *Telfair* applied to the case at hand, *Telfair* was based on the assumption that payments made directly by a debtor were not made pursuant to a plan. *Id.* at 1340 ("In this case, after confirmation, only the amount required for the plan payments remained property of the estate.  Telfair's regular loan payments, made outside of the plan, were

Countrywide also cites the Seventh Circuit *Heath* decision in support of the estate transformation approach. In *Heath*, the Seventh Circuit adopted the estate transformation model to resolve what it viewed was a conflict between §§ 1306(a) and 1327(b). *Heath*, 115 F.3d at 524. With minimal analysis, the Seventh Circuit "read the two sections, 1306(a)(2) and 1327(b), to mean simply that while the filing of the petition for bankruptcy places all the property of the debtor in the control of the bankruptcy court, the plan upon confirmation returns so much of that property to the debtor's control as is not necessary to the fulfillment of the plan." *Heath*, 115 F.3d at 524.

This Court finds that in addition to the problem of reconciling the plain language of §§ 1306(a)(2) and 1327(b) with the estate transformation approach, the transformation approach is inconsistent with Fifth Circuit precedent. *See Foster*, 670 F.2d at 478. Therefore, the Court declines to follow *Heath*.

In *Foster*, the Fifth Circuit held that all payments made to creditors during a chapter 13 case, whether by the debtor or the trustee, are made pursuant to the plan. *Id.* at 485-86. If payments are made directly by the debtor to a creditor, then the debtor serves as the disbursing agent; if payments are made by the standing trustee, then the trustee serves as the disbursing agent. *Id.*

*Foster* explicitly recognized that post-petition earnings become property of the estate, although it did not address the specific issue raised by Countrywide. *Id.* at 483. The core logic of the transformation theory urged by Countrywide is that post-petition earnings (i) become estate property only to the extent necessary to fund the plan through the trustee; and (ii) are the debtor's

---

therefore no longer property of the estate . . ."). As discussed in more detail below, this assumption directly contradicts Fifth Circuit law. *See Foster v. Heitkamp (In re Foster)*, 670 F. 2d 478 (5th Cir. 1982).

property to the extent not necessary to fund the plan through the trustee.  These positions are inconsistent with *Foster*.  If the debtor is the one responsible for maintaining the mortgage out of post-confirmation earnings, then *Foster* holds that those ongoing maintenance payments are made through the plan.[16]   As is obvious from the present dispute and the Court's holdings elsewhere in this opinion, the debtor must be able to maintain all payments on the mortgage to emerge from bankruptcy with a fresh start.  Those payments include principal, interest, escrows and fees that are required to be paid to maintain the mortgage.  Under *Foster,* all such payments are made pursuant to the plan.  Post-confirmation earnings are utilized to make those payments.  Accordingly, the transformation argument urged by Countrywide fails under Fifth Circuit precedent.

> There are also practical problems associated with the transformation approach:

> Section 1306(a) itself does not distinguish between property that is necessary for the success of the chapter 13 plan and property that is not necessary. *Fisher, supra,* at 962-63. If any estate remains by virtue of § 1306(a) after confirmation, then all the property enumerated in § 1306(a) should become property of the post-confirmation chapter 13 estate. There is also a practicable problem inherent in limiting the post-confirmation estate only to property necessary for the success of the chapter 13 plan. What property is necessary for the success of the chapter 13 plan? In a joint case, in the absence of a wage order under § 1325(c), which debtor's wages are protected by the automatic stay? In an individual case where the debtor holds more than one job, which paycheck is necessary for the success of the chapter 13 plan? Which one is not protected by the automatic stay and is subject to garnishment? There is nothing that distinguishes the debtor's paycheck from the co-debtor's paycheck or the debtor's primary paycheck from his secondary paycheck. Money is fungible.

---

[16] *See also Reynard*, 250 B.R. at 248 ("The chapter 13 plan payment is not the only payment necessary for the successful completion of a chapter 13 plan. Frequently, the confirmed plan requires the debtor make payments directly to a secured creditor, in this case the mortgage company, and in other cases, the car finance company. If the direct payments are not timely made, the secured creditor will seek relief from the automatic stay in order to repossess the vehicle or sell the home at foreclosure. If relief is granted, the chapter 13 case typically converts to a chapter 7 proceeding or is dismissed, both to the prejudice of the unsecured creditors provided for in the chapter 13 plan. Saving the family home or the family car is a key incentive to selecting chapter 13 over chapter 7-a selection frequently more beneficial to unsecured creditors than chapter 7. Not only is the plan payment to the chapter 13 trustee necessary for the success of the plan, but the direct payments to the secured creditors are also necessary.").

*Reynard*, 250 B.R. at 247-48.

The fourth approach, which Countrywide opposes, is the estate preservation approach. According to the estate preservation approach, all property of the estate remains property of the estate after confirmation until discharge, dismissal, or conversion. *Telfair*, 216 F.3d at 1340. Compared with the reconciliation approach, the estate preservation concept appears to go one step too far by lumping together assets that exist at confirmation and those received in the future. Nevertheless, the sole question that this Court must consider in this inquiry is whether future, post-confirmation earnings are estate property. The Court concludes that such earnings are estate property but need not go further.[17]

Accordingly, the Court adopts the reconciliation approach and, in so doing, determines that Rule 2016 applies to acts to collect fees from post-confirmation earnings of the debtor because such earnings are property of the estate. The Court now turns to whether Rule 2016 applies to fees and expenses that accrue during the bankruptcy case but are not collected until post-bankruptcy.

**ii.  Application of Rule 2016 Following Discharge**

There are two problems with Countrywide's claim that Rule 2016 does not apply to fees and expenses that are assessed during bankruptcy but not collected until post-bankruptcy.

First, as discussed above, Countrywide admits that it applied funds—without complying with Rule 2016—received from either Rodriguez or the chapter 13 trustee to the payment of undisclosed fees and expenses during the pendency of the Rodriguez bankruptcy case. Similarly, as discussed above, the Court finds Countrywide may have also misapplied payments during the

---

[17] The Court is wary that the problem associated with the estate termination approach (i.e. the amendment of § 1306(a)) is turned on its head under the estate preservation approach (i.e. § 1327(b) is amended). Since Countrywide opposes the estate preservation approach and this inquiry only deals with future earnings, the Court need not consider whether the estate preservation approach should apply to property existing at confirmation.

Morenos' and Hereras' cases. Accordingly, summary judgment is inappropriate to the extent Countrywide failed to abide by Rule 2016 during the Plaintiffs' cases.

Second, the gravamen of Plaintiffs' argument is lost in Countrywide's explanation. The most egregious conduct alleged by Plaintiffs is in the indirectness of Countrywide's alleged conduct.   Contrary to Countrywide's position in its supplemental brief discussed above, Countrywide previously acknowledged that Rule 2016(a) applies to any fees that it collects from the estate during the course of the bankruptcy case.   The following colloquy occurred at oral argument on October 22, 2009:

| | |
|---|---|
| Judge: | I want to get right into that because that is the core argu—the key question to me. And that's why this only links into 105.  Because if the fees were charged during the course of the case rather than after the case.  The debtor's post-petition earnings are property of the estate.  So, could you charge them during the case to the debtor's post-petition earnings without getting court approval under 2016. And the answer to that…and there are arguments out there that say that you could, you don't need to comply with 2016 even during the case, even against the debtor's income.  If those arguments are right, you win.  But, if those arguments are wrong and you can't charge under 2016 to the debtor's income during the course of the case, we then deal with what happens if the lender sits on these so that it doesn't—so that 2016 doesn't apply—the money is then due at the end of the case, in theory, unless 105 applies.  So, I wanted to start with the more fundamental question: Does 2016 apply to the charging of fees by a lender from the debtor's income during the course of the case? |
| Countrywide's Counsel: | I am not quite sure.  Let me just ask for a clarification of the question.  What do you mean charging the fee to the debtor's income? |
| Judge: | Well, if you charge a fee to the debtor and all of the debtor's post-petition earnings are property of the estate, I think that is the equivalent of charging it to their income.  If you are going to make the debtor pay a $500 attorneys fee during the course of the case, and that's going to come out of their income, is it governed by 2016? |
| Countrywide's Counsel: | I think if you were going to try to collect a fee from the estate, a fee for professional services, it would be subject to 2016.  I think another issue here is |

that we develop the facts, not all of the amounts obviously on the three letters that these plaintiffs got (garbled) are really amenable to the analysis under Rule 2016.

Judge:          Fair enough…

Countrywide's
Counsel:        I think if there's a fee for professional services that you seek to collect from the estate of the debtor then I think that 2016..Rule 2016 is applicable.  I think that the case law is also pretty clear that 2016—and there is a certain logic to it-- is not the sole avenue by which you can collect….

Accordingly, Countrywide acknowledges that Rule 2016 is applicable to fees collected during the bankruptcy case.

At this stage in this litigation, the issue of the applicability of Rule 2016 is resolved. Countrywide sought to have the automatic reference to this Court withdrawn.  The District Court recently decided not to withdraw the reference. *Rodriguez v. Countrywide Home Loans, Inc.*, No. 09-070 (S.D. Tex. Dec. 4, 2009).  The District Court's decision was based on its finding that Bankruptcy Rule 2016 applies to fees sought by lenders in chapter 13 cases. *Id.*  This Court continues to hear this matter by order of reference from the District Court.  Accordingly, it is now the "law of the case" that Rule 2016 applies.

But Countrywide attempts to take advantage of a loophole in Rule 2016.  Countrywide argues that Rule 2016 is inapplicable once the case is terminated and the estate ceases to exist. This argument is made because Rule 2016 only requires Countrywide to seek approval of its fees if they are to be collected from the estate.  Countrywide reasons that if it waits until the estate terminates, it can collect the very same fees from the debtor instead of from the estate.

If such a literal reading correctly allows Countrywide to escape the requirements of Rule 2016, then it would clearly raise concerns under 11 U.S.C. § 105.  The District Court's December 4, 2009 Memorandum Opinion holds that this Court was correct in finding that § 105 provides relief for the precise actions at issue in this case. *See Rodriguez*, No. 09-070.  Section

34 / 36

105 provides that the Court may issue judgments or orders that are "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105. As this Court has already stated,

> The Court can not administer an estate in a just, speedy, inexpensive, efficient, and equitable manner without requiring creditors to file a Rule 2016(a) application for fees and costs that creditors seek to collect post-confirmation. Without Rule 2016(a) applications, the Court cannot ensure compliance with court orders or protect a debtor's rights under § 1322(b)(5) and the right to a fresh start.

*Cano*, 410 B.R. at 534.

Thus, if Countrywide's alleged sharp dealings are technically permissible, they are certainly an abuse of process subject to § 105. Countrywide's arguments would preclude a debtor from obtaining a fresh start by obviating the Debtor's ability to implement § 1322(b)(5). Section 1322(b)(5) explicitly allows a debtors to maintain mortgage payments. Rule 2016 provides a mechanism for such maintenance of the mortgage by requiring disclosure and approval of fees. It also "ensures that creditors are not given a blank check to incur fees that will be charged against the estate." *Sanchez*, 372 B.R. at 304 (citations omitted). Rule 2016—and the fresh start—are thwarted when mortgagees wait until after bankruptcy to collect fees and expenses that are not disclosed while chapter 13 cases are pending.

Summary judgment is denied. Following trial, the Court will determine whether the facts in the Plaintiffs' cases demonstrate a violation of Rule 2016, the need for relief under § 105, or the absence of liability.

### Summary Judgment Granted on Breach of Contract

Plaintiffs seek claims for both breach of contract and for breach of the confirmed plans. It is true that the plan should be interpreted and applied as a contract. *In re Dow Corning, Corp.*, 456 F.3d 668, 676 (6th Cir. 2006) ("[T]he plan is effectively a new contract between the debtor

and its creditors.")(citing *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993).  However, the breach of contract theory is not independent of the breach of the confirmed plan theory.  *Cano*, 410 at 535.  The breach of contract theory cannot stand as a separate cause of action.  Summary judgment is granted to Countrywide.

### Summary Judgment Granted, in Part, and Denied, in Part, on Absence of Damages

Countrywide did not proceed with the three foreclosures after this lawsuit was filed.  Accordingly, Countrywide alleges an absence of damages.  It is certainly true that there are no damages that can be claimed from the actual loss of the three homes.  But, the fact that the foreclosures did not occur does not eliminate all forms of potential damages.  Countrywide has failed to show that even if Plaintiffs' claims of Rule 2016 and confirmation order violations are true—and the evidence suggests they may be—that Plaintiffs still did not suffer damages from Countrywide's actions.  Summary judgment is granted to the extent of actual damages alleged from a successful foreclosure, but denied as to all other alleged damages.

### Conclusion

For the reasons set forth above, Countrywide's Motion for Summary Judgment is granted, in part, and denied, in part.  A separate order will be issued.

SIGNED **December 9, 2009.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE