UNITED STATES BANKRUPTCY COURT Southern District of Texas
ENTERED
07/21/2010

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **YDALIA RODRIGUEZ,** | § | **Case No. 02-10605** |
| **Debtor(s).** | § | |
| | § | **Chapter 13** |
| | § | |
| **YDALIA RODRIGUEZ, *et al*,** | § | |
| **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **Adversary No. 08-01004** |
| | § | |
| **COUNTRYWIDE HOME LOANS, INC.,** | § | |
| **Defendant(s).** | § | **Judge Isgur** |
| | § | |

**MEMORANDUM OPINION GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

For the reasons set forth below, the Court grants, in part, and denies, in part, Plaintiffs' motion for class certification.

**Jurisdiction**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. *See also Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, --- F.3d ----, 2010 WL 2433091, at *4 (5th Cir. June 18, 2010) ("[B]ankruptcy court has authority to certify a class action of debtors whose petitions are filed within its judicial district provided the prerequisites for a class under Rule 23 are satisfied."). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2).

**Background**

**i. Summary of Dispute**

This class action lawsuit was initiated on February 26, 2008 by named Plaintiffs Ydalia Rodriguez, Maria Antoineta Herrera and David Herrera, and Lucy Moreno and Alfonso Moreno

("Plaintiffs"). Plaintiffs are all former chapter 13 debtors with mortgage contracts serviced by Countrywide Home Loans, Inc. (now BAC Home Loans Servicing, LP). Plaintiffs allegedly cured their pre-petition mortgage arrearages, completed their chapter 13 plans, and received a discharge. Plaintiffs claim that Countrywide nevertheless sought to foreclose on Plaintiffs' homes after Plaintiffs emerged from bankruptcy. According to Plaintiffs, Countrywide improperly charged unauthorized fees[1] to Plaintiffs' accounts during the pendency of their bankruptcy cases. Countrywide then allegedly threatened to foreclose if the fees were not paid after the Plaintiffs were discharged from bankruptcy. In essence, Plaintiffs claim that instead of receiving chapter 13's promise of a fresh start upon discharge, they were illegally forced into post-discharge default.

At the outset of the case, Plaintiffs alleged that Countrywide employed numerous, systemic practices that violated various provisions of the United States Bankruptcy Code.[2] These practices allegedly culminated in Countrywide's impermissible attempts to foreclose on the Plaintiffs' homes. After this Court's rulings on Countrywide's Motion to Dismiss (Doc. No. 63) and Motion for Summary Judgment (Doc. No. 287), and the United States District Court's decision on Countrywide's Motion to Withdraw the Reference, the dispute has been considerably narrowed. *See In re Rodriguez*, 396 B.R. 436 (Bankr. S.D. Tex. 2009) (denying, in part, and reserving judgment on, in part, Countrywide's Motion to Dismiss); *Rodriguez v. Countrywide Home Loans, Inc.*, 421 B.R. 341 (S.D. Tex. 2009) (denying Countrywide's Motion to Withdraw the Reference); *In re Rodriguez*, 421 B.R. 356 (S.D. Tex. 2009) (granting, in part, and denying in

[1] Although the parties at times distinguish the terms "fees" and "costs," the Court uses the terms interchangeably throughout the opinion.

[2] *See In re Rodriguez*, 421 B.R. 356, 361 (Bankr. S.D. Tex. 2009) (Plaintiffs alleged that Countrywide violated (i) the discharge injunction, (ii) automatic stay, (iii) their chapter 13 plans and/or the orders confirming their plans, (iv) 11 U.S.C. § 506(b) and/or Bankruptcy Rule 2016(a), and (v) their mortgage contracts).

part, Countrywide's Motion for Summary Judgment). *See also* MANUAL FOR COMPLEX LITIGATION § 21.133 (4th ed. 2004) ("The court may rule on motions pursuant to Rule 12, Rule 56, or other threshold issues before deciding on certification . . . ."). As set forth below, the key remaining issue is whether Countrywide's fee collection practices violate Federal Rule of Bankruptcy Procedure 2016(a) on a scale that merits certification of this class action.

**ii. Summary Judgment & Rule 2016(a)**

The Court discussed Rule 2016(a)'s application in this case in its December 9, 2009 Memorandum Opinion resolving Countrywide's Motion for Summary Judgment. *See Rodriguez*, 421 B.R. at 372-80. Since the Court's Rule 2016(a) analysis is "the law of the case" and fundamental to Plaintiffs' claims, the Court reiterates the relevant Rule 2016(a) principles here.[3] *See Countrywide*, 421 B.R. at 355 (upholding this Court's conclusion that Rule 2016(a) requires mortgage lenders to "disclose and seek bankruptcy court approval of fees and expenses charged post-petition and pre-discharge"); *Wilborn*, --- F.3d ----, 2010 WL 2433091, at *5 (assuming, without deciding, that "prior disclosure and approval are necessary" before contractually-allowed fees can be assessed against debtors in bankruptcy). *See also Woods v. Kenan (In re Woods)*, 215 B.R. 623, 625 (B.A.P. 10th Cir. 1998) ("Issues decided on appeal become the *law of the case* and are [generally] to be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court . . . .") (emphasis added).

Plaintiffs claim that Countrywide's collection practices violate Bankruptcy Rule 2016(a), which provides:

> An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services

[3] The Court is simply providing a summary of its Rule 2016(a) analysis. For a more complete understanding of Rule 2016(a)'s application, see *Rodriguez*, 421 B.R. at 372-80.

> rendered, time expended and expenses incurred, and (2) the amounts requested . . . . The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the application is filed by a creditor or other entity.

FED. R. BANKR. P. 2016(a). Thus, "[u]nder the plain language of Rule 2016, a mortgage lender must file a Rule 2016 application before collecting any reimbursable fees and costs while a chapter 13 case remains pending." *Rodriguez*, 421 B.R. at 372 (citing *Cano v. GMAC Mortgage Corp. (In re Cano)*, 410 B.R. 506, 532 (Bankr. S.D. Tex. 2009)).

Plaintiffs claim that two of Countrywide's fee collection practices violate Rule 2016(a). *Rodriguez*, 421 B.R. at 372. First, Plaintiffs claim that Countrywide misapplied bankruptcy plan payments that should have been credited to their monthly mortgage payments by instead crediting portions of the payments to unauthorized fees. *Id.* Second, Plaintiffs claim that Countrywide charged undisclosed and unauthorized fees to their accounts while their bankruptcy cases were pending and then attempted to collect those fees by threatening foreclosure after Plaintiffs were discharged from bankruptcy. *Id.*

As set forth in the next section, which discusses the named Plaintiffs' cases, Countrywide admits that it misapplied plan payments and charged fees without Court approval, but Countrywide claims its actions were on a smaller and less systematic scale than Plaintiffs allege.[4] However, at the summary judgment stage, Countrywide claimed that, irrespective of whether such collection activity occurred, its collection practices did not violate Rule 2016(a). *Id.*

Countrywide advanced two theories as to why its conduct did not violate Rule 2016(a). First, Countrywide argued that Rule 2016(a) is inapplicable to its post-confirmation collection

[4] Countrywide claims that it was not Countrywide's regular practice to charge, collect, or attempt to collect unauthorized fees. Any such collection activity was, according to Countrywide, sporadic and not part of a concerted or systematic fee collection process.

activity because, under 11 U.S.C. § 1327(b),[5] the estate ordinarily ceases to exist upon confirmation. *Id.* at 373. Countrywide correctly articulated that Rule 2016(a), by its express terms, only applies to property of the estate. However, the Court held that Countrywide's theory that the estate ceases to exist upon confirmation was incorrect under 11 U.S.C. § 1306(a)(2).[6] *Id.* at 373-74. The Court's conclusion was consistent with the majority view of the courts, including three circuit courts. *Id.* As explained by the Eleventh Circuit:

> While the case is pending, the post-petition property . . . [is] added to the estate until confirmation, the event that triggers [section] 1327(b) and "vests" the property of the estate in the debtor. That is, the property interests comprising the pre-confirmation estate property are transferred to the debtor at confirmation, and this "vesting" is free and clear of the claims or interests of creditors provided for by the plan, [section] 1327(b), (c). Finally, the property of the estate once again accumulates property by operation of [section] 1306(a) until the case is "closed, dismissed, or converted."

*In re Waldron*, 536 F.3d 1239, 1243 (11th Cir. 2008), *quoted in Rodriguez*, 421 B.R. at 374.

Countrywide's second defense was that Rule 2016(a) does not apply when fees are assessed during bankruptcy but not collected until post-bankruptcy. *Rodriguez*, 421 B.R. at 378. The Court rejected this argument for two reasons. First, as discussed in the next section, there is evidence that Countrywide collected unauthorized fees from the named Plaintiffs while their bankruptcy cases were pending. *Id.* To the extent Countrywide collected unapproved fees while cases were pending, Countrywide's second defense is a non sequitur.

The Court also rejected Countrywide's second argument under 11 U.S.C. § 105:

---

[5] Section 1327(b) provides, "[e]xcept as otherwise provided in the plan or the order confirming the plan, the *confirmation of a plan vests all of the property of the estate in the debtor*." 11 U.S.C. § 1327(b) (emphasis added).

[6] Section 1306(a)(2) provides, in part, that property of the estate includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 21 of this title . . . ." 11 U.S.C. § 1306(a)(2).

> Countrywide attempts to take advantage of a loophole in Rule 2016. Countrywide argues that Rule 2016 is inapplicable once the case is terminated and the estate ceases to exist. This argument is made because Rule 2016 only requires Countrywide to seek approval of its fees if they are to be collected from the estate. Countrywide reasons that if it waits until the estate terminates, it can collect the very same fees from the debtor instead of from the estate.
>
> If such a literal reading correctly allows Countrywide to escape the requirements of Rule 2016, then it would clearly raise concerns under 11 U.S.C. § 105. The District Court's December 4, 2009 Memorandum Opinion holds that this Court was correct in finding that § 105 provides relief for the precise actions at issue in this case. *See* [*Rodriguez*, 421 B.R. at 356]. Section 105 provides that the Court may issue judgments or orders that are "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105. As this Court has already stated [in *Cano*, 410 B.R. at 534],
>
>> The Court cannot administer an estate in a just, speedy, inexpensive, efficient, and equitable manner without requiring creditors to file a Rule 2016(a) application for fees and costs that creditors seek to collect post-confirmation. Without Rule 2016(a) applications, the Court cannot ensure compliance with court orders or protect a debtor's rights under § 1322(b)(5) and the right to a fresh start.
>
> Thus, if Countrywide's alleged sharp dealings are technically permissible, they are certainly an abuse of process subject to § 105. Countrywide's arguments would preclude a debtor from obtaining a fresh start by obviating the debtor's ability to implement § 1322(b)(5). Section 1322(b)(5) explicitly allows debtors to maintain mortgage payments. Rule 2016 provides a mechanism for such maintenance of the mortgage by requiring disclosure and approval of fees. It also "ensures that creditors are not given a blank check to incur fees that will be charged against the estate." *Sanchez*, 372 B.R. at 304 (citations omitted). Rule 2016—and the fresh start—are thwarted when mortgagees wait until after bankruptcy to collect fees and expenses that are not disclosed while chapter 13 cases are pending.

*Id.* at 380.

**iii. Named Plaintiffs' Cases**

The summary judgment and class certification stages have also narrowed the facts and allegations surrounding the named Plaintiffs' cases.[7] Although the class certification question deals with larger issues than the named Plaintiffs' individual cases, an explanation of these cases provides a necessary backdrop for resolving the question of whether the class should be certified.

**a. The Rodriguez Case**

Rodriguez filed her chapter 13 petition on August 2, 2002. Countrywide filed an original proof of claim listing an $8,919.38 pre-petition mortgage deficiency. Rodriguez's chapter 13 plan was confirmed on November 7, 2002.

Countrywide filed a motion for relief from the automatic stay on March 26, 2003, alleging that Rodriguez was delinquent on her post-petition mortgage payments. The motion was resolved by an agreed order entered on May 7, 2003, which stipulated to a post-petition deficiency of $3,051.32.[8] The agreed order also stated that Rodriguez's monthly mortgage payment was $938.00[9] and provided that Countrywide could assess a $50.00 fee for any future notice of default that it sent to Rodriguez.

After entry of the agreed order, Countrywide sent Rodriguez notice of default on two occasions, November 2005 and August 2006, while her case was pending. Both notices of default were sent because Rodriguez missed multiple monthly payments and, when Rodriguez

---

[7] The Court has not conducted a full trial on the merits of named Plaintiffs' cases. Many of the disputed facts and issues have been resolved by the parties. *See* COMPLEX LITIGATION, *supra*, § 21.21 ("Disputed facts material to deciding certification may be narrowed or eliminated by stipulations, requests for admission, affidavits, or declarations."). However, there are remaining, specific factual issues that need not be resolved at this stage in the litigation. *See id.*

[8] The agreed order included a $655.00 stipulation for attorney's fees and a $144.32 stipulation for late charges.

[9] The $938.00 statement clarified what appears to have been a misunderstanding between Rodriguez and Countrywide regarding the amount due for her monthly mortgage payment.

would make her monthly payment, she regularly paid $750.00 instead of $938.00. Rodriguez cured the amounts stated in both notices of default and paid the concomitant $50.00 notice fee in accordance with the May 7, 2003 agreed order. After Countrywide received each cure payment, Countrywide treated Rodriguez's account as current and did not disclose any additional charges or deficiencies on Rodriguez's monthly statements.

By the time Rodriguez received her discharge on August 27, 2007, Rodriguez had satisfied both the $8,919.38 pre-petition arrearage and the $3,051.32 post-petition deficiency. Nevertheless, on November 15, 2007, Countrywide sent Rodriguez a notice of default stating that Rodriguez owed $8,837.20 in post-petition mortgage payments and various fees. The notice further stated that Countrywide would accelerate Rodriguez's debt and foreclose on Rodriguez's home if she failed to cure the $8,837.20 deficiency.

Countrywide claims that nearly all of the $8,837.20 it sought arose from Rodriguez's missed or partial monthly payments, which were inadvertently excluded from the November 2005 and August 2006 notices of default.[10] Countrywide states that it recognized its mistake during a post-discharge review of Rodriguez's loan and sent the November 15, 2007 notice of default thereafter. Countrywide also admits that the $8,837.20 it sought included $127.78 in late fees.

Rodriguez moved to reopen her bankruptcy case and the Court granted the motion on February 13, 2008. Countrywide claims that after Rodriguez moved to reopen her bankruptcy case, Countrywide advanced its own money to cure Rodriguez's delinquency, canceled the foreclosure, and treated Rodriguez's account as current through February 2008.

[10] Countrywide claims that the November 2005 notice of default erroneously stated that Rodriguez was only three post-petition payments behind, when in fact Rodriguez owed twelve post-petition payments. Similarly, Countrywide claims that the August 2006 default notice listed only one default and failed to include additional arrearages.

Finally, it is noteworthy that Countrywide admits charging $172.00 in unauthorized inspection fees and misapplying $92 from a monthly mortgage payment during Rodriguez's case. The $92 should have been applied to Rodriguez's mortgage balance but was instead applied to the payment of an undisclosed inspection fee.

**b. The Herreras Case**

The Herreras filed a joint petition on November 29, 2001. Countrywide filed a proof of claim listing a total arrearage of $10,432.87. The Herreras' chapter 13 plan was confirmed on April 11, 2002. However, the plan listed the Herreras' arrearage to Countrywide at $2,931.10.[11]

On July 30, 2002, Countrywide filed a motion for relief from the automatic stay claiming that the Herreras were delinquent on post-petition mortgage payments. The motion was resolved by an agreed order on December 2, 2002. Under the agreed order, the Herreras were ordered to pay $5,435.00 to Countrywide. The $5,435.00 consisted of five monthly payments in the amount of $946.00 and $705.00 for attorney's fees and costs. The order further provided that Countrywide would be entitled to charge the Herreras a $25.00 fee for subsequent notices concerning future post-petition defaults.

In late 2006, the chapter 13 trustee discovered the deficiency in the Herreras' bankruptcy plan. The Herreras then filed an objection to Countrywide's proof of claim. The objection was resolved by an agreed order entered on June 22, 2007. The order provided that $8,327.00 in unpaid pre-petition arrearages would be added to the Herreras' principal balance and paid through regular monthly payments over an extended loan term.

[11] Countrywide states that it deposed the Herreras' bankruptcy attorney, who stated that she did not see Countrywide's proof of claim and based the $2,931.10 amount on information from the Herreras' previous bankruptcy case.

The Herreras were discharged on August 24, 2007. Nevertheless, on December 17, 2007, Countrywide sent the Herreras a notice of default stating that they owed $8,327.00 in unpaid arrearages and $238.67 in outstanding fees. The notice provided that Countrywide would institute foreclosure proceedings if the Herreras did not cure the delinquency by January 21, 2008. Countrywide admits the notice was sent erroneously and blames the mistake upon Countrywide's failure to update its non-bankruptcy servicing records to reflect the terms of the June 22, 2007 agreed order.

The Court further notes that the evidence indicates Countrywide charged the Herreras undisclosed fees during the course of their bankruptcy case. Countrywide charged the Herreras a $200.00 fee for services in connection with the filing of Countrywide's proof of claim. Countrywide also charged the Herreras numerous undisclosed inspection fees and Countrywide did not seek approval for the $238.67 in fees sought in the December 17, 2007 notice of default.[12]

Finally, although the evidence is not entirely clear at this time, Countrywide may have misapplied plan payments by crediting $206.33 to unauthorized post-petition fees. (Def.'s Br. 13, n.13).

**c. The Morenos Case**

The Morenos filed a chapter 13 petition on October 18, 2001. Countrywide filed a proof of claim on November 30, 2001 for $4,641.57. The Morenos confirmed their amended plan on February 22, 2002.

On May 8, 2002, Countrywide filed a motion for relief from the automatic stay. The motion alleged that the Morenos were delinquent on their mortgage payments. In connection

[12] Countrywide claims it was entitled to seek the $238.67 under the terms of the agreed order. The Court disagrees. The agreed order does not address Countrywide's authority to collect any post-petition fees.

with the motion, Countrywide posted an undisclosed and unauthorized charge of $705.00 to the Morenos' mortgage account. The Morenos cured the delinquency and Countrywide withdrew its motion on June 5, 2002, but failed to remove the unauthorized charge.

Countrywide filed a second motion for relief from the automatic stay on February 4, 2003. Countrywide charged $455.00 in attorney's fees to the Morenos' account in connection with the motion. The motion was resolved by an agreed order on March 5, 2003. The motion authorized Countrywide to charge $1,104.00 in post-petition arrearages, $44.16 in late charges, and $705.00 in attorney's fees to the Morenos' account. The total amount, $1,853.16, was to be paid through six monthly installments of $308.86.

On March 13, 2003, on the motion of the bankruptcy trustee, the Court dismissed the Morenos' case for failure to make plan payments. The Court vacated the dismissal order on April 3, 2003. The case was dismissed a second time on January 22, 2004. The Court vacated the second dismissal order on February 26, 2004.

The Morenos eventually paid their pre-petition mortgage arrearage and were discharged on December 27, 2006. On December 3, 2007, Countrywide sent the Morenos a notice of default that included $2,719.53 in pre-discharge fees. Countrywide claims that $1,231.98 of the $2,719.53 in fees were incurred during the two times in which the Morenos' case was dismissed (before the dismissal orders were vacated).[13] Countrywide does not offer any justification for its attempts to collect the remaining $1,487.55 in post-petition fees.

[13] Countrywide did not oppose the Morenos' motions to vacate the dismissal orders and did not appeal the entry of the orders vacating the dismissal orders. Accordingly, the Court fails to understand why these events have legal significance. If the orders were vacated, then Countrywide cannot rely on the vacated orders to impose the legal fees. Nevertheless, this is an open legal issue not yet briefed by the parties and it will be decided only at trial on the merits or by summary judgment. Furthermore, the Court expresses no view as to whether the entry of dismissal orders justified the incurrence of legal fees; that question should be addressed as part of the Rule 2016(a) application process.

The evidence suggests that Countrywide charged the Morenos various undisclosed and unauthorized fees throughout the course of their bankruptcy case. Accordingly, at least a portion of the $1,487.55 in fees may represent charges Countrywide posted to the Morenos' account without Court authorization. For example, Countrywide admits it charged an unauthorized $200.00 proof of claim filing fee shortly after the Morenos filed their bankruptcy petition. (Def.'s Mot. Summ. J. 19). Additionally, the March 5, 2003 agreed order authorized Countrywide to charge $705.00 in attorney's fees, but instead Countrywide charged a total of $1,160.00 to the Morenos during the course of their bankruptcy. Thus, Countrywide charged the Morenos $455.00 in unauthorized attorney's fees during their case. Finally, the evidence indicates Countrywide charged unauthorized inspection fees and possibly other unauthorized fees.

**iv. Countrywide's Internal Systems & Collection Practices**

In addition to evidence regarding the named Plaintiffs' cases, the majority of the evidence presented at the class certification hearing dealt with Countrywide's internal systems and its fee collection practices. Some of the evidence presented by Plaintiffs overlapped and was consistent with Countrywide's evidence. As discussed throughout the next section, the most contentious issues do not concern the facts themselves, but rather how the facts surrounding Countrywide's systems and practices apply within the class action framework. However, to the extent relevant factual issues are unresolved, the Court makes its findings of fact for the purpose of certification, along with its findings concerning undisputed facts, below. *See* COMPLEX LITIGATION, *supra*, § 21.21 ("An evidentiary hearing to resolve disputed facts relevant to the certification decision should not be a minitrial on the merits of the class or individual claims. Instead, the parties should present facts and arguments to let the judge determine the nature of the claims and

defenses and how they will be presented at trial, [and] whether there are common issues that can be tried on a class-wide basis . . . .") (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 91 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)).

**a. Countrywide's AS-400 System**

Countrywide's mortgage files are stored electronically in an AS-400 database. Both parties presented extensive evidence concerning the information stored in and the capabilities of Countrywide's AS-400 database. The key witnesses who discussed the AS-400 in detail were Jason Escalante and Thomas Bradford.[14] Although distinctions arose, Escalante and Bradford substantially agreed on many points involving the AS-400 system and its capabilities.

The AS-400 contains a massive database that stores all of the information relating to each mortgage serviced by Countrywide. For each mortgage account, the data compiled on the AS-400 includes (i) an itemization of all the fees posted to each account and whether the fee is classified as recoverable from the mortgagor,[15] (ii) an itemization of all the fees collected by Countrywide, (iii) a breakdown of all the payments made to Countrywide towards a mortgage

[14] Bradford, Plaintiffs' expert witness, is an AS-400 consultant who has worked with the AS-400 since 1988. Although Bradford displayed substantial knowledge of the AS-400's functionality, Bradford did not have specific knowledge of Countrywide's AS-400 database. (Cert'n Hr'g Tr. 30-62, Dec. 15, 2009). Bradford augmented this lack of first-hand knowledge by placing massive amounts of data provided by Countrywide into his own separate AS-400 database. *Id.* By making assumptions based on Countrywide's data, Bradford attempted to replicate Countrywide's AS-400 database within his AS-400 model. *Id.* Bradford is highly skilled and did an impressive job with Countrywide's data. His overall knowledge of the AS-400 database was very credible. Bradford's knowledge of Countrywide's system, which was gleaned by replicating Countrywide's AS-400, was often consistent with evidence presented by Countrywide. However, because he lacked first-hand knowledge of Countrywide's AS-400 and cross-examination revealed that some of his assumptions regarding Countrywide's AS-400 may have been incorrect (Cert'n Hr'g Tr. 139-141, Dec. 15, 2009), the Court found that Bradford's testimony, although credible, was not always as credible as that of Countrywide's witness, Jason Escalante.

Escalante has been employed by Countrywide since 1993 and has been a senior software delivery manager for approximately five years. Escalante's role within Countrywide is to provide information technology ("IT") support for Countrywide's foreclosure, bankruptcy, and real estate management teams. Escalante displayed a sound overall understanding of Countrywide's AS-400 system.

[15] A fee classified as "recoverable" is one that can be collected from the debtor whereas "non-recoverable" and "waived" fees are not collected from the debtor. Generally, post-petition fees were classified as recoverable. (Cert'n Hr'g Tr. 35-105, Dec. 14, 2009). *See also* (Cert'n Hr'g Tr. 214-16, Dec. 15, 2009).

account,[16] (iv) information concerning a mortgagor's bankruptcy filing and status, and (v) all information regarding the escrow and principal balance of the mortgage.[17] (Cert'n Hr'g Tr. 161-205, Dec. 14, 2009).

The only relevant data noticeably absent from the AS-400 database is information concerning court authorization of fee awards. The database does not track the amount or the occurrence of any fees awarded to Countrywide by a bankruptcy court. For example, the Court awarded $705.00 for attorney's fees in the December 2, 2002 agreed order between Countrywide and the Herreras. The Court's fee authorization would not be displayed on the AS-400 database. Only the fact that Countrywide charged $705.00 in attorney's fees to the Herreras would appear in the database.

However, the AS-400 does contain other data specifically related to mortgages owed by debtors in bankruptcy. Countrywide uses the AACER[18] service to track bankruptcy court proceedings. (Cert'n Hr'g Tr. 175-85, Dec. 14, 2009). When a mortgagor files for bankruptcy, AACER is used to automatically populate the date of the bankruptcy filing into the AS-400 database. (Cert'n Hr'g Tr. 175-77, Dec. 14, 2009). Warning codes then appear in the AS-400 "to let everyone within servicing know that a loan is affected by a bankruptcy." (Cert'n Hr'g Tr. 202-03, Dec. 15, 2009). Similarly, when a case is dismissed or discharged, Countrywide relies

---

[16] This breakdown indicates who made the payment, the amount of the payment, and the manner in which the payment was applied to the debt.

[17] The AS-400 database contains additional data; however, the Court need only discuss the data contained in the AS-400 that is relevant to this case.

[18] AACER stands for "automated access to court electronic records."

upon AACER to populate that information into the AS-400.[19] (Cert'n Hr'g Tr. 175-77, Dec. 14, 2009). *See also* (Cert'n Hr'g Tr. 220, Dec. 15, 2009). Escalante was unsure whether additional bankruptcy data was automatically populated or entered manually by technicians. Nonetheless, Escalante's deposition testimony indicates that the AS-400 database also contains the bankruptcy case number, the bankruptcy chapter, the name of the trustee handling the case, and the date of the chapter 13 plan confirmation. (Cert'n Hr'g Tr. 179-85, Dec. 14, 2009). *See also* (Cert'n Hr'g Tr. 203-04, Dec. 15, 2009).

There is also a bankruptcy ledger screen in the AS-400 database. The ledger, which distinguishes between pre and post-petition funds, is used to record all of the funds that are received in a bankruptcy case. (Cert'n Hr'g Tr. 204, Dec. 15, 2009). Countrywide employees update the bankruptcy ledger manually on a daily basis with loan payment and balance information. (Cert'n Hr'g Tr. 206, Dec. 15, 2009)

Furthermore, the AS-400 database is more than a record-keeping device for each individual mortgage account. It also has the capacity to run what appears to be an unlimited[20] range of queries which can access, sort, and extract mortgage data on any scale. An AS-400 query could range from one concerning a specific aspect of an individual mortgage account to a query accessing certain data from all mortgages serviced by Countrywide. For example, through the AS-400 database, Countrywide could easily run a search to locate all the fees charged to Rodriguez's account. Countrywide could also query all the fees charged to every Countrywide

[19] The Court notes that this data makes it easy to determine whether a fee was incurred on a mortgage account while a bankruptcy case was pending. Since fees are itemized by date in the AS-400 database, one need only run a query to determine whether any fees accrued during the pendency of the bankruptcy case. *See* (Cert'n Hr'g Tr. 217, Dec. 15, 2009).

[20] According to both Bradford and Escalante, the only limit on the capacity to run searches in the AS-400 is that the information must be contained in the AS-400 database. So long as the information exists on the system, it can be accessed through a query.

account in the Southern District of Texas, or even to every mortgage account nationwide.[21] Additionally, once a query is made, the results can be extracted and loaded into another AS-400 database. (Cert'n Hr'g Tr. 201, Dec. 14, 2009). This would enable the searcher to isolate data in a separate database and then run additional queries within that isolated data. (Cert'n Hr'g Tr. 201, Dec. 14, 2009). Basically, if the information is in the AS-400 system, it can be accessed, sorted, and extracted by Countrywide. As stated by Escalante, if the information is readily available, a "query can be written for anything." (Cert'n Hr'g Tr. 166-67, Dec. 14, 2009).

**b. Countrywide's Collection Practices**

The certification hearing reinforced Countrywide's admission at the summary judgment stage that Countrywide regularly posted fees to debtors' accounts without first seeking bankruptcy court approval under Rule 2016(a). However, Countrywide did not completely ignore bankruptcy court review of the fees it assessed post-petition to bankruptcy debtors. Countrywide presented evidence that, at times, it sought approval of fees when it filed an agreed order. The $705.00 in attorney's fees Countrywide sought in the December 2, 2002 agreed order with the Herreras exemplifies this point. Basically, when Countrywide was already filing a document with a bankruptcy court, it was not uncommon[22] for Countrywide to seek fees[23] along

[21] Another interesting example, which was discussed at the certification hearing, dealt with discharge queries. Escalante answered "yes" when asked whether a query could locate "everyone who had been discharged [from bankruptcy over] . . . a certain period of time." (Cert'n Hr'g Tr. 182, Dec. 14, 2009). Escalante also stated that a query can be written to search for specific fees according to their fee codes within the database. (Cert'n Hr'g Tr. 206, Dec. 14, 2009). *See also* (Cert'n H'rg Tr. 192-205).

[22] The Court does not find that it was Countrywide's regular practice to request fees when filing an agreed order. The Court simply recognizes that the evidence shows there were multiple occasions when Countrywide did seek fees in such circumstances.

with the primary relief sought. On the other hand, the evidence also indicates that Countrywide regularly charged fees without requesting approval from bankruptcy courts.

Renee Hertzler, the compliance manager in Countrywide's short-sales department, who has worked in various departments at Countrywide since 1993, gave extensive deposition testimony regarding fee collection. (Cert'n Hr'g Tr. 28-110, Dec. 14, 2009). Hertzler indicated that whenever a fee was assessed upon a mortgage account, the fee would be placed, either automatically or by a technician, in the AS-400 database.[24] For example, if an attorney submitted an invoice for a service provided to Countrywide in connection with a mortgage, Countrywide would pay the attorney and then place the fee on the mortgagor's account on the AS-400 database. Unless the fee was either waived or classified as non-recoverable, the placement of the fee in the AS-400 database enabled Countrywide to collect, or at least attempt to collect, the fee from the mortgagor. (Cert'n Hr'g Tr. 43-47, Dec. 14, 2009).

Hertzler's testimony demonstrates that this fee collection practice continued after the filing of a bankruptcy petition. When assessing attorney's fees against debtors in bankruptcy, for example, Hertzler stated that Countrywide did not have a policy to wait until the bankruptcy court approved the fees before classifying them as recoverable from the debtor in the AS-400. (Cert'n Hr'g Tr. 45-46, Dec. 14, 2009). Instead, once an attorney submitted a fee invoice involving a debtor in bankruptcy, the fee would be posted to the debtor's account, generally as a

---

[23] The Court makes no finding that the fees sought were always related to costs associated with the document being filed by Countrywide. For example, Countrywide charged the Morenos $455.00 for attorney's fees associated with their February 4, 2003 motion for relief from the automatic stay but requested $705.00 in attorney's fees in the March 5, 2003 agreed order. Thus, it appears Countrywide sought additional legal fees that were unrelated to the February 4, 2003 motion for relief from the stay. This assumption is also supported by the fact that Countrywide charged the Morenos $705.00, without the Court's authorization, in connection with its May 8, 2002 motion for relief from the automatic stay.

[24] *See also* (Cert'n Hr'g Tr. 135-150, Dec. 14, 2009) (Escalante discussing the placement of fees in the AS-400 database).

recoverable fee.[25] Furthermore, Hertzler stated that she could not recall any instance where Countrywide's bankruptcy department asked her to reclassify a fee because it had not been approved by a bankruptcy court. (Cert'n Hr'g Tr. 84, Dec. 14, 2009).

Similarly, the deposition testimony of Jenifer Reed, a supervisor in Countrywide's bankruptcy department, illustrates that Countrywide did not consider bankruptcy court authorization before charging fees to debtors in bankruptcy. Reed stated that Countrywide generally conducts a home inspection when a mortgage is not current and charges fees associated with the inspection to the mortgagor. (Cert'n Hr'g Tr. 256, Dec. 14, 2009). *See also* (Cert'n Hr'g Tr. 238, Dec. 15, 2009). Countrywide did not exclude bankruptcy debtors from this inspection fee collection practice. To the contrary, inspection fees were regularly assessed as recoverable fees against bankruptcy debtors' accounts. In Reed's experience, these inspection fees were automatically charged irrespective of whether such fees were submitted to the bankruptcy court for approval. (Cert'n Hr'g Tr. 256, 262, 291, Dec. 14, 2009).

Reed further acknowledged that Countrywide collected fees from bankruptcy debtors without court approval, and that Countrywide sought to recover uncollected fees that remained on debtors' accounts after bankruptcy. (Cert'n Hr'g Tr. 256-62, Dec. 14, 2009).

**c. Countrywide's Discharge Audit Procedures**

Countrywide conducts manual discharge audits of mortgages when debtors are discharged from bankruptcy. According to Countrywide, the discharge audit procedures revealed the unauthorized fees that Countrywide attempted to collect from the named Plaintiffs

[25] *See also* (Cert'n Hr'g Tr. 256, Dec. 14, 2009) (Countrywide's bankruptcy supervisor stating that inspection fees were automatically posted—generally as recoverable fees—in the AS-400 database regardless of whether the mortgagor had filed a bankruptcy petition).

post-discharge. Countrywide claims it began enhancing its discharge audit procedures in late 2007 and completed the enhancements in 2008. (Cert'n Hr'g Tr. 242, Dec. 15, 2009).

John Smith, Countrywide's senior vice president of foreclosure and real estate management, discussed how (in late 2007) Countrywide enhanced its procedures for monitoring, charging, auditing, and collecting fees assessed during bankruptcy. (Cert'n Hr'g Tr. 114-25, Dec. 14, 2009). In particular, Smith stated that Countrywide now has 360 bankruptcy technicians who review bankruptcy court orders and compare them with the fees due in the AS-400 database. (Cert'n Hr'g Tr. 126, Dec. 14, 2009). The bankruptcy technicians' duties also include conducting enhanced bankruptcy discharge audits, which entail:

> [A] full review of the loan to ensure, as it's being closed out, that all payments have been reviewed to ensure that they are posted in accordance with the trustee's designations or for incoming customer payments. They would also ensure that any fees that were remaining on the account were identified and if -- again, if it was in the case of discharge, if the account was to be current at that time, trying to make a determination with communication with counsel whether or not, in fact, those fees were appropriate or whether they needed to be reclassified or written off.

(Cert'n Hr'g Tr. 126-27, Dec. 14, 2009).

Kelly May, who has worked in Countrywide's bankruptcy department since 1999 and is currently the first vice president of bankruptcy servicing, elaborated on Countrywide's discharge procedures. (Cert'n Hr'g Tr. 198, Dec. 15, 2009). May stated that the bankruptcy technicians are directed to review post-petition fees, "to determine what they are; why were they incurred, have they been dealt with already . . . at another point in the case; had they already been re-classed or book-lossed for some reason." (Cert'n Hr'g Tr. 222, Dec. 15, 2009). Then the technicians ". . . [review] the appropriate orders in the case to determine if [the fees have] been dealt with there." (Cert'n Hr'g Tr. 222, Dec. 15, 2009). *See also* (Cert'n Hr'g Tr. 258, Dec. 15, 2009) (May admits

that Countrywide "could review any other orders [in addition to agreed orders] against the fees that have been charged to the account"). Countrywide is able to review the bankruptcy courts' docket through AACER, which enables the technicians to "pull up a copy of the applicable orders, view them, see if they address post-petition fees and if so how those fees are addressed." (Cert'n Hr'g Tr. 224, Dec. 15, 2009). If unauthorized fees exist, the bankruptcy technicians must then confer with Countrywide's attorneys to determine whether such fees are recoverable from the debtor. (Cert'n Hr'g Tr. 214, Dec. 15, 2009). If the fees are not recoverable from the debtor, then they are either reclassified as non-recoverable from the debtor (but potentially recoverable from other entities) or waived.

May acknowledged that before the 2007 procedures were implemented, Countrywide "did not believe there needed to be a court order for . . . fees to be charged to [a] debtor" and that "in some cases" such fees could be collected from the debtor post-discharge. (Cert'n Hr'g Tr. 246-47, Dec. 15, 2009). However, according to May, unauthorized fees have generally been waived since the 2007 audit procedures were implemented. (Cert'n Hr'g Tr. 246-47, Dec. 15, 2009).

There was evidence that brought the effectiveness of Countrywide's enhanced audit procedures into doubt. First, on cross-examination, May could not explain why Countrywide sought to collect unauthorized fees from the Morenos and Herreras in late 2007 after their respective discharges in 2007. (Cert'n Hr'g Tr. 249, Dec. 15, 2009). May also stated that procedures similar to those developed in 2007 for waiving unauthorized fees "were included in the discharge audit prior to 2007." (Cert'n Hr'g Tr. 248, Dec. 15, 2009). Finally, May admitted that she was generally unaware of Countrywide's collection policies and practices after the loan leaves the bankruptcy department. (Cert'n Hr'g Tr. 248, Dec. 15, 2009).

In sum, the point at which Countrywide's discharge audit procedures became fully operational is unclear. It is also unclear whether Countrywide's claim that it no longer collects unauthorized fees assessed during bankruptcy from debtors discharged after 2007 is accurate. It is quite clear, on the other hand, that Countrywide's regular course of business for loans in bankruptcy involves comparing the fees due in the AS-400 database with bankruptcy court orders through AACER.

**Analysis**

In order to certify a class, the plaintiff must satisfy the four prerequisites—numerosity, commonality, typicality, and adequacy of representation—found in Rule 23(a), and one of the categories of Rule 23(b).[26] FED. R. CIV. P. 23. *See also Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (providing that "in each case the burden of proof is on the plaintiff who seeks to . . . certify his suit"). However, before considering Rule 23(b), the "district court must conduct a rigorous analysis of the Rule 23(a) [prerequisites] . . . ." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (citations omitted). Once the prerequisites are met, the Court may then look to whether the class satisfies Rule 23(b). As set forth below, the Court grants, in part, Plaintiffs' motion for class certification pursuant to Rule 23(b)(2).

**i. The Class Definition**

At the outset, the Court finds it necessary to discuss and redefine the definition of the putative class. *See* FED. R. CIV. P. 23(c)(1)(B) (specifying that a class action certification order "must define the class and the class claims, issues, or defenses . . ."); NEWBERG, *supra*, § 1.1 (4th ed. 2002) ("A court may certify a class with respect to particular issues in a case rather than all

[26] Federal Rule of Bankruptcy Procedure 7023 incorporates Federal Rule of Civil Procedure 23. FED. R. BANKR. P. 7023.

elements of a claim or an entire case.") (citing FED. R. CIV. P. 23(c)(1)(B)). Plaintiffs seek to certify an "Unapproved Fees Class" comprised of approximately 125 individuals who:

> (a) filed a chapter 13 proceeding in the United States District Court for the Southern District of Texas on or before October 15, 2005 and have confirmed chapter 13 plans that treated mortgages which are serviced by Countrywide, and
>
> (b) as to whom Countrywide has assessed a fee or cost,[27] attributable to a time after the filing of a bankruptcy petition and before the date on which the case was closed, unless such fee or cost was listed in a proof of claim or was assessed pursuant to an order of the Bankruptcy Court, and
>
> (c) from whom Countrywide did collect or attempt to collect such fee or cost, or for whom Countrywide will seek to collect such fee or cost.

(Pls.' Br. 18-19).

This definition satisfies the requirement that a class be "adequately defined and clearly ascertainable." *See DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.") (citations omitted). The class's definition unambiguously sets forth the specific types of individuals for whom Plaintiffs seek redress. Such individuals are clearly ascertainable through queries of Countrywide's AS-400 database.

However, the Court nevertheless finds it necessary to (1) redefine the class with respect to the relief sought, and (2) narrow the definition of the class in order to exclude those putative class members who will not benefit from the relief available to the redefined class. *See In re Monumental Life Insurance Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision."). Plaintiffs seek a declaratory judgment finding Countrywide's conduct violates the Bankruptcy Code and an injunction prohibiting Countrywide from attempting to collect undisclosed fees. Plaintiffs also

[27] Plaintiffs define "fee or cost" as including any charges other than amounts assessed for interest, hazard insurance, or real estate taxes.

request compensatory damages (including disgorgement and restitution), punitive damages, and sanctions.

As set forth below in the Court's Rule 23(b) analysis, the Court grants certification on Plaintiffs' claim seeking injunctive relief and denies certification on Plaintiffs' claims for damages. Since Plaintiffs' damages claims do not satisfy Rule 23(b), the Court finds it unnecessary to determine whether the damages claims satisfy the Rule 23(a) prerequisites. Accordingly, the Court redefines the class as one seeking injunctive relief pursuant to Rule 23(b)(2). *See Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000) ("[A] court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate.").

Given the relief available to the redefined class, it is appropriate to further narrow the class to exclude those potential members who do not stand to benefit from injunctive relief.[28] Accordingly, the Court narrows the class to include only those individuals:

(a) who owed funds on a Countrywide serviced note as of February 26, 2008;

(b) who have not fully paid the relevant mortgage note, fees, or costs owed to Countrywide, its successors and assigns;

(c) who filed a chapter 13 proceeding in the United States Bankruptcy Court for the Southern District of Texas on or before October 15, 2005 and have confirmed chapter 13 plans that treated mortgages serviced by Countrywide; and

[28] Although the evidence indicates that few, if any, individuals fit within these categories, the Court identifies two types of potential class members who do not belong in the redefined class. *See Monumental Life*, 365 F.3d at 416 (Certification "under rule 23(b)(2) is appropriate only if members of the proposed class would *benefit* from the injunctive relief they request.") (emphasis added). First, the class members who have already fully paid their mortgages will not benefit from the redefined relief. Obviously, once a mortgage account is paid in-full, the proposed injunction (barring the collection of unauthorized fees) becomes useless. The primary remedy for any class member who paid unauthorized fees in the course of paying his or her mortgage in-full would probably be disgorgement. Second, class members who no longer had a mortgage serviced by Countrywide as of February 26, 2008—the date this class action was filed—will not benefit from the redefined relief. For example, if Countrywide transferred a putative class member's mortgage account to Wells Fargo on February 25, 2008, Wells Fargo would not be bound by the proposed injunction with regard to that putative class member's mortgage. Accordingly, such individuals are not appropriate class members.

> (d) as to whom Countrywide has assessed a fee or cost governed by Rule 2016(a), attributable to a time after the filing of a bankruptcy petition and before the date on which the individual received a chapter 13 discharge, unless such fee or cost was approved in a Bankruptcy Court order.

**ii. The Rule 23(a) Prerequisites**

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

As set forth below, the Court addresses each Rule 23(a) prerequisite in turn and finds that Plaintiffs satisfy Rule 23(a).

**a. Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). This involves a practical inquiry into the unique facts of the case to determine whether joinder is impracticable; however, the plaintiff need not go so far as to prove joinder is impossible. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Impracticable does not mean impossible.") (citations omitted). *See also* 1 NEWBERG, *supra*, § 3:3 (4th ed. 2002).

To satisfy the numerosity burden, a "plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman* 651 F.2d at 1038. A showing that the class consists of more than forty members "should raise a presumption that joinder is impracticable." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (quoting 1 NEWBERG, *supra*, § 3.05, at 3-25 (3d ed. 1992)). However, "the actual number of class members is [not necessarily] the determinative question, for '[t]he proper focus (under Rule 23(a)(1)) is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.'" *Zeidman*, 651 F.2d at 1038 (quoting *Philips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). Courts should consider additional factors, including, (i) the interest of judicial economy, (ii) whether the class involves small individual claims, (iii) the geographical dispersion of the class, and (iv) the ease with which class members may be identified. *See Zeidman*, 651 F.2d at 1038; 1 NEWBERG, *supra*, § 3:3 (4th ed. 2002) (the numerosity test helps assure that the two class action objectives of "judicial economy and access to the legal system, particularly for persons with small individual claims" are served).

Given these additional practical considerations, "[i]t is not surprising . . . that no definitive pattern has emerged under Rule 23(a)(1) in terms of the [necessary] number of purported class members." *Zeidman*, 651 F.2d at 1038. Nonetheless, the Fifth Circuit's *Mullen* decision provides authority for resolving the numerosity issues surrounding this case.

In *Mullen*, the Fifth Circuit determined that a class of between 100 and 150 members—comprised of individuals who developed respiratory illnesses after working on a floating casino operating out of Louisiana—satisfied the numerosity prerequisite. *Mullen*, 186 F.3d at 624-25. The Court noted that the size of the class was "within the range that generally satisfies the

numerosity requirement." *Id.* at 624 (citing 1 NEWBERG, *supra*, § 3.05, at 3-25 (3d ed. 1992)). The Court then held:

> Notwithstanding the lack of any direct evidence, the district court reasonably inferred from the nature of the putative class members' employment that some of them would be geographically dispersed [due to the transient nature of employment in the gambling business]. It also reasonably presumed that those potential class members still employed by Treasure Chest might be unwilling to sue individually or join a suit for fear of retaliation at their jobs. Based upon those considerations, it was within the district court's discretion to find that joinder of all 100 to 150 class members would be impracticable.

*Id.* at 625.

Based on the Fifth Circuit's *Mullen* decision and the numerosity factors, the Court finds that the class of approximately 125 individuals satisfies the numerosity standard.

**i. Class Size**

At the class certification hearing, Plaintiffs presented credible expert testimony indicating that approximately 125 individuals comprise "unapproved fees" class.[29] Under *Mullen*, the 125 potential class member figure fits squarely within the range that generally satisfies the numerosity requirement.

**ii. Size of Plaintiffs' Claims**

The relatively small claims involved in each representative's case supports a finding of numerosity.[30] *See* ARTHUR R. MILLER, AN OVERVIEW OF FEDERAL CLASS ACTIONS: PAST, PRESENT AND FUTURE 23 (1977), *available at* [http://www.fjc.gov/public/pdf.nsf/lookup/fdclsac.pdf]

---

[29] The 125 individuals were drawn from a pool of approximately 750 debtors in the Southern District of Texas, with mortgages serviced by Countrywide, who received a chapter 13 discharge during the applicable class period.

[30] The evidence indicates that the putative class members' claims are similar in size to those of the class representatives.

("If [claims] are small, the chances are that there is impracticability of joinder because people are not likely to become involved in litigation if only a small amount of money is at stake.").

In Rodriguez's case, for example, Countrywide admits that it misapplied a $92.00 payment by crediting it towards the satisfaction of unauthorized inspection fees. Countrywide also acknowledges that the delinquency notice it sent Rodriguez after her discharge included $127.78 in unauthorized late fees which accrued during Rodriguez's case. Without the class action device, it is unlikely that Rodriguez's claims, which could amount to as little as approximately $200.00, or even $92.00, could be resolved by the judicial system.

The Court reaches the same conclusion with regard to the Herreras' and Morenos' cases. For example, many of the inspection fees which Plaintiffs claim were unauthorized in the Herreras' case were for only $11.50. Although Plaintiffs make additional allegations, the Herreras' case primarily deals with allegations concerning a $200.00 undisclosed proof of claim fee and various undisclosed fees Countrywide sought post-discharge totaling $238.67. Similarly, the maximum amount at issue in the Morenos' case is the $2,719.53 in post-petition fees Countrywide sought on December 3, 2007. The Court is confident that a portion of the $2,719.53 includes unauthorized fees; however, it is quite possible the unauthorized amount Countrywide attempted to collect is well under $1,000.00.

Plaintiffs also claim Countrywide misapplied funds collected from the Herreras and Morenos. To the extent these allegations prove true, the amount of money at issue is likely on the same level as the $92 which Countrywide admits misapplying in Rodriguez's case.

Accordingly, the small size of the claims at issue favors a finding that the class is sufficiently numerous.

**iii. Judicial Economy**

Judicial economy also favors a finding that numerosity exists. Judicial resources are wasted when each individual debtor is forced to seek an injunction prohibiting Countrywide from collecting or attempting to collect unauthorized fees. The class action device enables the Court to grant injunctive relief more efficiently and on a larger scale. Instead of approximately 125 class members seeking individual injunctions, the class action device enables the entire class to seek relief in one lawsuit.

**iv. Geographical Dispersion**

This is not a case where the class is geographically disbursed. By definition, each class member must live within the Southern District of Texas. Accordingly, this factor favors Countrywide's position that numerosity is lacking.

**v. Ease of Identification**

The class members can be easily and quickly identified through running queries of the AS-400 database. This factor therefore supports Countrywide's contention that numerosity does not exist.

**vi. Conclusion: Plaintiffs Satisfy Rule 23(a)(1)**

*Mullen* demonstrates that Rule 23(a)(1) does not require a movant to show that every factor favors numerosity before a court can find numerosity exists. In *Mullen*, the Fifth Circuit upheld a class of 100 to 150 individuals based on two factors (in addition to the size of the class). This case deals with a class of approximately 125 individuals, which is nearly identical to the *Mullen* class. There are also two additional factors favoring certification, the small amounts at

issue and judicial economy.[31] Accordingly, under *Mullen*, the Court holds that the class satisfies Rule 23(a)(1).

**b. Commonality**

Rule 23(a)(2) provides that there must be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The threshold for commonality is not high and the claims at issue need not be identical. *See Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008); *James v. City of Dallas, Tex.*, 254 F.3d 551, 570 (5th Cir. 2001); 1 NEWBERG, *supra*, § 3:10 (4th ed. 2002) ("The requirement is easily met in most cases."). "The plaintiff need only show 'there is at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Doiron v. Conseco Health Ins. Co.*, 279 F. Appx. 313, 316 (5th Cir. 2008) (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). "Therefore, the fact that some of the [p]laintiffs may have different claims, or claims that may require some individualized analysis, is not fatal to commonality." *James*, 254 F.3d at 570.

In this case, since common questions of fact and law exist, Rule 23(a)(2) is satisfied.

**i. Common Questions of Fact**

The members of the putative class share a common experience. Countrywide allegedly charged unapproved fees during the pendency of the class members' bankruptcy cases and has collected, attempted to collect, or may attempt to collect such unapproved fees from them. This

---

[31] The Court does not ignore the factors favoring Countrywide's position. Instead, the Court finds the three factors favoring Plaintiffs' position, taken together, tip the scale in favor of numerosity. Additionally, the Court notes that "the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims" are two of Rule 23's principal objectives. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 402, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980). *See also* 1 NEWBERG, *supra*, § 1:6 (4th ed. 2002) ("the spreading of litigation costs [objective] . . . has been characterized as a recognition that the class action serves to afford individual claimants with small claims access to judicial relief that otherwise would be economically unavailable by means of individual litigation.") (citing *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339, 100 S. Ct. 1166, 63 L. Ed. 2d 427 (1980)). The Court's numerosity finding is consistent with these objectives.

common experience evolved into Plaintiffs' allegation that Countrywide employed a pattern or practice of charging fees to debtors without any regard for Rule 2016(a). Accordingly, the question of whether Countrywide systematically ignored Rule 2016(a) by charging unauthorized fees is a common question affecting the class. *See Bolin*, 231 F.3d at 975 (finding that to satisfy Rule 23(b)(2), class action plaintiffs must show harm resulting from a "uniform policy" and "not simply diverse acts in various circumstances"). *See also* 1 NEWBERG, *supra*, § 3:10 (4th ed. 2002) ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.").

**ii. Common Questions of Law**

Plaintiffs' allegation that Countrywide's collection practices violate Rule 2016(a) also involves common questions of law. At the summary judgment stage, the Court rejected Countrywide's contention that Rule 2016(a) was inapplicable to Countrywide's post-petition and post-discharge collection practices. *See Rodriguez*, 421 B.R. at 372-80. In essence, the Court held that Countrywide may not legally ignore Rule 2016(a). However, the Court did not resolve Rule 2016(a)'s scope. The question of Rule 2016(a)'s scope, which must be resolved at trial, is a common question of law that will affect all class members.

More specifically, the Court must determine whether Rule 2016(a) applies to every fee and cost Countrywide has assessed against debtors in bankruptcy, or only to certain fees and costs. *See also Wilborn*, --- F.3d ----, 2010 WL 2433091, at *5 ("There is disagreement among the bankruptcy courts as to the scope of the requirement under § 506(b) and Rule 2016 for lenders to obtain court approval before assessing contractually-allowed fees."). Rule 2016(a) provides:

> An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested . . . . The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the application is filed by a creditor or other entity.

FED. R. BANKR. P. 2016(a). Countrywide's counsel has previously acknowledged on the record that Rule 2016(a) applies to fees for professional services; counsel stated, "I think if you were going to try to collect a fee from the estate, a fee for professional services, it would be subject to 2016." *Rodriguez*, 421 B.R. at 379. This is consistent with the Court's conclusion and it is therefore safe to say that attorney's fees are subject to Rule 2016(a). However, the Court must still decide whether other fees and costs—such as the inspection fees charged to the named Plaintiffs—fall within Rule 2016(a)'s purview. In order to do so, the Court must interpret the meaning of "entity," "services," and "necessary expenses" within Rule 2016(a).

Furthermore, the Court must determine the extent to which Rule 2016(a) applies to fees assessed by Countrywide (1) after a case is dismissed from bankruptcy, and (2) before the dismissal order is vacated by the bankruptcy court.[32] As set forth in note 13 above, the Court is quite skeptical that a vacated order would have legal significance. Nevertheless, this issue must be fully briefed by the parties and the Court will consider further argument on this issue.

Accordingly, Rule 2016(a)'s scope is a legal question that is common to all class members.

---

[32] The Morenos' case best exemplifies this issue. On two occasions, the Court entered orders dismissing the Morenos' case from bankruptcy. The bankruptcy court subsequently vacated both dismissal orders. The Court must therefore determine whether 2016(a) applies to any fees assessed against the Morenos during this interim period. Additionally, the Court finds that this issue is common to many of the class members. The Court's review of the Southern District of Texas's records indicates that approximately 80 chapter 13 dismissal orders were vacated over the past year.

**iii. Conclusion: Plaintiffs Satisfy Rule 23(a)(2)**

Plaintiffs have shown that there are factual and legal issues whose resolution will affect all or a significant number of the putative class members. Plaintiffs have therefore satisfied Rule 23(a)(2).

**c. Typicality**

Rule 23(a)(3) requires that the "claims or defenses of the representative class are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *James*, 254 F.3d at 571. The typicality analysis "focuses on the similarity between the named plaintiffs' legal and remedial theories and theories of those whom they purport to represent." *Id.* The analysis "seeks to assure that the interests of the [class] representative[s] are aligned with the common questions affecting the class . . . ." 1 NEWBERG, *supra*, § 3:13 (4th ed. 2002). However, it does not require a complete identity of claims. *James*, 254 F.3d at 571. "Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id. See also* 1 NEWBERG, *supra*, § 3:13 (4th ed. 2002) ("The rationale for this provision is that a plaintiff with typical claims will pursue his or her own self-interest in the litigation, and in so doing, advance the interests of the class members, which are aligned with those of the representative.").

In this case, the essential characteristics of the class representatives' claims are that Countrywide (1) charged unauthorized fees during the pendency of their bankruptcies, and (2) attempted to collect the unauthorized fees (by threatening to foreclose) after the class representatives were discharged from bankruptcy. The class representatives seek an order enjoining Countrywide's allegedly illegal collection practices.

The essential characteristics of the putative class members' cases are nearly identical. Their claims arise from the same course of conduct at issue in the class representatives' cases; namely, Countrywide's collection practices. The putative class also shares the legal theory that Countrywide's collection practices violate Rule 2016(a). Finally, the injunctive relief sought by the class representatives will benefit the entire class.[33]

In sum, the claims of the class representatives and putative members essentially involve the same course of conduct by Countrywide. The claims can be resolved under the same legal theory. There are no divergent interests between the representatives and class members. Although facts specific to each case may differ, the Fifth Circuit has made clear that if "the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James*, 254 F.3d at 571. *See also Mullen*, 186 F.3d at 626 (finding typicality when the "named Plaintiffs' and proposed class members' legal and remedial theories appear[ed] to be exactly the same," even though the specific injuries suffered by the class members may not have been the same). Accordingly, Rule 23(a)(3)'s typicality prerequisite is satisfied.

**d. Adequacy of Representation**

Rule 23(a)(4) provides that a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "To meet Rule 23 requirements, the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (citing *Stirman v. Exxon Corp.*, 280 F.3d 554,

[33] The Court recognizes that some of the putative class members may nevertheless seek additional relief in the form of damages from Countrywide if the Court orders the injunction sought by the class. As set forth below, this relief is individualized and not subject to certification. However, the potential for additional, individualized relief does not defeat typicality.

563 (5th Cir. 2002)). This requires an "inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees . . . ." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982).

**i. Class Counsel**

Countrywide does not contest the adequacy of counsel and the Court finds Plaintiffs' counsel is sufficiently zealous and competent to represent the class. For over two years counsel has been handling this and other similar class actions before the Court. Counsel is intimately familiar with the underlying issues in these cases and has competently and zealously represented their clients in numerous proceedings before the Court. The Court sees no reason why counsel would not continue to represent Plaintiffs in the same manner throughout the remainder of the case.

**ii. Class Representatives**

In order for class representatives to satisfy the adequacy standard, they must "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001). However, the "class representatives need not be legal scholars and are entitled to rely on counsel . . . ." *Id.* at 483.

Countrywide argues that the class representatives are inadequate because they have been passive, uninformed participants throughout the class action. The Court disagrees. Upon review of the live and deposition testimony presented at the certification hearing, the Court concludes that the class representatives are sufficiently active and informed to satisfy the adequacy standard.

The Herreras both testified on the first day of the class certification hearing. Ms. Herrera, who handles the family's financial affairs, displayed an adequate knowledge of the overall class action and her unique role within it.[34] When asked why she is suing Countrywide, Ms. Herrera responded "[b]ecause I receive a letter that I owe a lot of fees and they are going to foreclose on my house." (Cert'n Hr'g Tr. 217, Dec. 14, 2009). Ms. Herrera also explained that a class action is comprised of "several different people who have the same problem as [her], the same similar -- problem as [her]." (Cert'n Hr'g Tr. 218, Dec. 14, 2009). Most importantly, Ms. Herrera demonstrated an understanding of her role as a class representative: "[The class representative is] to take care of the other people, to fight for them. Representative, a representative for all the other people . . . . I want that they return the money that they've took . . . . They are going to take houses of the other people. I don't want the same problem as me." (Cert'n Hr'g Tr. 218, Dec. 14, 2009).

Rodriguez also testified at the class certification hearing. (Cert'n Hr'g Tr. 4-24, Dec. 15, 2009). Rodriguez demonstrated a sufficient understanding of the nature of this class action lawsuit. For instance, Rodriguez stated that a class action encompasses "a group of people that the same thing has happened to" and that she was responsible for representing that group of people. (Cert'n Hr'g Tr. 9, Dec. 15, 2009). When asked on cross examination to explain who specifically comprised this class, Rodriguez responded, "[t]hey've gone through a bankruptcy and their homes have [been] taken -- they're being charged hidden fees and some people don't know." (Cert'n Hr'g Tr. 11, Dec. 15, 2009). Rodriguez further explained that she "want[s]

[34] Mr. Herrera also testified at trial. Mr. Herrera has been less involved in the case. Mr. Herrera follows the case mainly through communications with his wife and his bankruptcy attorney. Nevertheless, Mr. Herrera understood the basic purpose of a class action and role of class representatives. However, since Ms. Herrera handles the family's financial affairs and has been more involved in the case, the Court focuses primarily on her testimony when considering the adequacy of the Herreras' representation.

Countrywide . . . not to be charging hidden fees that they're not supposed to -- because so we won't lose our homes . . . ." (Cert'n Hr'g Tr. 11, Dec. 15, 2009).

The Morenos did not testify at the certification hearing; instead, Plaintiffs submitted the Morenos' deposition testimony to the Court. In her deposition, Ms. Moreno displayed her understanding that this case primarily involves Countrywide's alleged practice of charging unauthorized fees and improperly seeking to collect the unauthorized fees post-discharge.[35] (Moreno Dep. 107:1-6, Sept. 9, 2009). Additionally, after discussing how Countrywide's collection practices had affected her, Ms. Moreno stated that her goal for the class action was for "[t]his not to happen again to anybody." (Moreno Dep. 37:24). As a class representative, she recognized that it is her responsibility to "[k]eep in touch with everything that's going on, the meetings, and talking to our lawyers." (Moreno Dep. 105:18-19). She also understood that class actions entail "[w]atch[ing] out for others . . . for everybody that's been hurt this way" and not simply protecting one's own interests. (Moreno Dep. 105:15-16).

Not only are the class representatives aware of the nature of this class action and their role within it, the representatives have also been active participants in the class action. All of the representatives have willingly produced documents, answered interrogatories, and participated in depositions. Rodriguez and the Herreras testified at the certification hearing. Rodriguez, Ms. Herrera, and Ms. Moreno have also communicated with the class's attorneys on a regular basis, in order to remain informed on the case's status and to discuss other issues, including strategy and settlement. Accordingly, the Court rejects Countrywide's contention that the class representatives' knowledge of, and activity within, the class action renders them inadequate.

[35] Since Ms. Moreno is primarily responsible for the Moreno's household finances and has played a greater role in this case, the Court focuses primarily upon her deposition testimony. Nevertheless, upon reviewing his deposition, the Court also finds that Mr. Moreno is sufficiently involved in the case to satisfy the adequacy standard.

Countrywide also claims that the representatives are inadequate because unique facts and injuries are at issue in each individual case, which create divergent interests between the representatives and putative class members. If the Court had not redefined the class as one seeking only injunctive relief, this argument would potentially be meritorious. By narrowing the class's claims, however, the differences between each individual case became largely irrelevant. The only remaining differences involve the specific fees charged and collected in each individual case. These differences do not create conflicts of interest. Each class member stands to benefit from injunctive relief. Each class member will also be free to pursue any additional, individualized claims for damages outside of the class action. Accordingly, the differences that remain do not render the representatives inadequate. *See James*, 254 F.3d at 571 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests.").

In sum, the class representatives are not the most sophisticated individuals and are far from legal scholars.[36] They do not understand all of the legal technicalities at issue in this case. On the other hand, they all demonstrated a keen awareness of Countrywide's alleged improper collection practices. They also displayed a strong devotion to pursuing their claims not just on their own behalves but also on behalf of the entire class. Accordingly, the Court finds that the class representatives satisfy Rule 23(a)(4)'s adequacy requirement.

**iii. Conclusion: Plaintiffs Satisfy Rule 23(a)(4)**

For the reasons set forth above, the Court finds that the class counsel is both zealous and competent. The Court also finds that the class representatives are willing and able to play an

[36] For example, at least some of the representatives have not graduated high school, and one representative has difficulty reading.

active role in this lawsuit and to protect the interests of the entire class. Accordingly, Plaintiffs have satisfied Rule 23(a)(4)'s adequacy requirement.

**iii. Rule 23(b)(2) and (b)(3)**

Upon satisfying the Rule 23(a) prerequisites, Plaintiffs must then satisfy one of Rule 23(b)'s three prongs. Plaintiffs seek certification pursuant to Rule 23(b)(2) or, alternatively, Rule 23(b)(3). As set forth below, the Court certifies Plaintiffs' claim for injunctive relief pursuant to Rule 23(b)(2), and denies certification on all damages claims.

**a. Rule 23(b)(2)**

A Rule 23(b)(2) class may be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). "The (b)(2) class action . . . was intended to focus on cases where broad, class-wide injunctive or declaratory relief is necessary." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998). "The Advisory Committee Notes and our cases make clear that injunctive or declaratory relief is not 'appropriate' when the 'final relief relates exclusively or predominantly to money damages.'" *Bolin*, 231 F.3d at 975 (citations omitted). "The underlying premise of the (b)(2) class—that its members suffer from a common injury properly addressed by class-wide relief—begins to break down when the class seeks to recover . . . forms of monetary relief to be allocated based on individual injuries." *Allison*, 151 F.3d at 413. "Thus, Rule 23(b)(2) contains two requirements: (1) behavior generally applicable to the class as a whole; [and] (2) injunctive relief predominates over damages." *Bolin*, 231 F.3d at 975.

#### i. Rule 23(b)(2) Prong 1: Behavior Generally Applicable to the Class

In *Bolin*, the Fifth Circuit explained that in order for a defendant's alleged "pattern or practice" to satisfy the "generally applicable to a class as whole" prong, it "must consist of a uniform policy allegedly applied against the plaintiffs, not simply diverse acts in various circumstances." *Id.* at 976. Certification "is improper if the merits of the claim turn on the defendant's individual dealings with each plaintiff." *Id.*

*Bolin* applied the rule to a class comprised of plaintiffs who purchased Sears merchandise on credit, subsequently filed bankruptcy, and thereafter were subjected to the alleged illegal practices[37] employed by Sears to coerce payment of discharged, pre-bankruptcy debt. *Id.* at 972. The Court held:

> Here, while some of the challenged practices appear to present more of a uniform policy than others, several of the practices cited by Bolin, if proved, would present a case of conduct applicable to the class: Bolin alleges that the value chart, the credit offers, the practice of failing to file agreements with the bankruptcy court, and the form letters were promulgated by central authority and applied across the board. To the extent they are a centralized policy, they would be evidenced by Sears's policy manuals, customer accounts, and recovery records. These allegations are analogous to the reaffirmation filing issue in the prior class action, which Sears concedes was properly certified. Thus, the plaintiffs have alleged behavior generally applicable to the class.

*Id.* at 973.

In this case, Plaintiffs allege Countrywide employed a fee assessment and collection practice that ignored Rule 2016(a). Plaintiffs have presented evidence supporting this allegation. First, the evidence indicates that, instead of seeking authorization, Countrywide charged

[37] Plaintiffs alleged that Sears' illegal practices included "the development and reliance on a chart inflating the value of collateral; offers of new credit on extortionate terms; failure to file redemption and other repayment agreements; unwarranted assertions of security interests; abusive litigation practices, including contesting bankruptcy discharges and filing separate state court actions post-discharge; and making coercive and threatening communications to debtors, both orally and in writing." *Id.* at 972-73.

unauthorized fees in each of the class representatives' cases. After the representatives were discharged from bankruptcy, Countrywide attempted to collect the unauthorized fees and threatened foreclosure if the fees were not timely paid.

The evidence also indicates that the class as a whole was generally subjected to the same fee assessment and collection practices as the named Plaintiffs. In particular, the evidence shows that Countrywide had no policy for complying with Rule 2016(a). Multiple employees[38] of Countrywide, each of whom was intimately familiar with Countrywide's relevant bankruptcy and fee collection policies, testified that Countrywide would regularly assess fees without any concern for Rule 2016(a)'s requirements. The employees also testified that Countrywide would regularly classify unauthorized fees as recoverable from debtors in the AS-400 database.

Occasionally, Countrywide did seek fees within agreed orders submitted to bankruptcy courts. The Plaintiffs do not dispute that the agreed orders are binding. Although agreed orders do not satisfy Rule 2016(a)'s procedural requirements, such orders should not be revisited in this class action lawsuit. However, the evidence indicates that Countrywide sought fees within agreed orders largely when it was convenient to do so.

Overall, Countrywide assessed and charged fees to the class according to its understanding that its conduct was not regulated by Rule 2016(a), and Countrywide did not file Rule 2016(a) applications during the relevant period. Accordingly, the Court finds that Plaintiffs have sufficiently alleged behavior applicable to the class as a whole under Rule 23(b)(2) and *Bolin*.

[38] The employees include Hertzler, Reed, and May. Their respective positions and experiences with Countrywide are discussed above in the background section of this opinion.

**ii. Rule 23(b)(2) Prong 2: Injunctive Relief Predominates Over Damages**

In *Monumental Life*, the Fifth Circuit gave a detailed summary of Rule 23(b)(2)'s requirement that injunctive relief predominate over damages. *Monumental Life*, 365 F.3d at 415-21. The Court outlined the concepts at the foundation of Rule 23(b)(2): the "rule's focus on injunctive and declaratory relief presumes a class best described as a 'homogenous and cohesive group with few conflicting interests among its members.'" *Id.* at 415 (quoting *Allison*, 151 F.3d at 413). The class is united by a collective harm that "centers on the defendants' alleged unlawful conduct, not on individual injury." *Monumental Life*, 365 F.3d at 415. "Once monetary damages enter the picture, however, class cohesiveness is generally lost, because '[m]onetary remedies are more often related directly to the disparate merits of individual claims." *Id.* (quoting *Allison*, 151 F.3d at 413). "Where the need to address the merits of individual claims requires separate hearings, the efficiency gained by class litigation is lost." *Id.* at 415-16.

*Monumental Life* next explained the specific inquiry that courts must conduct:

> In *Allison*, . . . we held . . . that monetary relief, to be viable in a rule 23(b)(2) class, must "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." Monetary relief must be incidental, meaning that it is "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." Additional hearings to resolve "the disparate merits of each individual's case" should be unnecessary.

*Id.* at 416 (quoting *Allison*, 151 F.3d at 415).

The Court applied the predominance inquiry to plaintiffs' appeal of the district court's denial of Rule 23(b)(2) certification. The underlying class action dealt with African-American life insurance policyholders' allegations that over 280 life insurance companies engaged in two overtly discriminatory practices for over fifty years. *Id.* at 412. First, the plaintiffs alleged that

they were charged higher rates for the same policies sold to white policyholders. *Id.* Second, plaintiffs claimed that the defendants placed blacks in "specially designed substandard industrial policies providing fewer or lower benefits than . . . comparable plans sold to whites . . . ." *Id.* Plaintiffs "(1) sought an injunction prohibiting the collection of discriminatory premiums, (2) reformation of policies to equalize benefits, and (3) restitution of past premium overcharges or benefits underpayments." *Id.* at 412-13.

The district court denied certification because it found that the monetary relief sought by the plaintiffs did not flow from liability to the class as a whole. *Id.* at 418. "The court stated that 'many and a variety of hearings would be required to determine personalized harm to each individual plaintiff because of the mass of policies involved, differing underwriting practices among some 280 companies, differing built-in benefits, account dividends, and age at policy issuance.'" *Id.*

The Fifth Circuit reversed and remanded the district court's decision. The Court recognized that the plaintiffs' damages would "depend on the idiosyncrasies" of each specific policy. *Id.* at 419. However, the idiosyncrasies were not fatal to class certification because the plaintiffs proposed "using standardized formulas or restitution grids to calculate individual class members' damages." *Id.* Although hundreds of grids were necessary to account for the variations in policies, the grids enabled damages to be determined through the sort of objective calculations contemplated by Rule 23(b)(2):

> In the list of policy variables cited by defendants and the district court, none requires the gathering of subjective evidence. This is not, for example, like *Allison*, a title VII case in which class members' claims for compensatory and punitive damages necessarily "implicate[ ] the subjective differences of each plaintiff's circumstances." Rather, assuming that unlawful discrimination is found, class members automatically will be entitled to the difference between what a black and a white paid for

> the same policy. Not coincidentally, such damages flow from liability in much the same manner that an award of backpay results from a finding of employment discrimination.
>
> We are well aware that, as *Allison* qualifies, the calculation of monetary damages should not "entail complex individualized determinations." Although it is arguable that the construction of thousands of restitution grids, though based on objective data, involves the sort of complex data manipulations forbidden by *Allison,* we read *Allison* to the contrary. The policy variables are identifiable on a class wide basis and, when sorted, are capable of determining damages for individual policyowners; none of these variables is unique to particular plaintiffs. The prevalence of variables common to the class makes damage computation "virtually a mechanical task."
>
> Finally, defendants' records contain the information necessary to determine disparities between, on the one hand, [the] policies [sold to blacks], and on the other hand, plans sold to whites. Damage calculations do not require the manipulation of data kept outside defendants' normal course of business.

*Id.* (citations omitted).

**1. Plaintiffs' Damages Claims do not Satisfy Rule 23(b)(2)**

In the present case, Plaintiffs seek compensatory damages, including restitution and disgorgement, as well as punitive damages and sanctions. Plaintiffs claim that such remedies are incidental to the injunctive relief they seek under Rule 23(b)(2). In light of the Fifth Circuit's recent *Wilborn* decision, which analyzed disgorgement claims in a similar class action, the Court addresses Plaintiffs' claims for disgorgement first. The Court then addresses Plaintiffs' additional claims for damages. As set forth below, the Court denies certification of all Plaintiffs' damages claims under Rule 23(b)(2).

**a. Plaintiffs' Disgorgement Claim**

The Court's analysis of Plaintiffs' claim for disgorgement is governed by the Fifth Circuit's recent *Wilborn* decision. *Wilborn*, --- F.3d ----, 2010 WL 2433091. In *Wilborn*, a class

of plaintiffs alleged that Wells Fargo charged undisclosed and unauthorized fees to debtors in bankruptcy with mortgages serviced by Wells Fargo. *Id.* The alleged unauthorized fees included "attorneys' fees, recording fees, notification fees, title search fees, document fees, and property inspection fees." *Id.* The plaintiffs sought (1) a declaratory judgment that the undisclosed fees were per se unreasonable, (2) disgorgement of any fees and costs actually collected by Wells Fargo, and (3) an order enjoining Wells Fargo from charging fees and costs without bankruptcy court authorization. *Id.*

The Fifth Circuit determined that the claim for disgorgement was not incidental to the injunctive and declaratory relief sought by the plaintiffs:

> The Plaintiffs' request for disgorgement of fees is not merely incidental to the sought-after injunction and declaration. The amount that each plaintiff was charged, perhaps the amount that is "reasonable," and any amount to be disgorged will depend on the specific circumstances of each class member and whether and how fees were imposed. *See Maldonado*, 493 F.3d at 524. We therefore disagree with the bankruptcy court's determination that disgorgement amounts may be determined with mathematical certainty absent individual hearings.

*Id.* at 6. Thus, the plaintiffs' claims for disgorgement failed to satisfy Rule 23(b)(2). *Id.*

The disgorgement issues in this case are distinguishable from *Wilborn* on two levels. First, the only issue in this case is whether the fees charged were authorized by a bankruptcy court. In *Wilborn*, the bankruptcy court considered additional issues, including whether the fees were (1) reasonable, (2) disclosed to the debtors, and (3) agreed to by the debtors. *Id.* Here, the additional issues presented in *Wilborn* simply do not exist: the only issue is whether bankruptcy court orders authorized certain fees. This involves a less complex and more objective inquiry.

Second, the parties presented extensive evidence regarding the powerful capabilities of Countrywide's AS-400 database. The database enables Countrywide to readily identify

unauthorized fees in a relatively mechanical fashion. It does not appear that *Wilborn* involved a database with capabilities comparable to the AS-400 database. For instance, in *Wilborn*, the Court noted that it may be "necessary to determine whether fees were actually imposed on the debtors or merely recorded on internal records." *Id.* With the AS-400 database, a simple query can answer that question; it can isolate all the fees that are posted as recoverable on the class members' accounts. Accordingly, this leads to the conclusion that the disgorgement inquiry in this case would be less complex than that in *Wilborn*.

Nevertheless, the Court finds that the distinctions do not merit departing from *Wilborn* and certifying Plaintiffs' claim for disgorgement. Although the disgorgement inquiry in this case is probably less complex, the Court finds that it still entails considering the specific circumstances of each class member. Unlike in *Monumental Life*—where the plaintiffs presented formulas and grids that enabled the calculation of individual damages without specifically addressing individual cases—in this case, the Court can only analyze disgorgement damages on a case-by-case basis.[39] *See Monumental Life*, 365 F.3d at 419. In theory, the

---

[39] *Monumental Life's* explanation of how the case differed from the Fifth Circuit's *O'Sullivan* decision provides useful guidance which supports the Court's conclusion. *See Monumental Life*, 365 F.3d. at 420 n.19. After stating that the plaintiffs' formulas and grids avoided the need to make complex, individualized determinations, *Monumental Life* distinguished *O'Sullivan*:

> In this sense, the instant case is unlike *O'Sullivan* . . . in which we found monetary damages predominant in a proposed Rule 23(b)(3) class alleging violations of Texas's statute prohibiting the unauthorized practice of law. Non-lawyers were alleged to have used "legal skill or knowledge" in the preparation of mortgage closing documents. Whether certain practices by the non-lawyers violated the statute was determinable on a class wide basis; we explained, however, that monetary damages predominated, because the extent of these practices varied by transaction, and plaintiffs were entitled to a refund only for those practices that violated the statute. Therefore, *each* transaction had to be dissected to determine the extent of liability and damages.

calculation is less complex and more mechanical than that in *Wilborn*, but it is still individualized.

The Court also heeds *Wilborn's* admonition regarding the mortgagee's potential defenses. *Wilborn* stated that "where fees have been imposed Wells Fargo may have viable defenses to some plaintiffs' claims, such as waiver or estoppel." *Wilborn*, --- F.3d ----, 2010 WL 2433091, at *6. Countrywide has raised similar defenses that, if potentially meritorious, could diminish the homogeneity of the class by necessitating individualized hearings.

Finally, the Court denies certifying the disgorgement claims because the Court is not convinced the remedy is actually necessary or appropriate. *See Bolin*, 231 F.3d at 975 ("[A] court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate."). The remedy of disgorgement "wrests ill-gotten gains from the hands of a wrongdoer." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (citing *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)). "It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Id.* (citing *Huffman*, 996 F.2d at 802). This case does not necessarily involve ill-gotten gains. Plaintiffs do not allege that Countrywide fabricated charges for fees in order to steal money from unsuspecting debtors. Similarly, Plaintiffs do not claim that Countrywide conspired with outside professionals to charge unearned fees to debtors and share the ill-gotten profits. Instead, it at least appears that the fees at issue here were for services actually rendered. It also appears that Countrywide was permitted by their mortgage contracts to

---

*Id.* (citing *O'Sullivan*, 319 F.3d at 744-45). Thus, although *O'Sullivan* involved a Rule 23(b)(3) class, *Monumental Life* implicitly stated that *O'Sullivan's* transaction-by-transaction analysis exemplifies a form of the individualized determinations that are unacceptable under Rule 23(b)(2). This case's disgorgement inquiry resembles the damages analysis in *O'Sullivan*. The Court would have to review each charge applied to each class member's account and compare each charge to court orders to determine the extent of damages. According to *Monumental Life*, such transaction-by-transaction analysis has no place in a Rule 23(b)(2) class action.

perform (either through their employees or third parties) certain services that can be charged to the mortgagor. In at least some instances, such services are apparently provided to protect Countrywide's interest in properties encumbered by Countrywide's liens. The contracts also permit Countrywide to collect fees for services performed from the mortgagors.

The only disgorgement issue in this case is the legality of Countrywide's unauthorized fee collection practices under the Bankruptcy Code. There is no question that Countrywide is entitled to collect various amounts from mortgagors in bankruptcy. One of the major factors influencing chapter 13 filings is a debtor's desire to cure a delinquent mortgage and save his or her home. In order to do so, the debtor must ordinarily make monthly payments to the mortgagee during a bankruptcy case. Thus, there is nothing problematic about Countrywide accepting funds from debtors in bankruptcy. Such funds are often applied properly to principal and interest, the escrow account, or authorized fees.

The problematic disgorgement issue arises when Countrywide properly receives funds from the debtor but then applies those funds improperly; namely, in order to satisfy unauthorized fees. The Court finds that, to the extent any of the class members were harmed by this practice, disgorgement is probably not the appropriate remedy. In Rodriguez's case, for example, Countrywide was permitted to receive Rodriguez's monthly payments and apply them to satisfy permissible charges on Rodriguez's account. However, Countrywide admits misapplying $92 in order to satisfy unauthorized inspection fees. If, at trial, the Court determines that inspection fees are within the scope of Rule 2016(a), the proper remedy for Rodriguez is not an order mandating Countrywide to disgorge the $92. Rodriguez properly paid and Countrywide properly accepted the $92. After receiving the funds, Countrywide's act of misapplying the $92 did not convert the properly received funds into ill-gotten gains. As set forth below, the proper remedy

is an order enjoining Countrywide from collecting Rodriguez's loan balance until Countrywide credits the $92 to a permissible charge, such as the mortgage balance or escrow account.[40] The $92 is not an ill-gotten gain that must be returned to Rodriguez.

Accordingly, the Court denies certification of Plaintiffs' claim for disgorgement.

**b. Plaintiffs' Non-Disgorgement Damages Claims**

Although *Wilborn* did not consider other non-disgorgement claims for damages, the Court also finds that Plaintiffs' additional claims for compensatory and punitive relief are not incidental to injunctive relief under *Monumental Life*. In fact, these additional damages claims expose the class's lack of homogeneity when damages enter the picture. This is particularly evident upon review of the unique issues surrounding the Rodriguez and Herreras cases.

In Rodriguez's case, for example, Rodriguez made monthly payments below the amount she was required to pay on numerous occasions. Rodriguez even did so after the Court signed an agreed order stipulating that Rodriguez's monthly mortgage payment was $938.00. Countrywide also admits that it regularly sent Rodriguez inaccurate monthly account statements. The statements indicated that Rodriguez's mortgage account was current when, in fact, it was in serious default due to Rodriguez's incomplete monthly payments.

*Monumental Life* made clear that "damage[s] calculation[s] 'should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations.'" *Monumental Life*, 365 F.3d at 419 (quoting *Allison*, 151 F.3d at 415). The unique facts in Rodriguez's case—in which both Rodriguez and Countrywide made mistakes—open the door for new legal and factual issues that increase the complexity of analyzing Rodriguez's individual case. A determination of whether Rodriguez is entitled to compensatory and punitive damages

[40] As discussed below, the only putative class members who would not benefit from the injunction are those who have already paid their mortgage balances in-full. The Court does not include such individuals in the class.

would likely force the Court to improperly consider such new issues. If the Court were to do so, it would be losing sight of the class homogeneity that is a crucial aspect of Rule 23(b)(2) certification. *See Allison*, 151 F.3d at 413 ("[B]ecause of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group . . . .").

The conclusion also holds true upon review of the specific facts in the Herreras' case. The Herreras filed an inaccurate proof of claim on Countrywide's behalf that greatly understated the debt owed to Countrywide. Countrywide subsequently failed to abide by the June 22, 2007 agreed order when it attempted to collect $8,327.00 from the Herreras post-discharge. Countrywide had previously agreed that the $8,327.00 would be added to the principal balance of the Herreras' mortgage. Such facts would require further inquiry into legal and factual issues that are based on the Herreras' unique experience dealing with Countrywide.

In sum, the homogeneity that exists when focusing solely upon the question of whether to enjoin Countrywide from collecting unauthorized fees is lost when damages are at issue. This is especially true when the damages are not objectively determinable. *See Allison*, 151 F.3d at 417 ("The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide remedy . . . [and punitive damages] awarded on the basis of intangible injuries and interests, are uniquely dependent on the subjective and intangible differences of each class member's individual circumstances."). The Court is unable to objectively calculate damages on a class-wide scale when unique facts and legal issues must be considered in each class member's case. As evidenced by divergent characteristics of the Rodriguez and Herreras cases, damages will likely be unique in each case.

Accordingly, the Court denies Rule 23(b)(2) certification on all of Plaintiffs' damages claims.

**2. Plaintiffs' Claim for Injunctive Relief Satisfies Rule 23(b)(2)**

As discussed above, the Court finds that once the class is redefined as one only seeking injunctive relief, certification under Rule 23(b)(2) is appropriate. *See Bolin*, 231 F.3d at 975. Rule 23(b)(2)'s predominance requirement is easily satisfied when only injunctive relief is sought.

However, certification "under Rule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request." *Monumental Life*, 365 F.3d at 416. "The question whether the proposed class members are properly seeking such relief is antecedent to the question whether that relief would predominate over money damages." *Id.* As set forth below, the Court finds that the class has sufficiently demonstrated that it will benefit from the injunctive relief requested.

"Fashioning appropriate injunctive relief depends upon the particular facts and circumstances of a situation . . . ." *In re Mirant Corp.*, 378 F.3d 511, 523 (5th Cir. 2004). *See also Gore v. Turner*, 563 F.2d 159, 165 ("Appropriate relief . . . is to be determined on a case-by-case basis . . . .") (quoting *United States v. Jamestown Center-in-the-Grove Apartments*, 557 F.2d 1079, 1080 (5th Cir. 1977)). In each case, the court must tailor the injunctive relief to meet "the needs of the particular situation." *Turner*, 563 F.2d at 165 (quoting *Jamestown* 557 F.2d at 1080). "[I]n considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains." *Meltzer v. Bd. of Pub. Instruction*, 548 F.2d 559, 568 (5th Cir. 1977). In the class action arena, "the class must be sufficiently cohesive that any class wide injunctive relief can

satisfy the limitations of Federal Rule of Civil Procedure 65(f)—namely, the requirement that it 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required.'" *Shook v. Bd. of County Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008).

In this case, the Court finds that injunctive relief can be appropriately tailored to meet the specific needs of the Plaintiffs. In the event Plaintiffs prevail at trial, the Court is prepared to issue the following injunction: Countrywide shall not collect or attempt to collect any fees that (1) were incurred during the pendency of a class member's bankruptcy case, (2) are governed[41] by Rule 2016(a), and (3) have not yet been authorized pursuant to Rule 2016(a).

The proposed injunction would provide case-specific relief by protecting the class members from the primary harm alleged by Plaintiffs. Plaintiffs brought this class action principally to remedy Countrywide's fee assessment and collection practices. Plaintiffs argue that Countrywide's practices are antithetical to the "fresh start" provided by chapter 13.[42] In the mortgage context, chapter 13 debtors "receive a fresh start through the ability to stave off foreclosure, cure arrearages, and maintain mortgage payments." *Rodriguez*, 421 B.R. at 366. "This gives homeowners the opportunity to remain in their homes and emerge from bankruptcy current on their mortgage payments." *Id.* Plaintiffs claim that the collection of unauthorized fees thwarts this fresh start by placing debtors in default upon their emergence from bankruptcy.

If Plaintiffs prevail at trial and the Court orders the proposed injunction, Plaintiffs' fresh start will no longer be impeded by fees charged without authorization. For, even if Countrywide

---

[41] As set forth above in the section discussing Rule 23(a)(2), the scope of Rule 2016(a) is a question of law that must be resolved at trial.

[42] The fresh start "gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244-45, 54 S. Ct. 695, 78 L. Ed. 104 (1938). "The various provisions of the Bankruptcy Act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act." *Id.*

has posted unauthorized fees on class member accounts, Countrywide would be enjoined from collecting the fees. *See Wilborn*, --- F.3d ----, 2010 WL 2433091, at *6 ("The Bankruptcy Code does not prohibit [creditors] from maintaining internal records of costs incurred.") (quoting *In re Padilla*, 379 B.R. 643, 662 (Bankr. S.D. Tex. 2007)).

Furthermore, the Court finds it noteworthy that, assuming Countrywide's discharge audit procedures function in the manner described by Smith and May,[43] Countrywide can easily comply with the proposed injunction. Countrywide now employs approximately 360 bankruptcy technicians who use AACER to review court orders upon each debtor's discharge from bankruptcy. The technicians then compare the relevant court orders with the fees posted in the AS-400 database as recoverable from the discharged debtor. The technicians are required to determine whether any of the fees showing in the database were charged without the bankruptcy court's authorization. This is the exact inquiry that Countrywide's employees would be required to conduct if the Court imposes the proposed injunction. Since Countrywide employs approximately 360 bankruptcy technicians, the Court finds that reviewing approximately 125 class members' accounts would hardly be a Herculean task.

The Court also finds that the proposed injunction is properly tailored to protect not only those class members who were charged unauthorized fees but also those who had payments misapplied by Countrywide. More specifically, the injunction would encompass the scenario where (1) Countrywide charged unauthorized fees, (2) Countrywide subsequently collected the unauthorized fees, at least in part, by improperly applying funds received from a class member or bankruptcy trustee, and (3) the class member has not yet paid the mortgage in-full. Any funds that Countrywide has previously and incorrectly applied towards the satisfaction of unapproved

[43] As discussed above, John Smith is Countrywide's senior vice president of foreclosure and real estate management, and Kelly May is the vice president of bankruptcy servicing at Countrywide.

fees or expenses should actually have been applied to other, proper amounts that Countrywide is permitted to collect—i.e. the mortgage debt. The $92 Countrywide admits improperly applying towards unauthorized inspection fees in Rodriguez's case provides a useful example of this scenario. Assuming inspection fees are governed by Rule 2016(a), Countrywide should have applied the $92 it received from Rodriguez to amounts Countrywide was permitted to collect from Rodriguez. If the Court issues the proposed injunction, it would enjoin Countrywide from collecting Rodriguez's loan balance without crediting the $92 to a permissible charge. In essence, the injunction would require Countrywide to correct the misapplied payments before seeking to collect a class member's loan balance.[44]

Moreover, the proposed injunction is tailored to protect those class members who were previously charged unauthorized fees but are now deemed current on their payments by Countrywide.[45] Rodriguez's case once again provides a useful example of this scenario. After Rodriguez was discharged from bankruptcy, Countrywide sent Rodriguez a notice of default and threatened to foreclose if Rodriguez failed to cure the default. Once Rodriguez initiated this lawsuit, however, Countrywide claims that it updated her account as current and removed the deficiency. This act of deeming accounts current after litigation has commenced does not sufficiently protect class members. Countrywide is easily able to reclassify fees from non-recoverable to recoverable from the debtor in the AS-400 database. Thus, without the issuance of the proposed injunction, there would be nothing preventing Countrywide from seeking to

[44] Such an injunction, which affirmatively compels Countrywide to correct misapplied payments, is within the Court's equitable powers. *Alabama v. United States*, 304 F.2d 583, 590 (5th Cir. 1962) ("Mandatory injunctions affirmatively compelling the doing of some act, rather than merely negatively forbidding continuation of a course of conduct, are a traditional tool of equity.").

[45] The evidence indicates that only a small percentage of the putative class members fall within this category. And those like Rodriguez, who had payments misapplied by Countrywide, would benefit from the injunction even if their accounts were deemed current. Countrywide would still be required to correct the misapplications going-forward in order to be in compliance with the injunction.

collect unauthorized fees, which were deemed current during this class action, after the conclusion of this case. *See Meltzer*, 548 F.2d at 568 ("The purpose of an injunction is to prevent future violations . . . ."). *See also Meza v. Livingston*, 2010 WL 2000517, at *4 (5th Cir. 2010) ("A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice, even in cases in which injunctive relief is sought.").

The narrow tailoring of the proposed injunction is also evidenced by the fact that it does not go so far as to preclude Countrywide from subsequently seeking Rule 2016(a) authorization to collect fees that were previously assessed, without authorization, before the injunction's issuance. The injunction is not meant to punish Countrywide by impairing Countrywide's ability to collect authorized fees. To the contrary, the effect of the injunction is to encourage Countrywide to first seek bankruptcy court authorization of fees governed by Rule 2016(a) before taking affirmative steps to collect such fees.

In essence, the injunction restores the balance, previously ignored by Countrywide, that Rule 2016(a) strikes between creditor and estate interests. The desire for efficiency underlying the class action device facilitates this restoration. *See Wilborn*, --- F.3d ----, 2010 WL 2433091, at *4 ("Class actions promote efficiency and economy in litigation . . . ."). Without a class action, each individual class member would have to bring suit seeking an order enjoining Countrywide from collecting unauthorized fees. The class action enables one or more litigants to sue for an injunction that protects an entire class of individuals. The device therefore eliminates piecemeal litigation concerning whether Countrywide must seek Court approval for fees that it imposes: once the class is certified and the injunction is granted or denied, that issue will be resolved as to all class members.

If the proposed injunction is issued, Countrywide remains free to seek authorization of previously unauthorized fees by filing Rule 2016(a) applications. The Court recognizes that Rule 2016(a) applications invoke the judicial process. However, such applications do not amount to the individualized hearings discussed at length in *Monumental Life* and *Allison*.

Rule 2016(a) applications occur outside of the class action framework; they are simply ministerial tasks within a process that is anticipated by the Bankruptcy Code and Bankruptcy Rules. Bankruptcy courts routinely handle Rule 2016(a) applications in the ordinary course of the bankruptcy process. When a Rule 2016(a) application is filed with a bankruptcy court, there is notice and an opportunity for a hearing. However, in the vast majority of cases, no objection is filed and bankruptcy courts resolve the 2016(a) application without the necessity of a hearing. Although the Court has not located published statistics, the Court estimates that over 95% of applications for compensation are considered without an actual hearing. Indeed, the records of Southern District of Texas indicate that during the last 12 months, the bankruptcy judges in this district have issued over 7,500 orders pursuant to Rule 2016(a). Only a handful of the orders have been issued following a hearing. The Court sees no reason why this trend would not continue in Countrywide's case—assuming that the injunction is issued and Countrywide chooses to file Rule 2016(a) applications.

Nevertheless, in some instances, the Court (acting sua sponte) or a party raises issues regarding a Rule 2016(a) fee application. In most such cases, a hearing is required. However, those hearings are part of the routine humdrum of the bankruptcy process. No adversary proceeding is commenced and the disputes can be handled expeditiously by the bankruptcy courts. Once again, the Court sees no reason why this trend would not continue in Countrywide's case.

Finally, the Court underscores the efficiency provided by the proposed injunction. Rule 2016(a) applications impose a minimal burden on bankruptcy courts. That minimal burden will exist irrespective of whether the injunction is ordered on a class-wide or piecemeal, case-by-case basis. In either case, if Countrywide seeks fees under Rule 2016(a), the judicial process will be invoked. Accordingly, there is efficiency gained by having one trial (to determine whether or not to enjoin Countrywide's conduct), even if it may result in subsequent Rule 2016(a) applications.

In sum, the Court finds that the proposed injunctive relief would benefit the class. The injunction is also sufficiently tailored to satisfy the class' claims without imposing unnecessary restrictions upon Countrywide. Accordingly, the Court grants certification of the proposed class on its claim for injunctive relief under Rule 23(b)(2).

**b. Rule 23(b)(3)**

The Plaintiffs also seek to certify the class under Rule 23(b)(3). Since the Court has already granted certification on the claim for injunctive relief, the Court will only address whether Plaintiffs' damages claims satisfy Rule 23(b)(3). For the reasons set forth below, the Court declines to certify Plaintiffs' damages claims pursuant to Rule 23(b)(3).

Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "The question of predominance is more demanding than the Rule 23(a) requirement of commonality." *Wilborn*, --- F.3d ----, 2010 WL 2433091, at *4 (citing *O'Sullivan*, 319 F.3d at 738). The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (citing *Amchem Prods.*,

*Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)). "It requires the court to assess how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'" *Id.* (citing *O'Sullivan*, 319 F.3d at 738).

In *Wilborn*, the Fifth Circuit reversed the bankruptcy court's certification order under Rule 23(b)(3). The Court determined:

> The circumstances surrounding the charging of fees require an individual assessment of the claims. It appears that some debtors, like Wilborn, may have agreed to certain fees as an inducement to Wells Fargo for a loan modification and provided additional consideration for the modification. In other cases at least partial fees were approved for some debtors. Such varying circumstances will require the court to examine each individual bankruptcy case. The bankruptcy court cannot require Wells Fargo to simply disgorge all fees that were not previously approved because it is evident that there has been a wide "array of charges tailored" to each individual debtor. *See Maldonado*, 493 F.3d at 525-26.
>
> In some cases it may be appropriate to require Wells Fargo to disgorge fees, but we think that is for the bankruptcy court to decide. The differing circumstances of the debtors render the reasonableness of the individual charges a fact-specific inquiry rather than a class-oriented decision. *See Maldonado*, 493 F.3d at 526. In some instances, it may also be necessary to determine whether fees were actually imposed on the debtors or merely recorded on internal records. *See In re Padilla*, 379 B.R. 643, 662 (Bankr. S.D. Tex. 2007) ("The Bankruptcy Code does not prohibit [creditors] from maintaining internal records of costs incurred."). Furthermore, where fees have been imposed Wells Fargo may have viable defenses to some plaintiffs' claims, such as waiver or estoppel. *See In re Monumental Life Ins. Co.* Finally, the rulings of different bankruptcy judges during their cases may affect the computation of allowable charges by Wells Fargo. In short, the myriad issues that may arise in each case as to whether and how fees and costs were imposed preclude a class-wide disposition of the case under Rule 23(b)(3).

*Id.* at 5-6.

For reasons similar to those relied upon in denying certification of Plaintiffs' damages claims under Rule 23(b)(2), the Court denies certification under Rule 23(b)(3). *See id.* ("For similar reasons [to the Court's denial of certification under Rule 23(b)(3)], class certification is improper under Rule 23(b)(2)."). The unique circumstances that must be addressed when claims for damages are at issue "require an individual assessment of the claims." *Id.* Similarly, Countrywide may have defenses that require analysis of individualized cases. Finally, it is unclear whether the disgorgement claims, which require the least amount of individualized analysis of all Plaintiffs' damages claims, are even an appropriate remedy.

In sum, this is a class that is united and cohesive when injunctive relief is the only relief requested. The focus is properly upon Countrywide's fee assessment and collection practice, not on the individualized manner in which each class member may have been affected by the practices. However, when damages enter the fray, individualized issues begin to predominate as the Court must consider the harm suffered by each class member on a case-by-case basis. Accordingly, the Court denies to certify Plaintiffs' claims for damages under Rule 23(b)(3).

**iv. Notice to Class Members**

Rule 23 does not mandate notice in Rule 23(b)(2) class actions. 1 NEWBERG, *supra*, § 8:5 (4th ed. 2002) ("[C]lass actions seeking declaratory or injunctive relief under Rule 23(b)(2) are not subject to the individual notice requirements of Rule 23(c)(2)."). Instead, the Court has discretion to determine the extent to which the class members must be afforded notice of the class action. *See id.* ("Rule 23(d), which empowers the court to construct notice procedures 'for the protection of members of the class or . . . for the fair conduct of the action,' is clearly discretionary with the court."). The court may nevertheless issue orders requiring notice "to some or all of the members regarding the pendency of the class, proposed judgment or

settlement, soliciting input on the adequacy of class representation, opportunity to intervene and present claims or defenses, and the like." *Id.* "Notice is frequently advisable in (b)(1) and (b)(2) classes to assist in identifying conflicting interests, class antagonism, or other diverse problems of which the court was unaware at the certification hearing, and courts may order such notice under the discretionary power of Rule 23(d)(2)." *Id.*

In this case, the Court orders Plaintiffs to mail notice of the class certification to the class members. Notice must be mailed to the address of each class member that is listed in the AS-400 database. The notice must explain the nature of the class action and the potential for injunctive relief.

**v. Conclusion**

For the reasons set forth above, the Court grants, in part, and denies, in part, Plaintiffs' motion for class certification. A separate order will be issued.

SIGNED **July 21, 2010.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE